UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HEARTS WITH HAITI, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:13-cv-00039-JAW |
| PAUL KENDRICK, | ) ) ) | |
| Defendant. | ) | |

**ORDER DISMISSING DEFENDANT'S MOTION IN LIMINE**

Paul Kendrick seeks to exclude some of the designated expert testimony of Geoffrey Scott Hamlyn, Executive Director of Hearts with Haiti, Inc. (HWH). The Court concludes that some, but not all, of the proposed expert testimony may be admissible and, after setting forth some general principles, dismisses the motion in limine in anticipation of further development at trial.

I. BACKGROUND

This is a contentious civil action in which HWH and Michael Geilenfeld assert that Paul Kendrick has defamed them, placed them in a false light, invaded their privacy, and tortiously interfered with their advantageous economic relations. *Verified Compl. and Demand for Jury Trial* ¶¶ 89-105 (ECF No. 1). The Plaintiffs claim that Mr. Kendrick published numerous defamatory statements, accusing Mr. Geilenfeld, the Executive Director of St. Joseph Family of Haiti, of sexually abusing children under his organization's care, and further accusing HWH, a significant financial contributor to the St. Joseph Family, of failing to protect the Haitian

children from Mr. Geilenfeld's abuse. *Id.* ¶¶ 47-48. Mr. Kendrick has firmly denied the essential allegations. *Defenses and Answer* (ECF No. 8).

### A. Paul Kendrick's Positions

On March 21, 2014, Paul Kendrick filed a motion in limine, challenging whether Geoffrey Scott Hamlyn, HWH's Executive Director, should be allowed to testify about (1) his understanding of the motivations of HWH's donors; (2) hearsay statements from HWH's donors; (3) his "reach extender" methodology; and (4) his "comparative revenue analysis." *Def.'s Mot. to Seal* Attach. 1 *Def.'s Mot. in Limine to Exclude Op. Test. of Mr. Hamlyn* (ECF No. 151) (*Def.'s Mot.*). Mr. Kendrick concedes that Mr. Hamlyn may testify about matters within his personal knowledge, such as "gross operating revenues, annual trends, and evidence of a significant loss of gross revenues beginning on a particular date." *Id.* at 6. However, Mr. Kendrick strenuously argues that Mr. Hamlyn may not testify—either as a lay or expert witness—about why donors did not donate because such testimony would be based on inadmissible hearsay. *Id.* at 2-8. He further maintains that Mr. Hamlyn may not testify as a supposed expert that HWH lost donations due to Mr. Kendrick's alleged defamation. *Id.* at 8-12. More specifically, Mr. Kendrick contends that Mr. Hamlyn's likely testimony about "reach extenders" and "comparative revenue analysis" does not meet the necessary standards for scientific reliability. *Id.* In addition, he asserts that Mr. Hamlyn's comparative analysis opinions were not timely disclosed by the Plaintiffs. *Id.* at 12-14. Finally, Mr. Kendrick argues that Mr. Hamlyn lacks the necessary credentials to testify as a financial damages expert. *Id.* at 14.

### B. HWH and Mr. Geilenfeld's Responses

On April 21, 2014, HWH and Michael Geilenfeld responded to Mr. Kendrick's motion in limine, dismissing all of Mr. Kendrick's arguments as being "without merit on all points."[1] *Pls.' Opp'n to Def.'s Mot. in Limine* at 1 (ECF No. 183) (*Pls.' Opp'n*). After reviewing the standards for the admissibility of expert testimony, the Plaintiffs first respond to Mr. Kendrick's attack on Mr. Hamlyn's qualifications by arguing that Mr. Hamlyn has "relevant experience in the fields of nonprofit fundraising, budgeting, marketing, and donor outreach and donor database management, from 2002 to the present." *Id.* at 4. The Plaintiffs dispute Mr. Kendrick's contention that Mr. Hamlyn's knowledge of why the donors reduced or stopped their donations is based on hearsay, and contend instead that his knowledge is based on a logical inference from circumstantial evidence. *Id.* at 5-7. The Plaintiffs also contend that Mr. Hamlyn's comparative analysis of HWH's revenue is based on publicly available financial data, allowing him to test HWH's fundraising after Mr. Kendrick's allegedly defamatory comments. *Id.* at 7-9. Finally, the Plaintiffs focus on the impact Mr. Kendrick's comments had on HWH's ability to raise funds in the Boston area. *Id.* at 9-11.

