| | | |
|---|---|---|
| HEARTS WITH HAITI, INC.,<br>et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:13-cv-00039-JAW |
| | ) | |
| PAUL KENDRICK, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON CONSOLIDATED MOTION FOR SANCTIONS

For years, Michael Geilenfeld has run organizations in Haiti dedicated to helping disadvantaged Haitian children, and Hearts with Haiti is an organization dedicated to supporting those organizations. Paul Kendrick has become utterly convinced that Mr. Geilenfeld is using these organizations to sexually abuse children and he has broadcast his belief to countless people in an effort to force Mr. Geilenfeld to stop sexually abusing children. Mr. Geilenfeld and Hearts with Haiti have emphatically denied Mr. Kendrick's charges and they have sued Mr. Kendrick to vindicate their reputations and to force Mr. Kendrick to stop repeating his allegations. Recognizing the case entails sensitive information requiring confidentiality during the discovery phase, the Court issued confidentiality orders that prohibit the parties from disseminating information garnered during the discovery process. Charging that Mr. Kendrick violated some of those confidentiality orders, Mr. Geilenfeld and Hearts with Haiti come to the Court to demand sanctions. The Court finds that Mr. Kendrick has in fact violated some of the Court orders, and

the Court sanctions him in the amount of attorney's fees and costs that Plaintiffs' counsel incurred in bringing the successful part of the sanctions motion.

## I.   BACKGROUND

### A.   Hearts with Haiti and Michael Geilenfeld

Hearts with Haiti is a nonprofit corporation with a mission to provide support to disabled and disadvantaged Haitian children. *Compl.* at 1 (ECF No. 1). Michael Geilenfeld, a resident of Pétion-Ville Commune, Port-au-Prince Arrondissement, Republic of Haiti, is the founder and Executive Director of St. Joseph Family of Haiti. *Id.* ¶ 2. Mr. Geilenfeld has been involved with a number of organizations, including St. Joseph Family of Haiti, St. Joseph's Home for Boys, Resurrection Dance Theater of Haiti, Wings of Hope, Trinity House, and Lekòl Sen Trinite, all of which assist with Haitian children in different ways. *Id.* ¶¶ 7-39. Hearts with Haiti was established in 2001 to support these organizations. *Id.* ¶¶ 40-42.

### B.   Paul Kendrick

Paul Kendrick is a resident of Freeport, Maine. *Id.* ¶ 3. In 2011, Mr. Kendrick became aware of allegations that Mr. Geilenfeld was abusing Haitian children and, firmly believing the allegations to be true, he emailed and published statements that warned about Mr. Geilenfeld's abuse of children to numerous third parties, including benefactors of Hearts with Haiti. *Id.* ¶¶ 47-67. On or about January 9, 2012, he gave a radio interview in which he repeated these allegations. *Id.* ¶¶ 69-73.

### C.   The Hearts with Haiti Lawsuit

Mr. Geilenfeld has steadfastly denied the allegations of his abuse of Haitian children and on February 6, 2013, he and Hearts with Haiti filed suit in this Court against Mr. Kendrick, alleging that he had defamed them, had placed them in a false light, and had tortiously interfered with advantageous business relations, and they sought damages and an injunction against Mr. Kendrick. *Id.* at 1-20. On March 8, 2013, Mr. Kendrick answered the Complaint, admitting some and denying other allegations, and asserting, among other affirmative defenses, the affirmative defense of truth or lack of falsity. *Defenses and Ans.* (ECF No. 8).

### D. The April 19, 2013 Confidentiality Order

On April 16, 2013, Mr. Kendrick moved the Court to issue a consented-to confidentiality order. *Mot. for Confidentiality Order* (ECF No. 14) (*Confidentiality Mot.*). In his motion, Mr. Kendrick mentioned that the dispute involved "allegations of child sexual abuse" and he "anticipated that the identity of alleged victims and witnesses will be the subject of extensive discovery." *Id.* at 1. Furthermore, he noted that "financial and proprietary information will be disclosed and produced in the course of the lawsuit." *Id.* Mr. Kendrick proposed a confidentiality order, using the Court's Form Confidentiality Order with certain amendments. *Id.* at 1-2. On April 19, 2013, the Magistrate Judge signed the Consent Confidentiality Order, which consisted of eleven pages of detailed confidentiality provisions. *Consent Confidentiality Order* (ECF No. 16).

### E. The August 12, 2013 Motion, Mr. Kendrick's Response, and the October 21, 2013 Amended Order

On August 12, 2013, the Plaintiffs moved to amend the confidentiality order on the ground that, even after the filing of the lawsuit, Mr. Kendrick had continued to publish misconduct allegations against the Plaintiffs, against people that he thought were aligned with the Plaintiffs, including benefactors of the Plaintiffs. *Pls.' Mot. to Retain Confidential Designations and to Amend the Confidentiality Order* (ECF No. 65). The Plaintiffs claimed that Mr. Kendrick was inappropriately using information that they had produced during discovery to "further bully, harass, intimidate, annoy, embarrass, and oppress them and their benefactors." *Id.* at 1. Mr. Kendrick objected to what he contended was the Plaintiffs' over-inclusive use of confidentiality and argued that they had failed to demonstrate that he had breached the confidentiality order. *Def.'s Opp'n to Pls.' "Mot. to Retain Confidential Designations and to Amend the Confidentiality Order"* (ECF No. 71).

During this same time, on July 8, 2013, Mr. Kendrick moved to ensure that certain documents that disclosed the identities of victims of sexual abuse remain confidential. *Def.'s Mot. to Retain Classified Designation of Certain Docs.* (ECF No. 49). On July 29, 2013, the Plaintiffs filed an opposition to Mr. Kendrick's motion. *Pls.' Resp. in Opp'n to Def.'s Mot. to Retain Classified Designation of Certain Docs.* (ECF No. 60).

On October 21, 2013, the Magistrate Judge issued a decision granting in part and denying in part the Plaintiffs' motion. *Mem. Decision on Mots. to Retain Classified Designation* (ECF No. 81) (*Am. Confidentiality Order*). In pertinent part, the Magistrate Judge observed:

If the defendant in fact is engaging in the very activity that is the subject of the plaintiffs' claims against him and if he is doing so or is likely to do so using the information that the plaintiffs have provided in discovery, good cause for specifically limiting the defendant's use of discovery material in fact exists.

*Id.* at 5. In order to prevent abuse of discovery, the Magistrate Judge amended the Confidentiality Order to include the following provision:

**15. Use of Discovery.** This order forbids the use or disclosure of discovery information by the parties, counsel for the parties, or their experts, for any purpose whatsoever other than to prepare for and present at trial in the above-captioned matter, including any appeal thereof. Information obtained through discovery shall not be used for any publications purposes or disseminated to anyone other than counsel for the parties, the parties—and in the case of the corporate party, a single representative—or their experts.

