UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| HEARTS WITH HAITI, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    2:13-cv-00039-JAW ) |
| PAUL KENDRICK, | ) ) |
| Defendant. | ) |

**SECOND ORDER REGARDING THE EXPERT TESTIMONY
OF GEOFFREY SCOTT HAMLYN**

With trial looming, the Court held a *Daubert* hearing to determine whether and the extent to which a Plaintiffs' expert will be allowed to testify as an expert at trial. The Court concludes that the expert does not possess expert qualifications in standard deviation analysis or in reach extender analysis; however, the Court also concludes that the expert may testify about his comparative statistical analysis, comparing Plaintiff Hearts With Haiti, Inc.'s fundraising success with that of similar organizations.

**I.    BACKGROUND**

On September 24, 2014, the Court dismissed the Defendant Paul Kendrick's motion in limine concerning the proposed expert testimony of Geoffrey Scott Hamlyn, Executive Director of Hearts With Haiti, Inc. (HWH), in anticipation of further development at trial. *Order Dismissing Def.'s Mot. in Limine* (ECF No. 264) (*Order*).

With trial looming, the Court held a *Daubert*[1] hearing on June 18, 2015 during which Mr. Hamlyn testified. *Minute Entry* (ECF No. 379). The Court's September 24, 2014 Order set forth the applicable legal principles, which the Court will not reiterate here. At the June 18, 2015 hearing, the Court suggested that it appeared the scope of Mr. Hamlyn's testimony had been narrowed and asked the Plaintiffs to clarify the content of Mr. Hamlyn's proposed expert testimony. On June 22, 2015, the Plaintiffs filed a clarification, representing that Mr. Hamlyn would not be proffered to testify that the likely cause of HWH's comparative lack of fundraising success after January 2011 was Mr. Kendrick's communications to HWH, SJF (Saint Joseph Family) and Mr. Geilenfeld's donors. *Clarification of Anticipated Expert Test. of Geoffrey Hamlyn* (ECF No. 385) (*Pls.' Clarification*). Instead, the Plaintiffs plan to limit his expert testimony to "his comparative market trend analysis." *Id.* at 1.

## II.   GEOFFREY SCOTT HAMLYN'S PROPOSED TESTIMONY

On June 22, 2015, the Plaintiffs filed a sworn statement from Geoffrey Scott Hamlyn setting forth thirty-seven separate paragraphs of his proposed testimony. *Id.* Attach. 1 *Decl. of Geoffrey Hamlyn Pursuant to 28 U.S.C. § 1746* (*Hamlyn Decl.*). As previously noted, in their clarification, the Plaintiffs stated that they will not proffer Mr. Hamlyn's testimony to the effect that HWH's decline in fundraising was the likely result of the Defendant's defamation. *Pls.' Clarification* at 1. They also assert that they intend to offer Mr. Hamlyn as a fact, not an expert witness on his

---

[1]   *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

"personal knowledge and experiences under Rule 701," which, they say, is "not the subject of the Court's *Daubert* inquiry." *Id.*

Mr. Hamlyn was employed from July 2011 to July 2014 as the Executive Director of HWH and has been designated to offer opinion testimony about his comparative analysis of the Plaintiffs' damages. *Hamlyn Decl.* ¶¶ 1-3.

### A.   Methodology

Mr. Hamlyn proposed to testify about his "comparative analysis of 2009-2013 revenue among a sample of nonprofits operating in Haiti with the corresponding revenue of [HWH] during the same period." *Id.* ¶ 4. Noting that the January 2010 earthquake in Haiti presented "unique circumstances," Mr. Hamlyn declined to track only HWH's financial results and instead he compared the HWH results against "nonprofits operating in Haiti." *Id.* ¶ 5.

Mr. Hamlyn "conducted a survey of an online database of U.S. nonprofits and their financial information, www.Guidestar.org, to determine the trends of giving to nonprofits operating in Haiti focusing on the percentage change in revenue during the period of 2009 to present." *Id.* ¶ 6. Mr. Hamlyn explained that he undertook a keyword search for "Haiti" using GuideStar's search engine and in order to obtain an "unbiased sampling of organizations, the 'advanced search' feature was not utilized to filter the keyword search based on U.S. geographic location, income, or assets." *Id.* ¶ 7.