## II. GEOFFREY SCOTT HAMLYN'S QUALIFICATIONS AND OPINIONS

### A. Qualifications

---

[1] In his deposition, Mr. Hamlyn clarified that he is acting as an expert for HWH only, not for Mr. Geilenfeld. *Pls.' Opp'n* Attach. 5 *Excerpts of Videotaped Dep. of Geoffrey S. Hamlyn* 9:2-12 (ECF No. 183) (Mar. 18, 2014) (*Hamlyn Dep. 1*) ("I'm serving as an expert witness for the corporation of Hearts with Haiti and the financial damages that we've suffered").

3

Mr. Hamlyn graduated magna cum laude from The University of Texas at Austin in 2006 with a bachelor's degree in music and from The Juilliard School in 2008 as a master of music, specifically in viola performance. *Def.'s Mot. to Seal* Attach. 4 at 10 (ECF No. 151) (*Hamlyn Curriculum Vitae*).

Mr. Hamlyn's practical experience in the fundraising world began in 2008-09 while studying at The Juilliard School. *Id.* He worked as a paid intern in the field of arts administration. *Id.* In 2010, Mr. Hamlyn worked as a paid intern for Changing Our World, Inc. in fundraising. *Id.* His curriculum vitae (CV) states that he gained "fundraising and client interaction experience through engagements including Abilities!, The National Peace Corps Association, and The Global Fund to Fight AIDS, TB, & Malaria." *Id.* Also in 2010, he joined Cultures in Harmony as the Operations Manager. *Id.* His CV describes "Cultures in Harmony" as "an international cultural diplomacy 501c3 nonprofit" and states that he was involved in "oversight over fundraising, grantwriting, international travel, concert planning, personnel, budgeting, reporting, donor acknowledgement, & strategic planning." *Id.* During the same time, he worked for Changing Our World, Inc. as Associate Director, Fundraising. *Id.* His CV describes "Changing Our World" as "a major international philanthropic services consulting firm" and indicates that he was involved in "project management, budget development, strategic planning, campaign development, donor research, donor solicitation, case development, event management, contract development, measurement and evaluation, the creation of marketing materials, and general counsel." *Id.*

4

Finally, in 2011, he began working as the Executive Director of HWH, which his CV describes as "a 501c3 nonprofit with a mission to support street children, the disabled, and the disadvantaged in Haiti." *Id.* His CV indicates that as Executive Director, he has "oversight over operations including, but not limited to fiscal management, board governance, fundraising, strategic planning, administration, donor management, marketing, media, personnel, reporting, and international relations." *Id.*

In February 2011, Mr. Hamlyn published a paper entitled, "Arts Fundraising in a Tough Economy" in *FLiP*. *Id.*

**B.    Opinions**

In the expert designation, Mr. Hamlyn states he has been designated "to offer opinion testimony in this matter regarding Plaintiffs' damages." *Pls.' Opp'n* Attach. 4 *Decl. of Geoffrey Hamlyn* at 1 (ECF No. 183) (*Hamlyn Decl.*). There are two major components to Mr. Hamlyn's expert opinion. First, he undertakes a statistical analysis of HWH's fundraising from 2009 through 2011 and compares HWH's results with the fundraising results of 29 other Haiti-nonprofits. *Id.* at 1-6. Using January 2011 as the month in which Mr. Kendrick began communicating with HWH's donors, *id.* at 1-2, Mr. Hamlyn states that, based on other Haiti-nonprofits, HWH experienced $1,181,127 in lost revenue for 2011. *Id.* at 4. In addition, after gathering "the majority of the surveyed nonprofits' financial information for fiscal and calendar years 2012," *id.* at 5, Mr. Hamlyn states that HWH experienced $1,259,487 in lost revenue for 2012. *Id.* at 6.

5

Next, Mr. Hamlyn focuses on a "demonstrative example," using contributions to HWH from Boston-area donors. *Id.* at 6-7. He states that in 2010, Boston-area donors contributed $497,930 to HWH and approximately $250,000 was raised by The Cotting School and its surrounding community. *Id.* at 7. Noting that Mr. Kendrick had disseminated his allegations of child abuse to those within The Cotting School community, he opined that many in that community "distance[d] themselves from and end[ed] their relationships with HWH, SJF[2] and Michael Geilenfeld." *Id.* Mr. Hamlyn indicates that in 2010, Boston-area donors contributed $497,930 to HWH; in 2011, the figure fell to $76,647; and, in 2012, to $7,301. *Id.*

In addition to his designation, Mr. Hamlyn prepared a report entitled, "Report on Relative Financial Position and Losses." *Def.'s Mot. to Seal* Attach. 4 (*Report on Relative Financial Position and Losses*). In that report, Mr. Hamlyn concludes that "beginning in 2011, attacks by Paul Kendrick, Freeport, Maine, making public claims of child abuse in the homes of the SJF, have caused precipitous declines in overall revenues, with a particular dearth of unrestricted support for the operations of the ministry." *Id.* at 1. Mr. Hamlyn also states in his report that the declines in HWH's fundraising occurred "[a]s a result of concerns over Kendrick's allegations." *Id.* at 2. He notes that two of HWH's Board Members—Fr. John Unni and Kay O'Halloran— resigned because of Mr. Kendrick's allegations. *Id.* at 4.