*Id.* at 6-7. The Magistrate Judge declined, however, to prohibit defense counsel from providing Mr. Kendrick access to the discovery material because, as he noted, the "ability of the defendant and his counsel to consult during trial preparation is an important concern." *Id.* at 7. But the Magistrate Judge emphasized:

If and when the plaintiffs present this court with evidence that the defendant has violated the amended confidentiality order, the court will consider imposing a counsel's-eyes-only limitation on any specified documents from the information provided in the plaintiffs' responses to the defendant's discovery requests. Ultimately, of course, violations of this court's orders can lead to a finding of contempt of court.

*Id.*

### F. Plaintiffs' First Motion for Sanctions and Order

On December 13, 2013, the Plaintiffs moved for sanctions against Mr. Kendrick. *Pls.' Mot. for Sanctions Against Def. for Violation of the Ct.'s Orders* (ECF No. 99). The Plaintiffs claimed that Mr. Kendrick disseminated their sealed discovery

responses "in furtherance of his campaign to malign Plaintiffs." *Id.* at 1. On January 3, 2014, Mr. Kendrick filed an opposition to the motion on the ground that the released documents were publicly available on the Court's PACER system. *Def.'s Objection to Pls.' Mot. for Sanctions* (ECF No. 106).

On March 20, 2014, the Magistrate Judge issued a decision granting the Plaintiffs' motion for sanctions. *Mem. Decision on Mot. for Sanctions* (ECF No. 144) (*Sanctions Order*). The Magistrate Judge rejected Mr. Kendrick's contention that it was his understanding that the documents were not confidential because they were made available to the public through the Court's PACER system. *Id.* at 2. The Magistrate Judge observed that the documents themselves had been marked confidential and a motion to seal the documents had been filed with the Court and the Court had granted the motion prior to Mr. Kendrick's publication. *Id.* The Magistrate Judge found that Mr. Kendrick knew the document had been erroneously placed on PACER. *Id.* at 2-3. The Magistrate Judge expanded the confidentiality order to include a "counsel's eyes only" provision and he imposed a $1,000.00 fine against Mr. Kendrick. *Id.* at 4.

### G.     Plaintiffs' Second Motion for Sanctions: February 12, 2014[1]

On February 12, 2014, the Plaintiffs filed a second motion for sanctions. *Pls.' Mot. to Seal Second Mot. for Contempt and Sanctions Against Def. for Repeated*

---

[1]     The Plaintiffs' second, third and fourth motions for sanctions contained a number of issues not set forth in this Order. On September 26, 2014, the Plaintiffs filed a consolidated motion, emphasizing only some of the alleged violations by Mr. Kendrick and the Court has focused on the issues in the consolidated motion. *Pls.' Consolidated Second, Third, and Fourth Mots. for Sanctions and Findings of Contempt Against Def.* (ECF No. 266).

*Violation of the Ct.'s Orders* Attach. 1 *Pls.' Second Mot. for Contempt and Sanctions Against Def. for Repeated Violation of the Ct.'s Orders* (ECF No. 128) (*Pls.' Second Mot.*). They claimed that Mr. Kendrick "used separate violations of the confidentiality provisions in order to harass witnesses noticed on Plaintiffs' side, including by bombarding third-party employer representatives of the witness with accusatory emails. . . ." *Id.* at 1-2. Specifically, they alleged that Mr. Kendrick had harassed, intimidated and bullied a key witness, Jessica Reitz, "by attacking her reputation at her employer, the United States Agency for International Development (USAID)." *Id.* at 12.

They also asserted that Mr. Kendrick misused his presence in the deposition room by disseminating and widely publicizing "confidential deposition testimony to harass, distract, and disadvantage Plaintiffs and their counsel's preparation for and presentation at the depositions." *Id.* Specifically, they alleged that Mr. Kendrick published confidential deposition testimony from Jean Viard,[2] one of the alleged victims, on a blog called "reseaucitadelle.blogspot.com," which they maintain was the blog of both Mr. Kendrick and a man named Cyrus Sibert. *Id.*

On March 27, 2014, Mr. Kendrick responded to the second motion for sanctions. *Def.'s Mot. to Seal Def.'s Unredacted Opp'n to Pls.' Second Mot. for Sanctions and Two Exs.* Attach. 1 *Def.'s Unredacted Opp'n to Pls.' Second Mot. for Contempt and Sanctions Against Def.* (ECF No. 160). Mr. Kendrick denied having

---

[2] Typically the Court would not publish the name of a victim; however, at the hearing, the attorneys clarified that Mr. Viard does not wish to remain anonymous and they used his name publically.

control over Reseaucitadelle.blogspot.com, which he said is Mr. Sibert's blog. *Id.* at 5. As regards the Plaintiffs' contentions about Ms. Reitz, Mr. Kendrick responded that his actions were based on his "good faith belief that" Ms. Reitz, as a USAID employee, was interfering "with an investigation into allegations of child abuse." *Id.* at 6-7.

On March 31, 2014, the Plaintiffs contended that Mr. Kendrick admitted at his deposition that he consciously violated the Court's Confidentiality Orders and that he sought to destroy Ms. Reitz's "livelihood and employment at USAID by repeatedly, *as many as thirty times per day*, disseminating protected discovery information to her colleagues, superiors, and other third parties." *Pls.' Reply in Support of Their Second Mot. for Contempt and Sanctions Against Def. for Repeated Violation of the Ct.'s Orders* at 2 (ECF No. 164) (emphasis in original). They also claimed that Mr. Kendrick's attempts to distance himself from Cyrus Sibert's website are "disingenuous and misleading." *Id.* at 3.

## H. Plaintiffs' Third Motion for Sanctions: March 19, 2014

On March 19, 2014, the Plaintiffs moved a third time for sanctions against Mr. Kendrick. *Pls.' Third Mot. for Contempt and Sanctions Against Def. for Repeated Violation of the Ct.'s Orders* (ECF No. 141) (*Pls.' Third Mot.*). In this motion, the Plaintiffs alleged that in continued violation of the Court's confidentiality orders, Mr. Kendrick mass emailed excerpts of an investigative report prepared by Attorney Rosario Rizzo and Investigator Edward Clark (Rizzo Report). *Id.* at 1-2. They say the report was designated confidential pursuant to the Amended Confidentiality

Order and after Mr. Kendrick's attorney inadvertently disclosed it, Mr. Kendrick mass emailed the information to "hundreds of third-party recipients in an effort to further defame and harass Plaintiffs[] and their supporters." *Id.* at 2. They also asserted that Mr. Kendrick used discovery information to destroy Jessica Reitz's livelihood. *Id.* at 2-3.