From approximately 1,700 search results for the keyword, "Haiti," Mr. Hamlyn produced a "random sample" of 100 nonprofits, including HWH, for "in-depth analysis

of publicly available financial records." *Id.* ¶ 8.  He further reduced this group of 100 nonprofits to 29, "based upon publicly [sic] availability of financial records." *Id.* ¶ 9.  To arrive at this number, he eliminated "nonprofits that did not have digitized financial profiles on GuideStar at the time of evaluation." *Id.*  He also eliminated "nonprofits whose financial information for calendar or fiscal years 2009, 2010 and [/] or 2011 was not available on GuideStar." *Id.* ¶ 10.  As of February 2014, he "did not access several nonprofits' financial information for fiscal and calendar years 2012 because their 990s had not yet been collected, analyzed, verified, and published by GuideStar on its online database." *Id.* ¶ 13.

    **B.**    **2009-2011**

Mr. Hamlyn incorporated the data for calendar and fiscal years 2009, 2010 and 2011 in "comma-separated value (CSV) format directly from GuideStar" and "incorporated into a table for purpose of comparative analysis." *Id.* ¶ 14.  Mr. Hamlyn then calculated the "[p]ercentage change in revenue from 2009-2010 and 2010-2011 . . . for each nonprofit." *Id.* ¶ 15.  "These results, not including HWH's data, were then averaged and the standard deviation of percentage change was calculated for 2009-2010 and 2010-2011." *Id.*  Mr. Hamlyn compared "HWH's change in revenue with the average percentage change in revenue of the nonprofits surveyed serving as a benchmark for the broader market trend." *Id.* ¶ 16.  Mr. Hamlyn found that HWH had "the third greatest year-to-year percentage increase from 2009-2010 (349%) and the greatest percentage decrease from 2010-2011 (-72%)." *Id.* ¶ 17.  Mr. Hamlyn also found that "[o]n average, in 2011 each surveyed nonprofit was able to raise 89% of

4

the revenue it raised in 2010, after experiencing peak giving in the aftermath of the earthquake. In 2011, HWH raised 28% of its 2010 peak revenue mark." *Id.*

Mr. Hamlyn explained that "HWH was particularly successful at soliciting donations during calendar year 2010 in the aftermath of the January 12, 2010 earthquake which destroyed two of [SJF]'s three children's homes' facilities." *Id.* ¶ 19. However, "after Mr. Kendrick began his communications to HWH's and SJF's and Michael Geilenfeld's donors in January 2011, HWH experienced the worst percentage decline in revenue from calendar year 2010 to 2011." *Id.*

Mr. Hamlyn opined that if HWH had "followed the market trend in 2011, it would have experienced an 11% decline in donation revenue from 2010 to 2011." *Id.* ¶ 21. Noting that HWH's actual revenue for 2011 was $557,464, Mr. Hamlyn expressed the view that its projected revenue would have been $1,754,928, a difference of $1,197,464 for 2011. *Id.*

C.  2012

Mr. Hamlyn stated that on April 16, 2014, he obtained "the majority of the surveyed nonprofits' financial information for fiscal and calendar years 2012." *Id.* ¶ 22. For those nonprofits whose 2012 data did not appear in GuideStar, Mr. Hamlyn found financial information in the organization's Form 990. *Id.* He noted that the financial information for these nonprofits is not yet available for year 2013. *Id.* Using the same method as before, Mr. Hamlyn calculated the "[p]ercentage change in revenue from 2010-2012 . . . for each nonprofit." *Id.* ¶ 24. "These results, not including HWH's data, were then averaged and the standard deviation of percentage

5

change was calculated for 2010-2012." *Id.* Mr. Hamlyn then compared "HWH's change in revenue with the average percentage change in revenue of the nonprofits surveyed serving as a benchmark for the broader market trend." *Id.* ¶ 25.

For the year 2012, Mr. Hamlyn found that the "average percentage change in revenue of the surveyed nonprofits from 2010 to 2012 was -9%." *Id.* ¶ 26. In other words, "in 2012 each surveyed nonprofit was able to raise 91% of the revenue it raised in 2010, two years after it experienced peak giving in the aftermath of the earthquake." *Id.* By contrast, HWH "experienced the greatest percentage decrease in revenue from 2010-2012, -74%. In 2012, two years after the earthquake, HWH raised 26% of its 2010 peak revenue mark." *Id.* ¶ 27.