---

[2] SJF refers to St. Joseph Family of Haiti, the parent of a network of nonprofit institutions, including St. Joseph's Home for Boys. *See Order Denying Def.'s Mot. for Partial Summ. J.* at 4 (ECF No. 237).

6

## III. DISCUSSION

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court designated trial judges as gatekeepers responsible for determining whether the requirements of Federal Rule of Evidence 702 are met in any given case.[3] *Id.* at 589 n.7. "'A judge exercising the gatekeeper role must evaluate whether the challenged expert testimony is based on reliable scientific principles and methodologies in order to ensure that expert opinions are not 'connected to existing data only by the *ipse dixit* of the expert.'" *Kirouac v. Donahoe*, No. 2:11-cv-00423-JAW, 2013 U.S. Dist. LEXIS 6331, at *5 (D. Me. Jan. 16, 2013) (quoting *Knowlton v. Bankers Life & Cas. Co.*, No. 1:09-cv-00334-MJK, 2012 U.S. Dist. LEXIS 1365, at *2-3 (D. Me. Jan. 6, 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

---

[3] The *Daubert* Court set out four non-exclusive factors that a trial judge may consider in determining the reliability of expert testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (listing the four factors). However, the Supreme Court subsequently emphasized that the key word is "may." The Supreme Court has held that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

7

However, "[w]hen the 'adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion.'" *Id.* (quoting *Zuckerman v. Coastal Camps, Inc.*, 716 F. Supp. 2d 23, 28 (D. Me. 2010)); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (same).

### B. Qualifications

Under Federal Rule of Evidence 702, a person may qualify as an expert "by knowledge, skill, experience, training, or education." FED. R. EVID. 702. Turning first to Mr. Hamlyn's education, Mr. Kendrick observes in his motion that neither of Mr. Hamlyn's formal academic degrees relates to financial or statistical analysis. *Def.'s Mot.* at 14. In his deposition, Mr. Hamlyn testified that he studied statistics through a distance learning course at the University of California at Los Angeles in the last two quarters of 2013. *Hamlyn Dep. 1* 10:13-11:8. With only this distance learning course in his field of expertise, Mr. Hamlyn's formal educational background would raise questions about whether he qualifies as an expert in financial or statistical analysis.

The Court turns to whether he qualifies as an expert based on his "knowledge, skill, experience, [or] training." FED. R. EVID. 702. The First Circuit has written that "[t]he test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five

8

bases enumerated in Rule 702—knowledge, skill, experience, training, or education." *Santos v. Posadas De P.R. Assocs., Inc.*, 452 F.3d 59, 64 (1st Cir. 2006). In other words, "experts come in various shapes and sizes; there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Id.* at 63.

Here, the evidence in the record of Mr. Hamlyn's on-the-job training in the field of statistical and financial analysis is thin. The record lists Mr. Hamlyn's past employment and it may be that he has gained sufficient experience based on his past and current employment to perform this analysis and to testify as an expert. But the Court cannot tell based on this limited record whether Mr. Hamlyn has ever performed this type of analysis previously, under what circumstances, whether his prior analyses were ever peer-tested, and the purposes for his earlier analyses. With this said, the Court observes that most of Mr. Hamlyn's analysis is a matter of common sense: (1) isolating comparable charities; (2) analyzing their fundraising success in comparable periods; and (3) comparing an average of their returns against HWH's returns. It is possible that Mr. Hamlyn's past and current employers required him to perform this type of analysis in order to measure their fundraising success against comparable nonprofits. Furthermore, with the exception of his standard deviation analysis, none of this seems too esoteric.[4]

---

[4] The Court wonders whether Mr. Hamlyn's distance learning course qualifies him to perform a standard deviation analysis and is concerned that this part of his opinion may make his conclusions seem more reliable than they actually are. Using standard deviation analysis, he concludes that the "confidence interval at 95% was +/- 24.05%, +/- 19%, and +/- 56% for the mean percentage change during the periods of 2010-2012, 2010-2011, and 2009-2012, respectively." *Hamlyn Decl.* at 6. Mr. Hamlyn explains that this means that "in the time periods evaluated HWH's percentage change was not in line with the percent change of the broader market sector of Haiti nonprofits." *Id.*

9

Based on this record, the Court is not prepared to exclude or include Mr. Hamlyn as a financial and statistical expert. Before he testifies, the Court will require the Plaintiffs to present evidence out of the hearing of the jury as to Mr. Hamlyn's work or experience qualifications that allow him to present the type of statistical and financial analysis for which he has been proffered.