On April 9, 2014, Mr. Kendrick filed his response to the Plaintiffs' third sanctions motion. *Def.'s Mot. to Seal Def.'s Unredacted Opp'n to Pls.' Third Mot. for Sanctions* Attach. 1 *Def.'s Unredacted Opp'n to Pls.' Third Mot. for Contempt and Sanctions Against Def.* (ECF No. 169). Mr. Kendrick asserted that the Plaintiffs have offered "no evidence in support of [their] argument" that Mr. Kendrick violated the confidentiality provisions of the Orders. *Id.* at 1. Mr. Kendrick explained that once he obtained information that a former board member described an "encounter . . . with one . . . guest who discussed the North American Man Boy Love Association" at one of the Haitian orphanages run by Mr. Geilenfeld, he was motivated to release that information. *Id.* at 2. Regarding Jessica Reitz, Mr. Kendrick once again stated that his actions were based on the "good faith belief that a government employee, who is not a party to this lawsuit, used her position to obtain information about a governmental investigation and then shared that information with the target of that investigation." *Id.* at 1-2.

On April 14, 2014, the Plaintiffs filed a reply to Mr. Kendrick's response, reiterating their earlier arguments. *Pls.' Reply in Support of Their Third Mot. for*

*Contempt and Sanctions Against Def. for Repeated Violation of the Ct.'s Orders* (ECF No. 178).

## I.    Plaintiffs' Fourth Motion for Sanctions:  July 3, 2014

On July 3, 2014, the Plaintiffs filed a fourth motion for sanctions.  *Pls.' Fourth Mot. for Contempt and Sanctions Against Def. for Additional Violations of the Ct.'s Orders* (ECF No. 220) (*Pls.' Fourth Mot.*).  In this motion, the Plaintiffs allege that on June 18, 2014, "excerpts of confidential discovery deposition transcripts were erroneously filed on the" Court docket without seal and that when the error was discovered, defense counsel quickly moved to correct the error.  *Id.* at 2-3.  However, the Plaintiffs claimed that when Mr. Kendrick came upon the deposition excerpts, he "immediately and repeatedly mass e-mailed excerpts of these transcripts to hundreds of Plaintiffs' benefactors to harass, intimidate, and malign Plaintiffs' benefactors and further interfere with Plaintiffs' advantageous relationships with them."  *Id.* at 3. They also asserted that he placed these transcripts on his website.  *Id.*

On July 23, 2014, Mr. Kendrick responded.  *Def.'s Objection to "Pls.' Fourth Mot. for Contempt and Sanctions Against Def. for Additional Violations of the Ct.'s Orders"* (ECF No. 223).  Mr. Kendrick insisted that he "did nothing unlawful or unethical when he re-published already publicly filed redacted material, following the lead of the Plaintiffs and after the Court had already permitted the filing."  *Id.* at 1-2.  Mr. Kendrick explained that the subject of the fourth motion was excerpts from the depositions of two Haitian victims, neither of whom requested confidentiality.  *Id.* at 2.  Mr. Kendrick asserted that the Plaintiffs violated the confidentiality order by

designating as confidential both depositions even though such a designation required good cause. *Id.* He also pointed out that on May 2, 2014, he had objected to the Plaintiffs' confidentiality designations and on June 4, 2014, the Plaintiffs themselves had made public excerpts from one of the depositions. *Id.* at 3-4. Furthermore, Mr. Kendrick maintained that defense counsel had not "erroneously" filed excerpts of one of the depositions; instead, he said that defense counsel was merely following the Plaintiffs' lawyers' filing practices. *Id.* at 6-7. He also accused the Plaintiffs of selective filing of excerpts that favor their side of the controversy but objecting to excerpts that are unfavorable. *Id.* at 8.

The Plaintiffs filed their reply on August 6, 2014. *Pls.' Reply in Support of Their Fourth Mot. for Contempt and Sanctions Against Def.* (ECF No. 225). They asserted that Mr. Kendrick "concedes that he repeatedly mass e-mailed protected discovery information in violation of the provisions of the Court's amended Order which restricts dissemination of discovery only to use in case preparation and trial" and that "[h]e offers no explanation or excuse for the violations." *Id.* at 1. They contended that in one of his emails in which he discussed the Plaintiffs' fourth motion for sanctions, he wrote: "Blah, blah, blah . . . more smoke and mirrors." *Id.* The Plaintiffs argued that if Mr. Kendrick had wished to challenge their confidentiality designations, he should have come to Court, rather than ignore the designation. *Id.* at 1-2.

**J.    The September 12, 2014 Dismissal**

In September 2014, it appeared that this bitter dispute was heading to trial. The Court placed the matter on a trial list for October 7, 2014, the parties filed pretrial memoranda, and the Magistrate Judge held a final pretrial conference on September 12, 2014. *See Trial List* (ECF No. 231); *Def.'s Pretrial Mem. Pursuant to Local Rule 16.4* (ECF No. 234); *Pls.' Final Pretrial Mem.* (ECF No. 235); *Report of Final Pretrial Conf. and Order* (ECF No. 246). As it appeared that the sanctions motions would be eclipsed by trial, the Magistrate Judge dismissed the pending motions without prejudice. *Order on Mots. for Sanctions* (ECF No. 241).

### K.     Michael Geilenfeld is Arrested and Imprisoned in Haiti

On September 23, 2014, counsel for the Plaintiffs informed the Court that Haitian authorities had arrested Mr. Geilenfeld in Haiti and he was in prison. *Oral Mot. to Continue* (ECF No. 260). This news caused the trial scheduled to begin October 7, 2014 to be continued. *Oral Order Granting Mot. to Continue Trial for 90 Days* (ECF No. 261).

### L.     The September 26, 2014 Consolidated Motion

The continuance revived the earlier-filed sanctions motions and, in order to expedite the resolution of those motions and to narrow the areas of contention, the parties agreed to file a consolidated motion, setting forth the principle arguments of both sides. The consolidated pleading was filed on September 26, 2014. *Pls.' Consolidated Second, Third, and Fourth Mots. for Sanctions and Findings of Contempt Against Def.* (ECF No. 266) (*Pls.' Consolidated Mot.*). After some discussion, Mr. Kendrick through counsel informed the Court that he wished to

testify at any sanctions hearing, and after a number of false starts, the Court held

the hearing on January 30, 2015. *Minute Entry* (ECF No. 289).