Mr. Hamlyn opined that if HWH had "followed the market trend in 2012, it would have experienced a 9% decline in donation revenue from 2010 to 2012." *Id.* ¶ 28. "HWH's 2012 projected revenue would have been $1,793,609; HWH's actual revenue in 2012 was $518,618. The difference between HWH's projected revenue and actual revenue for 2011, $1,274,991, represents HWH's lost revenue for calendar year 2012." *Id.*

D. 2013

On May 20, 2015, Mr. Hamlyn obtained "the majority of the surveyed nonprofits' financial information for fiscal and calendar years 2013." *Id.* ¶ 29. For those nonprofits whose information was not available on GuideStar, Mr. Hamlyn obtained their information on the Form 990s. *Id.* The data for 2014 was not yet available as of June 2015. *Id.* Using the same methodology, Mr. Hamlyn averaged

6

the revenue from each nonprofit and applied a standard deviation of percentage change for 2010-2013.  *Id.* ¶ 31.  He compared the data of the benchmark nonprofits with HWH's 2013 performance.  *Id.* ¶ 32.

Mr. Hamlyn found that the average percentage change in revenue from 2010 to 2013 was -9% and on average, each "nonprofit was able to raise 91% of the revenue it raised in 2010." *Id.* ¶ 33.  But HWH "experienced a percentage decrease in revenue from 2010-2013 of -52%" or "48% of its 2010 peak revenue mark." *Id.* ¶ 34.  Applying the same analysis, Mr. Hamlyn stated that if HWH had "followed the market trend in 2013, it would have experienced a 9% decline in donation revenue from 2010 to 2013." *Id.* ¶ 35.  In numbers, HWH's projected revenue for 2013 would have been $1,793,416 and its actual revenue was $951,082.  *Id.*  He opined that $842,334 "represents HWH's lost revenue for calendar year 2013." *Id.*

E.     **Summary**

In paragraph 36 of his declaration, Mr. Hamlyn summarized his opinion:

While HWH was particularly successful at soliciting donations in response to the earthquake of January 12, 2010 it, conversely, experienced the worst percentage decline in revenue in both 2010-2011 and 2010-2012 time periods.  Moreover, while the nonprofits evaluated enjoyed robust growth over the four-year period from 2009-2012, HWH's growth was anemic, at only 18%.  The comparative analysis demonstrates that the dramatically increased financial support achieved by the entire Haiti nonprofit sector was maintained throughout 2011, into 2012, and into 2013.  That is to say that dramatically increased financial support for the Haiti nonprofit sector peaked in 2010, but the sector was able to maintain much of the increased donor capacity brought about as a result of increased interest and need following the earthquake.  By contrast HWH suffered precipitous, statistically significant losses that are not in line with market treads for this time period.

*Id.* ¶ 36.

### III.   THE SEPTEMBER 24, 2014 ORDER

In its September 24, 2014 Order, the Court expressed misgivings about whether Mr. Hamlyn's education alone would have qualified him to testify as an expert in the field of financial or statistical analysis. *Order* at 8 ("With only this distance learning course in his field of expertise, Mr. Hamlyn's formal educational background would raise questions about whether he qualifies as an expert in financial or statistical analysis"). The Court was also concerned about whether his on-the-job training in the field of statistical and financial analyses was sufficient to qualify him as an expert. *Id.* at 9 ("Here, the evidence in the record of Mr. Hamlyn's on-the-job training in the field of statistical and financial analysis is thin"). The Court was specifically doubtful about whether Mr. Hamlyn would qualify to testify as an expert in standard deviation analysis. *Id.* at 9 n.4.

In addition, at one point, Mr. Hamlyn had been designated as an expert to testify about a "reach extender" analysis in which he identified prominent people in the New England market who had advocated for HWH in the past and had stopped doing so, leading others to stop giving to HWH. *Id.* at 10-15; *Tr. of Proceedings* 48:2-18 (June 18, 2015) (ECF No. 382) (*Daubert Tr.*). The Court was dubious about whether, if the donors themselves did not testify, Mr. Hamlyn would be allowed to testify about the asserted motivations of donors. *Order* at 12 ("The problem relates to the facts and opinions underlying Mr. Hamlyn's opinion and the extent to which Mr. Hamlyn should be allowed to testify to them").

In its Order, the Court noted that even though Mr. Hamlyn's qualifications to perform statistical and financial analyses seemed thin, it was possible "that he has gained sufficient experience based on his past and current employment to perform this analysis and to testify as an expert." *Id.* at 9. The Court wrote that it would "require the Plaintiffs to present evidence out of the hearing of the jury as to Mr. Hamlyn's work or experience qualifications that allow him to present the type of statistical and financial analysis for which he has been proffered." *Id.* at 10.