## C. Opinions

Assuming the Plaintiffs are able to demonstrate that Mr. Hamlyn is an expert, the Court has no compunctions about allowing him to testify to the core findings in his statistical and financial analysis.[5] The primary area of disagreement seems to focus on the extent to which Mr. Hamlyn should be allowed to opine as to the causes for HWH's fall-off of donations. Here, the Plaintiffs' and Mr. Kendrick's arguments pass like ships in the night.

The Plaintiffs urge the Court to conclude that Mr. Hamlyn's opinions about causation are permissible inferences based on circumstantial evidence: (1) in 2010, the year before Mr. Kendrick's campaign, HWH received nearly $2,000,000 in contributions; (2) in 2011 and 2012, after Mr. Kendrick began his campaign, HWH received around $500,000 each year; (3) Mr. Kendrick directly emailed HWH's donors with his allegations about Mr. Geilenfeld's alleged child sexual abuse; (4) those donors reduced or stopped their gifts; and (5) the reduction in giving is related to Mr. Kendrick's campaign. *Pls.' Opp'n* at 6-7; *Report on Relative Financial Position and*

---

[5] The Court is not convinced that Mr. Kendrick's quarrels with Mr. Hamlyn's methodology and scientific validity require exclusion. The Court has already noted that the Supreme Court in *Daubert* preferred cross-examination, presentation of contrary evidence, and instructions on burden of proof over exclusion. *Daubert*, 509 U.S. at 596.

*Losses* at 2-6. The Court agrees with the Plaintiffs that the jury would be entitled to make such an inference, especially because Mr. Kendrick himself has apparently admitted that he intended to affect donations to HWH by emailing these allegations to potential donors. *See Pls.' Opp'n* at 10 & n.5. But the question here is the extent to which Mr. Hamlyn, testifying as an expert, should be allowed to tell the jury that they should draw such an inference. More specifically, the issue is whether Mr. Hamlyn will be allowed to testify as to what donors told him about why they did or did not give.

Mr. Kendrick objects to Mr. Hamlyn telling the jury about the "subjective motivations of donors." *Def.'s Mot.* at 2. To be clear, Mr. Kendrick does not object to this testimony if properly presented by a donor and Mr. Kendrick acknowledges that at trial, the Plaintiffs could call as witnesses individuals who elected not to make contributions because of Mr. Kendrick's allegations. *Id.* at 3; *see Armenian Assembly of Am., Inc. v. Cafesjian*, 746 F. Supp. 2d 55, 67 (D.D.C. 2010) ("[A] charitable organization could recover damages for lost contributions by presenting evidence that particular contributors who might otherwise have made contributions were unwilling to do as a result of a defendant's conduct"); *Hous. Works, Inc. v. Turner*, 00 Civ. 1122 (LAK)(JCF), 2004 U.S. Dist. LEXIS 18909, at *120 (S.D.N.Y. Sept. 15, 2004) ("[T]he plaintiff has not submitted a statement from even a single funder confirming that he or she decided to withhold donations because of the City's contract dispute with Housing Works").

The problem relates to the facts and opinions underlying Mr. Hamlyn's opinion and the extent to which Mr. Hamlyn should be allowed to testify to them. *See* FED. R. EVID. 703. Mr. Hamlyn's testimony about what an individual donor(s) told him as to his or her motivations behind reducing or stopping his or her contributions would be hearsay. These out-of-court statements would be for their truth and do not fall into any obvious exceptions. FED. R. EVID. 801, 803-04. It is true that experts may be allowed to "rely on those kinds of facts or data in forming an opinion . . . [that] need not be admissible for the opinion to be admitted." FED. R. EVID. 703. Furthermore, the proponent of the opinion is allowed to disclose the facts or data underlying the opinion "only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.* A classic example is a physician's testimony about the reports of other medical practitioners in forming medical opinions.[6] *Manocchio v. Moran*, 919 F.2d 770, 780 (1st Cir. 1990) ("Medical examiners are physicians, and physicians commonly base their opinions on tests and examinations performed by other physicians; for example, the reading of an x-ray by a radiologist"). The First Circuit imposes the obligation on the trial judge to make a preliminary determination as to the admissibility of the underlying facts. *See United States v. Corey*, 207 F.3d 84, 88 (1st Cir. 2000).