## II.     THE JANUARY 30, 2015 SANCTIONS HEARING

### A.     Michael Geilenfeld: An Update

According to his lawyers, Mr. Geilenfeld remains incarcerated in Haiti while

the Haitian judicial system determines whether there is sufficient evidence to bring

charges.  They say Haiti has an inquisitorial or inquisition legal system where a

private lawyer initiates the criminal process by filing a complaint. *Tr. of Proceedings*

7:1-11 (ECF No. 292) (*Sanctions Hr'g Tr.*).  The complaint is referred to a judge, called

an inquisition judge, who performs an investigation, which includes conducting

hearings and taking testimony. *Id.* 7:10-13.  The initial investigation typically takes

four to five months and, at the end of the initial investigation, the inquisition judge

issues a preliminary report. *Id.* 7:14-18.  Mr. Geilenfeld's lawyers understand that

this part of the process has been completed in his case. *Id.* 7:14-15.

The case is now at the second stage, during which the investigating judge

consults with the prosecutor to determine whether charges should be formally

initiated and if so, what charges should be brought. *Id.* 7:17-21.  This consultation

may take several weeks. *Id.* 7:21.  Mr. Geilenfeld's lawyers understand that this part

of the process is complete as well. *Id.* 7:21-22.

The case is then returned to the inquisition judge to issue what is called an

ordinance, which is a court order and functions in a fashion similar to an indictment.

*Id.* 7:23-8:4.  There is no deadline, but the attorneys believe that this part of the

process should be concluded within the next thirty to sixty days.  *Id.* 9:22-10:3.  If no charges are brought, Mr. Geilenfeld will be released and this case will be able to move forward.  *Id.* 10:8-11.  If charges are brought, it is within the judge's discretion as to whether Mr. Geilenfeld remains incarcerated in Haiti during the prosecution.  *Id.* 8:11-13.

### B.    Paul Kendrick's Testimony

Mr. Kendrick testified extensively at the sanctions hearing.  *Id.* 40:17-108:3. The Court describes his responses to the separate allegations of the Plaintiffs.

#### 1.    Jessica Reitz

Mr. Kendrick said that he understood that Jessica Reitz was a former board member of either Hearts with Haiti or the St. Joseph's family of homes in Haiti, and that Ms. Reitz was employed by USAID and stationed at Port-au-Prince.  *Id.* 44:17-45:3.  Mr. Kendrick confirmed that while reviewing the discovery in this case, he came across some email threads involving Ms. Reitz.  *Id.* 44:4-7.  Mr. Kendrick characterized these emails as discussing Ms. Reitz "trying to interfere with visas for two Haitian men who were attempting to travel to the United States."  *Id.* 46:12-14. Also, he said that the emails revealed that Ms. Reitz was "seeking confidential information from a U.S. Embassy employee named Brian Hoyt about what's going on with any criminal investigation of Mr. Geilenfeld by Homeland Security, U.S. Embassy, U.S. State Department investigators."  *Id.* 46:17-24.

Mr. Kendrick admitted sending these emails to others.  *Id.* 47:9-12.  Mr. Kendrick confirmed that he had sent the emails to Madame Arielle Villedrouin, the

executive director of IBESR, the Haitian child protection agency. *Id.* 47:15-19. He also sent the email thread to "Homeland Security agents who were paying attention to the case." *Id.* 47:20-22. Furthermore, he sent the email thread to "the head of the USAID and . . . to people who had, at least in the past, supported the mission of Geilenfeld's orphanages." *Id.* 47:22-24.

Mr. Kendrick acknowledged that he might have been violating court orders when he disseminated this email thread; in his words, it was "mixed in my mind, sure." *Id.* 48:4-7. When pressed on cross-examination, Mr. Kendrick admitted that he knew when he disseminated the Reitz emails, he was violating a court order:

> Q. You agree that these are the Jessica Reitz e-mails - -
> A. With a cover letter to Mme. Villedrouin, yes.
> Q. And you agree that your forwarding these e-mails is a violation of the discovery order, correct?
> A. Yes, it is a violation of the discovery order. You're asking me my state of mind when I saw them and continue to see them. I'm getting upset seeing them now.
> Q. As you sit here today, Mr. Kendrick, would you agree that this is a violation of the discovery order?
> A. Yes, sir.

*Id.* 75:7-18.

### 2. The Rizzo Report

Mr. Kendrick testified that he received a copy of the Rizzo Report from Attorney King and that there were things in the Rizzo Report that he found troubling. *Id.* 49:11-15. The Rizzo Report contained the results of an interview with Father John Unni, the pastor of the St. Cecilia's Church in Boston and someone who had been involved in missionary work in Haiti. *Id.* 49:16-50:4. According to Mr. Kendrick, the report indicated that Father Unni told the Rizzo investigators that when he

visited the St. Joseph's Home for Boys in Petionville near Port-au-Prince, he came across a man whom he later determined was a member of the North American Man Boy Love Association or NAMBLA. *Id.* 50:5-18. Mr. Kendrick testified that the report says that when Father Unni asked Mr. Geilenfeld whether he was aware that a member of NAMBLA was staying at the orphanage, Mr. Geilenfeld "seemed unconcerned saying, you know, we run a guest house there." *Id.* 52:2-13.

Mr. Kendrick acknowledged that he shared this information with Homeland Security, IBESR in Haiti, U.S. Embassy officials, and "people who expressed a concern about the welfare of children in Haiti, i.e., donors, supporters of Hearts with Haiti." *Id.* 53:17-23. Mr. Kendrick also admitted that he understood that the court confidentiality orders provided that documents marked confidential were not to be disclosed. *Id.* 61:23-62:16. Mr. Kendrick agreed that the Rizzo investigative report was marked confidential. *Id.* 67:24-68:3; 69:7-16. Mr. Kendrick never actually directly responded to a number of questions that asked whether he knew when he distributed this information that he was violating a court order, but he explained why he disclosed the investigative report:

> Mr. Deane, I'm glad to answer all these questions. I understand there's a confidentiality order. The issues I divulged have to do with a member of the North American Man Boy Love Association having access to children, Haitian children, and secondly, U.S. Embassy employees trying to block, interfere with a criminal investigation of a U.S. citizen who ran an orphanage in Haiti and was being charged with - - by victims of child sexual abuse.

*Id.* 71:5-13.