## IV.   THE JUNE 18, 2015 *DAUBERT* HEARING

### A.   Geoffrey Scott Hamlyn's Qualifications

#### 1.   Formal Education

At the June 18, 2015 *Daubert* hearing, Mr. Hamlyn testified that he received a bachelor's degree in music from the University of Texas Austin. *Daubert Tr.* 19:3-11. He went to graduate school at The Julliard School of Music in New York City, receiving a master's degree in music in viola performance. *Id.* 19:12-15. He is currently enrolled at Duke University in a master's of public policy degree program. *Id.* 19:16-20. In 2013, Mr. Hamlyn took one extension course in introductory statistics, and one in microeconomics, through the University of California at Los Angeles' Extension Service (UCLA). *Id.* 19:21-20:1. At Duke, in the fall of 2014, he took a course in intermediate statistics and in the spring of 2015, a more advanced quantitative methods course. *Id.* 20:2-7. He has also taken two microeconomics courses at Duke. *Id.* 20:7-8.

#### 2.   On-The-Job Training

### a.     Changing Our World

From 2010 through 2011, Mr. Hamlyn worked as an intern and as an associate for Changing Our World in New York City.  *Id*. 20:17-23.  Changing Our World is a "major, international consulting firm that works specifically with nonprofit organizations and corporate giving programs to help them identify new funders and to align their missions with causes that they endeavor to support."  *Id*. 21:1-5.  First as an intern and later as an associate, Mr. Hamlyn assisted in the preparation of comparative analyses.  *Id*. 21:9-11.  Mr. Hamlyn worked as "part of a team" for Changing Our World "to establish a large set of deliverables that showcased the organization's trend in terms of its revenue generation and juxtaposed against the trends of the organizations and comparative set."  *Id*. 22:18-22, 24:24.  Acknowledging that he came to Changing Our World with a background in music, Mr. Hamlyn explained that as an intern he was "learning on the job" and he acknowledged that he "did not possess the skills necessary at the time of arrival."  *Id*. 24:5-10.  However, he "learned quickly from [his] supervisors about how to do comparative analysis and all the other types of duties that [he] ended up fulfilling at Changing Our World."  *Id*. 24:10-13.  He continued this type of analysis as an associate.  *Id*. 24:13-16.

### b.     Hearts With Haiti

Mr. Hamlyn left Changing Our World to work for HWH in the summer of 2011. *Id*. 26:4-10.  Mr. Hamlyn explained that HWH hired him to "shore up their fundraising."  *Id*. 26:16-17.  Mr. Hamlyn described his duties at HWH as including: (1) creating a budget for the capital campaign; (2) repeatedly revising the budget for

10

the capital campaign; (3) preparing for a yearly audit; (4) devising an annual budget; and (5) toward the end of his employment, making monthly income projections. *Id.* 27:2-14. Mr. Hamlyn testified that he performed comparative analyses for HWH that were "very similar" to the comparative analyses he had performed for the Global Health Council while he was working for Changing Our World. *Id.* 27:16-28:1. At HWH, he described performing a comparative analysis by using the same methodology set forth in his expert designation. *Id.* 28:3-14.

### B. Cross-Examination

On cross-examination, Mr. Hamlyn acknowledged that he had performed his initial analysis before he entered the master's degree program at Duke; however, he also said that he had updated the analysis. *Id.* 30:21-31:3. He conceded that he had never undertaken a lost profits analysis before this lawsuit. *Id.* 31:4-8. Regarding his responsibility for the comparative analyses projects, Mr. Hamlyn explained that at Changing Our World, the work was done in teams and as an associate, he conducted the research and the senior members of the team were "client facing" and that they "review[ed] the research conducted by the associates." *Id.* 31:9-17.

Mr. Hamlyn was then cross-examined about his methodology, his use of a random or unbiased samples, his use of the general category of "revenue" in his analysis, and his causation opinions, among other things. *Id.* 34:5-62:16.

## V. DISCUSSION

### A. Standard Deviation Analysis

11

The Court concludes that Mr. Hamlyn is not qualified to testify as an expert in standard deviation analysis.[2]  The Court raised this specific concern about Mr. Hamlyn's qualifications in its September 24, 2014 Order.  *Order* at 9 n.4 ("The Court wonders whether Mr. Hamlyn's distance learning course qualifies him to perform a standard deviation analysis and is concerned that this part of his opinion may make his conclusions seem more reliable than they actually are").