Two contrasting examples suffice. In his opinion, Mr. Hamlyn mentions that The Cotting School and its community significantly reduced their contributions to HWH after receiving Mr. Kendrick's emails. *Hamlyn Decl.* at 7. If the Plaintiffs

---

[6] This is a civil action and does not present any *Crawford* issues. *See Crawford v. United States*, 541 U.S. 36 (2004); *United States v. Cameron*, 699 F.3d 621 (1st Cir. 2012).

present trial testimony from someone from The Cotting School to establish an evidentiary foundation for Mr. Hamlyn's opinion, then Mr. Hamlyn would have a right to assume the accuracy of that testimony in formulating his opinions. *See DaSilva v. Am. Brands, Inc.*, 845 F.2d 356, 360 (1st Cir. 1988) ("Federal Rules of Evidence 702 and 703 . . . allow an expert to present scientific or technical testimony in the form of opinion based on facts or data perceived or made known to the expert before or at trial").

The contrast is Father John Unni. The causation issue as to whether Father Unni's actions were related to Mr. Kendrick's allegations is at least convoluted. Father Unni was a member of HWH's board of directors and a person able to influence other donors, something Mr. Hamlyn calls "reach extenders." *Report on Relative Financial Position and Losses* at 4. In his report, Mr. Hamlyn states that "[i]ssues surrounding the allegations and HWH's response strategies have directly contributed to the loss of valuable reach extenders and donors including, but not limited to, Fr. John Unni." *Id.* Mr. Hamlyn also notes that Father Unni resigned from the HWH Board "because of Paul Kendrick's allegations." *Id.*

However, in his deposition, Mr. Hamlyn described a more complicated sequence of events. Mr. Hamlyn testified that Mr. Kendrick contacted Father Unni and because of those allegations, Father Unni met with one of the alleged victims. *Def.'s Mot. to Seal* Attach. 3 *Excerpts of Videotaped Dep. of Geoffrey S. Hamlyn* 42:11-43:6 (ECF No. 151) (Mar. 18, 2014). Mr. Hamlyn also acknowledged that Father Unni then told the members of the HWH Board that he found the victim's account of abuse

13

to be credible, and subsequently, Father Unni resigned because he was concerned about the allegations and because he wanted the HWH Board to conduct an investigation. *Id.* 44:8-23.

Based on this testimony, Father Unni's actions with HWH were linked to three factors: (1) Mr. Kendrick's allegations; (2) his meeting with one of the alleged victims and his conclusion that the victim's description was credible; and (3) the HWH Board's response. Whether Father Unni's actions can be said to be caused by Mr. Kendrick's allegations alone is, based on the record, questionable. Despite the potential complexity of why an individual donor does or does not give, Mr. Hamlyn acknowledged that he put all donors in Massachusetts in the same category, presumably including people like Father Unni. *Id.* 53:2-25. Under Federal Rule of Evidence 703, especially in light of the murky evidence of Father Unni's motivations, the Court is doubtful that Mr. Hamlyn would be allowed to testify as to what Father Unni told him about his reasons for disassociating himself from HWH. This same logic applies with equal force to other donors. Why people do and do not give money is often complicated and the Court is not convinced that, even as an expert, Mr. Hamlyn should be allowed to simplify those motivations.

The Court is unclear as to how much of Mr. Hamlyn's proposed testimony would meet the standards for admissibility under Federal Rule of Evidence 703, and whether the Plaintiffs intend to present evidence at trial from donors that were deterred from making donations to HWH because of Mr. Kendrick's allegations—as opposed to the donor's individual circumstances, his or her investigation into the

allegations, his or her dissatisfaction with HWH's response, or a myriad of other reasons. The record here is not clear and detailed enough to allow the Court to arrive at a definitive conclusion about the admissibility of Mr. Hamlyn's expert testimony as designated. Having set forth some general principles, the Court anticipates that before Mr. Hamlyn testifies, the parties will clarify the scope of his testimony outside the presence of the jury.

## IV. CONCLUSION

The Court DISMISSES without prejudice Defendant's Motion in Limine to Exclude Opinion Testimony of Mr. Hamlyn (ECF No. 152).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 24th day of September, 2014