### 3. Cyrus Sibert

Mr. Kendrick explained that Cyrus Sibert is a Haitian journalist, "a political journalist for the most part," and that he first met Mr. Sibert in 2008, after Mr. Kendrick read that "he had published testimony of victims of child sexual abuse at the Project Pierre Toussaint in northern Haiti." *Id.* 41:23-42:4. Mr. Kendrick testified that Mr. Sibert is not his employee and that Mr. Sibert does not work for him. *Id.* 42:5-9. Mr. Kendrick has, however, collaborated with Mr. Sibert. *Id.* 42:10-11. Mr. Kendrick said that Mr. Sibert had a blog and Mr. Kendrick agreed that he would "from time to time ask [Mr. Sibert] if he will publish things." *Id.* 42:23-25.

Mr. Kendrick was repeatedly asked about his answer to interrogatory 2 that he gave on June 21, 2013. The interrogatory reads:

> 2. Identify each and every e-mail address, website, or blog site, you or your representatives had access to, control of, or use from January 2003 to the present.

Pl.'s Ex. 9 at 1. Mr. Kendrick listed http:/istwanouayisyen.com and reseaucitadelle.blogspot.com in his response. *Id.* at 2. Mr. Kendrick repeatedly denied that he had conceded in answering this interrogatory that he had control over Mr. Sibert's blog, noting that the interrogatory was phrased in the alternative, "access to, control of, <u>or</u> use." *Sanctions Hr'g Tr.* 77:22-78:6 ("There's a big or in there and yes, I have access to websites, i.e., I can send the proprietors of these websites articles, information, perhaps open letters, correspondence I've written and then they make the decision as to whether or not they will publish that information on their website. That's the access I have") (emphasis added). At the same time, Mr. Kendrick agreed that he had sent information to the proprietors of websites "because I hope

they would publish it." *Id.* 79:15-19. Mr. Kendrick also agreed that Mr. Sibert would not have had access to the Reitz emails unless Mr. Kendrick had sent them to him. *Id.* 84:25-85:6, 92:6-14. Mr. Kendrick conceded that he had forwarded by email excerpts of victim deposition transcripts, but he would not acknowledge that he had emailed these transcripts to third parties, saying that he might have emailed them to himself. *Id.* 101:10-102:4.

### 4. The PACER Documents

When questioned about whether he had pulled confidential documents from PACER and distributed them, Mr. Kendrick first said that before the lawsuit, he had "never heard of PACER." *Id.* 55:21-22. He then explained that whenever he sees anything on PACER, he assumes that "anyone can see that. They filed my whole deposition on PACER, they did." *Id.* 55:24-56:1. When asked if he thought the deposition transcripts that were filed on PACER were "fair game," Mr. Kendrick replied, "[y]ou bet I did, yes." *Id.* 56:2-7.

## III. LEGAL PRINCIPLES

The parties' disagreement is framed under the rules for civil contempt of court. As the Supreme Court has observed, "[c]ivil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). The First Circuit has cautioned, however, that "'[r]ecognizing the contempt power's virility and damage potential, courts have created a number of prudential principles designed to oversee its deployment.'"

*United States v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005) (quoting *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991)). The First Circuit has set out four criteria before a court may impose sanctions for civil contempt:

> (1) The alleged contemnor had notice that he was within the order's ambit;
>
> (2) That the order was clear and unambiguous;
>
> (3) That the alleged contemnor had the ability to comply; and
>
> (4) That the order was indeed violated.

*Id.*

The First Circuit has elaborated on the "clear and unambiguous" requirement, noting that "the words of the court's order [must] have clearly and unambiguously forbidden *the precise conduct on which the contempt allegation is based*." *Id.* at 28 (emphasis in original). "The test is whether the putative contemnor is 'able to ascertain from the four corners of the order precisely what acts are forbidden.'" *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002) (quoting *Gilday v. Dubois*, 124 F.3d 277, 282 (1st Cir. 1997)). Furthermore, a complainant must prove civil contempt by clear and convincing evidence. *Id.* at 77. Once the Court determines that a sanction is in order, it has "'wide discretion in its choice of sanctions.'" *Baella-Silva v. Hulsey*, 454 F.3d 5, 12 (1st Cir. 2006) (quoting *Goya Foods*, 290 F.3d at 77-78). In general, the sanction should be "reasonably proportionate to the offending conduct." *Id.* at 13 (internal citations and quotation marks omitted).

## IV.    DISCUSSION

## A. A Stark Conflict

The positions of the parties could not be more antithetical. Mr. Geilenfeld sees himself as a good man, a former Brother with the Missionary Brothers of Charity, and a man who has dedicated his life to helping some of the poorest and most disadvantaged children in the world. He points out that he was instrumental in founding a series of institutions within Haiti that have vastly improved the lives of child slaves, street children, orphans and the disabled, and he has raised considerable sums of money from concerned citizens and groups within the United States to assist in his charitable mission. By contrast, it is not too strong to say that Mr. Kendrick views Mr. Geilenfeld as evil incarnate, a man who under a beneficent guise is a pedophile and who has created a charitable fiction to lure vulnerable and innocent boys to a place where he can control them in order to sexually assault and rape them with impunity.

Having evaluated Mr. Kendrick during his testimony, the Court concludes that Mr. Kendrick sees himself as a good man, a man on a mission to prevent the harm to Haitian children that flows from sexual abuse. Convinced that he is right and that he is speaking truth to power, Mr. Kendrick tends to view others who do not share his views as complicit in Mr. Geilenfeld's scheme to abuse children and Mr. Kendrick includes in his condemnation such people as Ms. Reitz, an official with USAID, and the attorneys representing Mr. Geilenfeld. *See, e.g.*, *Sanctions Hr'g Tr.* 107:13-16 ("I'm sorry for op-edding Mr. Deane, but you can be part of the solution in stopping child abuse or you can become part of the problem and you're part of the problem").

By contrast, Mr. Geilenfeld sees Mr. Kendrick as a sanctimonious, vindictive fanatic, a man who jumps at erroneous conclusions and who has waged an obsessive smear campaign against him and others in an effort to destroy their reputations and good works.

## B.     The Court's Role

As to which view is correct, the Court is and must remain agnostic at least until a verdict. The Plaintiffs and Mr. Kendrick have a right to neutral decision-makers, to an orderly, fair, and impartial judicial process, where their irreconcilable perspectives may be properly evaluated and resolved. Early on, the parties recognized that the sensational nature of the allegations in this case made it imperative that there be limitations on the dissemination of discovery because in order to proceed with the case, there would be a need to protect the alleged victims of sexual abuse and a need to share sensitive financial and proprietary information. *Confidentiality Mot.* at 1-2.