In their presentation, the Plaintiffs failed to address the Court's concern.  His educational background does not qualify him as an expert in standard deviation analysis.  Neither Mr. Hamlyn's undergraduate nor graduate degrees touched on this subject.  Although Mr. Hamlyn received some basic education in statistics, including one online statistics course at UCLA and two statistics courses at Duke and although standard deviation analysis is often taught in statistics courses, there is no evidence that Mr. Hamlyn has ever received formal training in standard deviation analysis.  Mr. Hamlyn did not mention his education in standard deviation analysis during his June 18, 2015 testimony and there is no evidence as to where, if anywhere, he learned how to perform this type of analysis.  Regarding on-the-job training, on cross-

---

[2]   It is unclear whether the Plaintiffs intend to offer Mr. Hamlyn's opinions as an expert in standard deviation analysis.  In his June 12, 2015 sworn declaration, Mr. Hamlyn repeatedly referred to his standard deviation analysis and stated that he had calculated the standard deviation for different periods.  *Hamlyn Decl.* ¶¶ 15, 24, 31 (e.g. "These results, not including HWH's data, were then averaged and the standard deviation of percentage change was calculated for 2009-2010 and 2010-2011").  However, at the *Daubert* hearing, when asked about his proposed testimony, Mr. Hamlyn asserted that "the standard deviation and the confidence interval was not cited in the recent affidavit." *Daubert Tr.* 42:25-43:3.  In any event, upon questioning, he represented that he did not plan on testifying at trial about a standard deviation statistical analysis that he performed for the purpose of identifying charitable giving trends for Haiti.  *Id.* 43:4-8.  The Court's ruling clarifies that if Mr. Hamlyn intends to present testimony on direct examination about a standard deviation analysis, he may not do so.

examination, Mr. Hamlyn confirmed that he had never performed a standard deviation statistical analysis for an employer. *Daubert Tr.* 32:12-15. There is no basis in this record to conclude that he received any formal or on-the-job training in standard deviation calculation.

In short, Mr. Hamlyn is not an expert in standard deviation analysis and may not express expert opinions on this subject during his direct testimony.

### B.    Reach Extender Analysis

As expressed in its September 24, 2014 Order, one of the Court's major concerns about Mr. Hamlyn's proposed expert testimony was his reach extender analysis, which included opinions about the reasons for HWH's disappointing fundraising results after 2010. *Order* at 10-15. However, at the *Daubert* hearing, after Mr. Hamlyn testified that he intended to present his reach extender analysis at trial, *Daubert Tr.* 48:2-7, Attorney Deane confirmed that Mr. Hamlyn was not going to express an opinion on his reach extender analysis at trial. *Id.* 58:18-59:2.

Based on the Plaintiffs' concession, which is consistent with the Court's earlier misgivings, the Court rules that Geoffrey Scott Hamlyn may not testify during direct examination about his reach extender analysis in this case.

### C.    Comparative Statistical Analysis

#### 1.    Education

In its September 24, 2014 Order, the Court wrote that "[a]ssuming the Plaintiffs are able to demonstrate that Mr. Hamlyn is an expert, the Court has no compunctions about allowing him to testify to the core findings in his statistical and

13

financial analysis." *Order* at 10. At the *Daubert* hearing, the following exchange took place:

> Q. Do you consider yourself to be a statistician?
> A. I am a public policy professional, and I have taken advanced coursework in statistics and economics.
> Q. One course in statistics, is that correct?
> A. I've taken three courses in statistics.
> Q. Do you feel that three courses in statistics can make a person qualified to testify as an expert in statistics or any subject, for that matter?
> A. I'm not qualified to demonstrate whether or not I'm an expert. That's a legal issue. I do believe that I possess expertise on this issue and that I have the qualifications necessary to render judgment on it.

*Daubert Tr.* 32:16-33:2. The Court concludes that Mr. Hamlyn's three courses in statistics do not qualify him as an expert in statistics. However, this does not answer whether Mr. Hamlyn must be a statistician to render his opinion, however characterized.

### 2. On-the-Job Experience

The Plaintiffs presented Mr. Hamlyn's on-the-job experience in preparing "comparative statistical" analyses in rather broad strokes. The Court gleans from his testimony that he worked as an intern and associate from 2010 to sometime in 2011 in assisting the preparation of similar analyses for Changing Our World, in particular for one project involving Global Health Council, and when he joined HWH in 2011, along with a number of other duties, he performed a similar comparative statistical analysis.