Mr. Kendrick has availed himself of the protections of confidentiality orders when it has suited him. In fact, it was Mr. Kendrick who first proposed that the exchange of discovery be protected by orders assuring confidentiality, a proposal that the Court reduced to an order. *Id.*; *Consent Confidentiality Order.* Ironically, while his compliance with court confidentiality orders was being litigated, on January 7, 2015, Mr. Kendrick filed another consented-to motion to include documents from the Cotting School under the protection of the Court's Consent Confidentiality Order in this case. *Joint Consented to Mot.* (ECF No. 287); *Order* (ECF No. 288).

In the unusual circumstances of this case, however, there has been a separate compelling reason to maintain confidentiality. The Plaintiffs are complaining that Mr. Kendrick has made manifestly serious and false accusations of sexual misconduct involving children against them, which have caused them damage, and they have come to Court to obtain, among other things, a court order requiring Mr. Kendrick to cease his campaign against them. The essence of the claimed damage to the Plaintiffs is the dissemination of the accusations and if the accusations continue throughout the litigation, the damages only persist.

More importantly, in order to prepare their cases, the rules of court require the parties, both the Plaintiffs and Mr. Kendrick, to exchange otherwise private information and the law empowers the lawyers to demand normally private information from third parties. FED. R. CIV. P. 26, 30. This type of discovery is essential to a properly functioning legal system in order to allow the parties to prepare for trial and to avoid trial by ambush. Often, as in this case, the law protects the parties from public disclosure of the sensitive information obtained during discovery. *United States v. Kravetz*, 706 F.3d 47, 55 (1st Cir. 2013) (noting that there is no public right of access to civil discovery). It is fundamentally unfair for Mr. Kendrick to use the information that the Plaintiffs and others are compelled by law to produce against them and thereby to escalate his allegations against the Plaintiffs.

The place to test the parties' positions is not on websites or email blasts; it is in the crucible of a court of law, where both parties are represented, witnesses testify under oath, exhibits are admitted under rules of evidence, instructions of law are

given, and an impartial jury deliberates and renders a verdict. The Court is in no position to prejudge who will prevail. However, if the Plaintiffs are successful and Mr. Kendrick's allegations are disproven, then Mr. Kendrick's dissemination of confidential material during the interval leading up to the trial and verdict will cause the Plaintiffs to lose for winning. Allegations of sexual misconduct, particularly in circumstances like this one, are so serious and lurid that they take on a life of their own and, if persistently repeated, no verdict will entirely undo the damage. Of course, it may be that the Plaintiffs are not able to prove their case and that Mr. Kendrick will be absolved of any liability. If that is the case, Mr. Kendrick's allegations will be vindicated and the Plaintiffs will lose but only after having received due process.

### C. The Four Civil Contempt Criteria

#### 1. Notice to Mr. Kendrick

The first *Saccoccia* criterion is met here. Mr. Kendrick himself proposed the first confidentiality order dated April 19, 2013 and the provisions of that Order and of the Memorandum Decision dated October 21, 2013 were applicable to the parties in this case, including Mr. Kendrick.

#### 2. Clear and Unambiguous

The second *Saccoccia* criterion is met as well. The April 19, 2013 Consent Confidentiality Order provided:

**5. Protection of Confidential Material.**

**(a) General Protections.** Documents designated CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER under this Order shall not be used or disclosed by the parties . . . for any purpose whatsoever other

than to prepare for and to conduct discovery and trial in this action, including any appeal thereof.

*Consent Confidentiality Order* at 3 (emphasis in original). The Consent Confidentiality Order went on to state:

> **(b) Limited Third-Party Disclosures.** The parties . . . shall not disclose or permit the disclosure of any CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER documents to any third person or entity except as set forth in subparagraphs (1)-(6).

*Id.* (emphasis in original). On October 21, 2013, the Magistrate Judge amended paragraph 15 of the confidentiality order as follows:

> **15. Use of Discovery.** This order forbids the use or disclosure of discovery information by the parties . . . for any purpose whatsoever other than to prepare for and present at trial in the above-captioned matter, including any appeal thereof. Information obtained through discovery shall not be used for any publications purposes or disseminated to anyone other than counsel for the parties, the parties – and in the case of the corporate party, a single representative – or their experts.

*Am. Confidentiality Order* at 6-7.

The Court concludes that these provisions are "clear and unambiguous" under *Saccoccia*. Mr. Kendrick had to understand that (1) he was a party to the litigation, (2) the Consent Confidentiality Order and the Court's later Order applied to him, (3) it strictly restricted the use he could make of the contents of documents marked "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER," and (4) the Orders expressly prohibited the dissemination of such confidential material disclosed during the discovery process to third parties. He also demonstrated his comprehension of these Orders during his testimony at the sanctions hearing. *See* Section II.B, *supra.*

Moreover, this was not Mr. Kendrick's first violation of the Court's confidentiality orders. On March 20, 2014, the Magistrate Judge sanctioned him $1,000.00 for disseminating confidential discovery material on August 17, 2013. *Sanctions Order* at 2, 4. Mr. Kendrick's disseminations that are the subject of the pending motions were made after the Magistrate Judge's March 20, 2014 Sanctions Order and Mr. Kendrick is not in a good position to assert he was unaware of the confidentiality orders and the need to comply with their terms.

### 3. Mr. Kendrick's Ability to Comply

The confidentiality orders in this case did not compel Mr. Kendrick to do anything to comply with their provisions; Mr. Kendrick was only required not to act, namely, not to disclose. The Court concludes that Mr. Kendrick had the ability to comply with the Court's orders. The third *Saccoccia* criterion has been satisfied.

### 4. The Violation of the Orders

The question narrows to whether under *Saccoccia* Mr. Kendrick violated these Orders as the Plaintiffs have alleged in their three pending motions.

### a. The Second Motion

The Plaintiffs' second motion for sanctions claims two violations of the Orders. First, the Plaintiffs assert that Mr. Kendrick violated the confidentiality orders by "bombarding third-party employer representatives of the witness with accusatory emails. . . ." *Pls.' Second Mot.* at 1-2. Specifically, they alleged that Mr. Kendrick had harassed, intimidated and bullied a key witness, Jessica Reitz, "by attacking her reputation at her employer, the United States Agency for International Development

(USAID)." *Id.* at 12. Next, the Plaintiffs assert that Mr. Kendrick published confidential deposition testimony from one of the alleged victims on "Reseaucitadelle.blogspot.com," which they maintain was the blog of both Mr. Kendrick and Cyrus Sibert. *Id.*

The Court concludes that on February 5, 2014, Mr. Kendrick violated the confidentiality orders of this Court by disseminating an email chain, including emails from Jessica Reitz, that had been produced in discovery and that were subject to the confidentiality orders of this Court. Mr. Kendrick did so by disseminating the email chain to Madame Arielle Jeanty Villedrouin of the Institut du Bien-Etre Social et de Rechereches (IBESR) of Haiti, by disseminating the email chain to a large number of email recipients at USAID and others, and by disseminating the email chain to Cyrus Sibert. Pls.' Ex. 6 (*Email from Paul Kendrick to Mme. Arielle Jeanty Villedrouin*); Pls.' Ex. 7 (*Email from Paul Kendrick to various recipients*); Pls.' Ex. 8 (*Web Posting on* http://reseaucitadelle.blogspot.com/2014/02/Haiti-pedophile-us-diplomats-protect-html). The Court also finds that Mr. Kendrick violated the confidentiality orders of this Court by disseminating the confidential deposition testimony of Mr. Viard to Mr. Sibert, which found its way to Mr. Sibert's blog. Pls.' Ex. 12 (http://reseaucitadelle.blogspot.com/2014/02/flash-de-la-cocaine-lorphelinat-saint_2).