### 3. Geoffrey Scott Hamlyn's Expert Testimony: Less Than Meets the Eye

In general, expert opinions are admissible if they are "relevant not only in the sense that all evidence must be relevant [pursuant to Federal Rule of Evidence 402], but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). In other words, "[t]he fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is 'whether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved.'" *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995) (quoting *United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994)) (internal punctuation omitted). Here, the Court concludes that Mr. Hamlyn's testimony is relevant to an important fact in issue, namely, the extent to which HWH suffered financial losses from 2011 onward.

Also, the Court concludes that his testimony will likely "'assist the trier of fact to understand or determine a fact in issue.'" *First Marblehead Corp. v. House*, 541 F.3d 36, 42 (1st Cir. 2008) (quoting *Ruiz-Troche*, 161 F.3d at 81). The Plaintiffs argue that the impact of Mr. Kendrick's statements about HWH is especially difficult to quantify because the January 2010 earthquake resulted in a massive infusion of charitable funds for nonprofit organizations operating in Haiti and this degree of charitable giving was not likely to continue at the same pace as publicity about the earthquake diminished. The Plaintiffs also assert that as Mr. Kendrick began

15

commenting about HWH in 2011, the impact of his accusations on fundraising can best be measured by comparing its fundraising results with the fundraising results of other Haitian-oriented nonprofits.  This evidence, if believed, would assist the jury in determining whether HWH suffered a loss in fundraising from 2010 through 2013 and the extent of that loss.

The Defendant's major complaint about Mr. Hamlyn's testimony is that he is not qualified "by knowledge, skill, experience, training, or education" to testify as an expert.  FED. R. EVID. 702.  The Court agrees with the Defendant to some extent and it has winnowed some of Mr. Hamlyn's opinions, such as his standard deviation analysis, because it is a comparatively arcane area of statistics and the Court has not been convinced that he is sufficiently qualified to express those opinions.

However, the Court concludes that Mr. Hamlyn is qualified to present to the jury what he terms a "comparative statistical analysis," comparing HWH's fundraising results to the fundraising results of comparable organizations.  First, it strikes the Court that, even though Mr. Hamlyn dresses up his opinion as a "comparative statistical analysis," the nub of his opinion is much less than meets the eye.  All Mr. Hamlyn has done is to start with the fundraising results of a known entity, HWH, over the period from 2010 through 2013, and compared those results during the same interval to similar organizations.

Mr. Hamlyn's degree of training and experience with these analyses is not exactly overwhelming. Nevertheless, the First Circuit has written that to be qualified as an expert, "[i]t is not required that experts be 'blue-ribbon practitioners' with

16

optimal qualifications." *United States v. Vargas*, 471 F.3d 255, 262 (1st Cir. 2006) (quoting *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006)). Instead, "experts come in various shapes and sizes; there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos v. Posadas de P.R. Assocs., Inc.*, 452 F.3d 59, 63 (1st Cir. 2006). Thus, the First Circuit has allowed law enforcement officers to testify as experts on how drug organizations work, even though these opinions are not subject to peer review and are not susceptible to scientific testing. *United States v. Rosa-Carino*, 615 F.3d 75, 80-81 (1st Cir. 2010). In view of the nature of the proffered testimony, the Court concludes that by virtue of his on-the-job training and experience, Mr. Hamlyn has squeaked by the Rule 702 standard to express his judicially-truncated expert opinions.

### 4. The Potential for Prejudice

One danger in allowing Mr. Hamlyn to testify as an expert is that the jury will place undue emphasis on his status as an expert; what the United States Supreme Court described as the potential for expert testimony to be "both powerful and quite misleading." *Daubert*, 509 U.S. at 595. Nevertheless, rather than exclusion, having met the minimum standard for expert testimony, the strength or weakness of Mr. Hamlyn's training and experience goes "to the weight of the proffered testimony, not to its admissibility." *Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007). The Defendant raises a number of questions about the foundational adequacy of Mr. Hamlyn's opinions; however, as the Supreme Court wrote in *Daubert*:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

509 U.S. at 596.

## VI. CONCLUSION

The Court GRANTS in part and DENIES in part the Defendant's Renewed Motion to Exclude Expert Testimony of Mr. Hamlyn (ECF No. 387). The Court rules that Mr. Hamlyn may not testify on direct examination about his standard deviation analysis or about his reach extender analysis. The Court rules that Mr. Hamlyn may testify as an expert regarding his comparative statistical analysis.

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of June, 2015