The Court does not find that the Plaintiffs have proven by clear and convincing evidence that Mr. Kendrick actually posted or controlled the posting of either the Reitz email chain or Mr. Viard's deposition testimony on reseaucitadelle.blogspot. Mr. Kendrick acknowledged that reseaucitadelle.blogspot is a website of his Haitian

collaborator, Cyrus Sibert, but he emphasized that he does not control what Mr. Sibert publishes on his website. The Court does not accept the Plaintiffs' point, reiterated during cross-examination, that Mr. Kendrick admitted in his interrogatory answer that he controlled Mr. Sibert's website or blog. There is enough ambiguity in the way the Plaintiffs phrased the interrogatory to create a significant doubt as to whether Mr. Kendrick was in fact admitting he controlled the websites and blog sites listed in the answer.

This means that the Court holds Mr. Kendrick responsible for deliberately violating the Court's orders by dissemination, but not for publication on Mr. Sibert's website and blog site.

### b.    The Third Motion

The Plaintiffs' third motion claims that Mr. Kendrick mass emailed excerpts of an investigative report prepared by Attorney Rosario Rizzo and Investigator Edward Clark. *Pls.' Third Mot.* at 1-2. They say the report was designated confidential pursuant to the Confidentiality Order and after Mr. Kendrick's attorney inadvertently disclosed it, Mr. Kendrick mass emailed the information to "hundreds of third-party recipients in an effort to further defame and harass Plaintiffs[] and their supporters." *Id.* at 2. They also repeated the claim that Mr. Kendrick continued to use discovery information to destroy Jessica Reitz's livelihood. *Id.* at 2-3.

During his testimony at the January 30, 2015 hearing, Mr. Kendrick admitted that he had forwarded the excerpt of Father Unni's testimony about Mr. Shanley (i.e., the NAMBLA member) to "the world," including Homeland Security and IBESR.

*Sanctions Hr'g Tr.* 53:17-23, 55:11-12, 104:24-105:7. The Court concludes that by forwarding this discovery information to third parties, Mr. Kendrick violated the Court's confidentiality orders.

Regarding the Plaintiffs' claims that Mr. Kendrick used confidential discovery information in an attempt to get Ms. Reitz fired from her position at USAID, the Court addressed that issue in its discussion of the Plaintiffs' second motion.

### c.     The Fourth Motion

In Plaintiffs' fourth motion, they allege that on June 18, 2014, excerpts of confidential discovery deposition transcripts of two alleged victims were erroneously filed on the Court docket without seal and that when the error was discovered, defense counsel quickly moved to correct the error. *Pls.' Fourth Mot.* at 2-3. However, the Plaintiffs claimed that when Mr. Kendrick came upon the deposition excerpts, he "immediately and repeatedly mass e-mailed excerpts of these transcripts to hundreds of Plaintiffs' benefactors to harass, intimidate, and malign Plaintiffs' benefactors and further interfere with Plaintiffs' advantageous relationships with them." *Id.* at 3. They also asserted that he placed these transcripts on his website. *Id.*

The evidence establishes that on June 19, 2014, Mr. Kendrick forwarded to himself copies of excerpts from deposition transcripts of two alleged victims. Pls.' Ex. 15. During his testimony, Mr. Kendrick conceded that he sent excerpts of the transcripts to a number of people. *See* Section II.B.3, *supra*. Whether Mr. Kendrick knew that the deposition transcripts had been placed on PACER in error and should not have been disseminated is contested. During his January 30, 2015 testimony, he

denied it, saying that before becoming involved in this lawsuit, he did not know what PACER was, and that when something is posted on PACER, he has assumed it was public and could be disseminated without violating the Court's confidentiality orders. *See* Section II.B.4, *supra*.

Mr. Kendrick's profession of ignorance would be more credible if on March 20, 2014, the Magistrate Judge had not sanctioned him $1,000.00 for doing something similar on August 17, 2013. *Sanctions Order* at 2, 4. In the Magistrate Judge's words:

> The defendant seeks to avoid his clear violation of the consent confidentiality order and this court's order sealing the document on which the list appeared by asserting that it was his "understanding that documents available to the public through this Court's PACER system were not confidential, and in fact were published by the Court for the public's benefit." (citation omitted). This assertion is rejected. The document was labeled confidential, the motion seeking to rectify the filing error was promptly filed with a copy to the defendant through his attorneys, and the court's order granting the motion to seal the document was entered on the docket before the defendant's publication and also sent electronically to the defendant's attorneys. The confidential nature of the document could not have been clearer.

*Id.* at 2. The dissemination of these transcripts is remarkably similar to Mr. Kendrick's August 17, 2013 dissemination. The deposition transcripts are both marked "<u>Confidential Transcript</u>" on the front page. Pls.' Ex. 15 (emphasis in original).

In light of this history, the Court is exceedingly skeptical about Mr. Kendrick's insistence that he did not know that he should not have distributed these exhibits marked confidential. Even though the standard is a high one for the imposition of sanctions, the Court concludes that the Plaintiffs have established by clear and convincing evidence that Mr. Kendrick knowingly violated the Court's confidentiality

orders when he pulled this discovery from PACER and distributed it. The Court concludes that Mr. Kendrick knew that the material was subject to restrictions under the Court's order, but that he concluded that the contents of the material justified his violation.

### D. "What Would You Have Me Do?"

During his testimony, Mr. Kendrick justified his violations of the court orders by saying in effect that he was answerable to a higher imperative:

> There is a bigger thing here, sir, than a defamation lawsuit against me. It's about making sure that the poorest kids in Haiti are not raped each day by Mr. Geilenfeld; period, sir.

*Sanctions Hr'g Tr.* 61:14-17. Mr. Kendrick used an analogy to a burning building:

> You're creating scenarios where I'm walking by a burning building and I say nothing because someone has said don't say anything about any information that you discover on a certain street. This was about the rape of kids. What's [] so complicated about this, sir?

*Id.* 69:17-70:1.

Mr. Kendrick repeatedly answered Attorney Deane's questions with a question of his own: "What would you have me do?" *Id.* 62:11-12, 64:20-24. Mr. Kendrick's question, however, answers itself: Mr. Kendrick—like everyone else—must obey Court orders. Despite what he believes is the moral imperative of his cause, Mr. Kendrick does not stand above the law.

Developments in this case give some hope that Mr. Kendrick will stop violating the Court's confidentiality orders. First, Mr. Geilenfeld is currently incarcerated in Haiti and during his incarceration, even from Mr. Kendrick's perspective, Mr. Geilenfeld presents virtually no risk of harm to any children. Second, Mr. Kendrick

promised during his January 30, 2015 testimony to do what he should have done all along, namely, to consult with his attorneys before disseminating information about this case. *Id.* 107:17-22 (If confronted with a similar situation, "I would ask my attorneys to immediately approach the judge"). Third, at this point, Mr. Kendrick will have been sanctioned twice by the Court for disobeying its orders and, having been sanctioned twice, Mr. Kendrick should not test the patience of the Court a third time.

### E.    The Sanction

In their consolidated motion, the Plaintiffs ask the Court to consider a number of sanctions, beginning with a monetary sanction, leave to apply for an award of attorney's fees, findings of contempt, an order barring Mr. Kendrick from contesting his liability or advancing affirmative defenses, and entry of default judgment. *Pls.' Consolidated Mot.* at 45. Mr. Kendrick urges the Court not to be overly harsh, but he also recognizes that some sanction is likely forthcoming in view of his admitted violations. *Sanctions Hr'g Tr.* 114:22-115:16.

As a guide, the First Circuit has stated that "[c]ivil contempt may be imposed . . . to compensate a party harmed by non-compliance." *Saccoccia*, 433 F.3d at 27. "A trial court has wide discretion in its choice of sanctions." *Baella-Silva*, 454 F.3d at 12 (internal citations and quotation marks omitted). At the same time, the Court "must fashion sanctions that will ensure compliance with the Court's orders and at the same time correct some of the damage done by their violations." *Asociacion de*

*Suscripcion Conjunta del Seguro de Responsabilidad v. Sec'y of the Treasury of P.R.*, No. 08-1707 (JAF), 2013 U.S. Dist. LEXIS 4124, at *18 (D.P.R. Jan. 9, 2013).

Here, the Court is stymied because the harm caused by disseminating a false allegation is markedly different from the harm caused by disseminating a true one, and the resolution of the truth or falsity of Mr. Kendrick's accusations against Mr. Geilenfeld and Hearts with Haiti must await trial. But the Plaintiffs expended attorney's fees and costs for preparing the motions for sanctions and for preparing for and attending the January 30, 2015 testimonial hearing. Without speculating, in the circumstances of this case, the Court is unable to determine a proper measure of "make-whole relief." *Goya Foods*, 290 F.3d at 78.

Yet, this does not mean the Court is powerless to devise a measured remedy. An award of attorney's fees and costs is not uncommon for successful contempt motions. *See, e.g.*, *id.* (attorney's fees and costs are "normal embellishments . . . to the actual losses sustained by the injured party"); *Bear Republic Brewing Co. v. Cent. City Brewing Co.*, 887 F. Supp. 2d 331, 334 (D. Mass. 2012) ("The determination of an appropriate sanction shall await Bear Republic's filing of an application for attorney['s] fees and costs incurred in prosecuting the motion for contempt"); *Nat'l Glass & Gate Serv. v. Serv. Everywhere, LLC*, No. 08-186S, 2009 U.S. Dist. LEXIS 95202, at *8 (D.R.I. Sept. 24, 2009) (recommending the granting of a motion for award of attorney's fees and costs); *Hall v. Striper Marina, Inc.*, No. 08-427 S, 2009 U.S. Dist. LEXIS 49625, at *1-4 (D.R.I. June 12, 2009) (awarding travel expenses, fees and costs for appearing at a settlement conference without full settlement authority).

Here, especially where the earlier sanction of $1,000.00 did not deter Mr. Kendrick, the Court resolves that to require him to pay a reasonable attorney's fee and costs for the motions that his violations of the confidential orders necessitated is, in the Court's view, the most appropriate sanction. The Court observes that in preparing this motion for award of attorney's fees, Norman, Hanson & DeTroy should be conservative in its billing, and know that the Court is aware that the Plaintiffs did not prevail on all matters that the Plaintiffs pressed during their briefing and presentation. The Court expects Norman, Hanson & DeTroy not to claim payments for time spent on those parts of the motions for sanctions that were not pressed or that did not result in a favorable ruling.

To this end, the Court orders Norman, Hanson & DeTroy to submit an application for approval of the attorney's fees and costs it expended in preparing and prosecuting the motions within fourteen (14) days of the date of this Order. Mr. Kendrick may file an objection to the amount of the requested attorney's fees within seven (7) days of Norman, Hanson & DeTroy's filing.

V.    **CONCLUSION**

The Court GRANTS in part and DENIES in part the Plaintiffs' Consolidated Second, Third, and Fourth Motions for Sanctions and Findings of Contempt Against Defendant (ECF No. 266). The Court finds Paul Kendrick in contempt of Court for violating the Consent Confidentiality Order (ECF No. 16) of this Court dated April 19, 2013 and the Memorandum Decision on Motions to Retain Classified Designation

(ECF No. 81) dated October 21, 2013.  The Court finds that Mr. Kendrick violated the Court's confidentiality orders as follows:

(1) By disseminating to multiple third parties an email chain that had been produced in discovery regarding Jessica Reitz;

(2) By disseminating to Cyrus Sibert excerpts of transcripts of confidential depositions of alleged victims;

(3) By disseminating to multiple third parties excerpts of a transcript of the testimony of Father John Unni concerning the investigative findings of attorney Rosario Rizzo and former FBI agent Edward Clark; and

(4) By disseminating to multiple third parties excerpts of transcripts of confidential depositions of alleged victims.

The Court ORDERS a sanction in the amount of attorney's fees and costs necessitated by Defendant Paul Kendrick's contempt of court.  It otherwise DENIES the Plaintiffs' Consolidated Second, Third, and Fourth Motions for Sanctions and Findings of Contempt Against Defendant (ECF No. 266).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of February, 2015