# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

HEARTS WITH HAITI, INC.,     )
et al.,     )
    )
       Plaintiffs,     )
    )
      v.     )     2:13-cv-00039-JAW
    )
PAUL KENDRICK,     )
    )
       Defendant.     )

## ORDER ON DEFENDANT'S RULE 59 MOTION FOR A NEW TRIAL OR ALTERNATIVE POST-JUDGMENT RELIEF AND PLAINTIFFS' RULE 59(e) MOTION TO ALTER OR AMEND JUDGMENT TO INCLUDE PRE- AND POST-JUDGMENT INTEREST, TO INCLUDE THE APRIL 22, 2015 SANCTION, AND TO REFLECT DISMISSAL WITHOUT PREJUDICE OF PLAINTIFFS' PUNITIVE DAMAGES CLAIMS

At some point, Paul Kendrick, a passionate and relentless advocate for abused children, became convinced that Michael Geilenfeld, the founder and owner of an orphanage for boys in Haiti, had been sexually abusing some of the boys in his care. Mr. Kendrick not only accused Mr. Geilenfeld of sexual misconduct but also charged Hearts with Haiti, a United States not-for-profit corporation created to raise funds for Mr. Geilenfeld's orphanage, with enabling Mr. Geilenfeld's predation. Mr. Geilenfeld and Hearts with Haiti sued Mr. Kendrick in federal court in Maine under various legal theories, most notably defamation.

A little more than two years later, after a rancorous discovery period, the case went to trial on July 6, 2015. It was an emotional and contentious trial. The parties called twenty-five witnesses and introduced over two hundred exhibits into evidence.

Mr. Geilenfeld took the stand and steadfastly denied the charges of child sex abuse; numerous witnesses involved in the orphanage either directly or as fundraisers testified for him.  In addition to his own testimony, Mr. Kendrick called seven men as witnesses who testified either in court or by deposition that Mr. Geilenfeld had in fact sexually abused them.  With the evidence in irreconcilable conflict, the parties presented the case for resolution to the jury.

On July 23, 2015, after thirteen days of testimony, the jury rendered a verdict that represented a resounding vindication for Mr. Geilenfeld.   The jury found that Mr. Kendrick had negligently defamed Mr. Geilenfeld and Hearts with Haiti, that he had defamed them knowing that the statements were false or making the statements with reckless disregard to their truth, that he tortiously interfered with their advantageous economic relations, and that he had placed Mr. Geilenfeld in a false light.  The jury awarded $7,000,000 to Mr. Geilenfeld and $7,500,000 to Hearts with Haiti.

Post-trial motions followed.  Mr. Kendrick seeks a new trial based on asserted legal errors committed by the trial court, demands a steep reduction in the amount of the verdicts, which he contends are excessive, and asks the Court to rescind its earlier sanction order that imposed an $8,000 penalty against Mr. Kendrick.  Despite their unconditional victory, the Plaintiffs are not satisfied either.  They filed their own post-trial motion, demanding pre- and post-judgment interest, urging the Court to retain its earlier sanction order of $8,000, and rankling at the Court's dismissal of their punitive damages count with prejudice.

Except for the motion to revisit the sanctions order, the Court denies Mr. Kendrick's motions. The Court is not convinced that it erred in allowing the Plaintiffs to present evidence that Mr. Kendrick's tortious conduct caused Mr. Geilenfeld's arrest and imprisonment in Haiti. Turning to the damages awards, the Court will not disturb the considered and unanimous judgment of a federal jury. In the exercise of its discretion, the Court grants the motion to rescind the $8,000 sanction for Mr. Kendrick's discovery violation with the sole caveat that if the verdict is substantially altered, the Plaintiffs may return to the Court and reargue the sanctions issue. The Court also grants the Plaintiffs pre- and post-judgment interest as provided by Maine law, excluding a period of prejudgment interest caused by the Plaintiffs' requested continuances. The Court declines to dismiss the punitive damages count without prejudice unless the verdicts that precipitated the Plaintiffs' decision not to proceed with the punitive damages count are substantially revised.

## I.    FACTS

### A.    The Parties

#### 1.    The Plaintiffs

Hearts With Haiti (HWH) is a nonprofit corporation with a mission to provide support to disabled and disadvantaged Haitian children. *Compl.* at 1 (ECF No. 1) (*Compl.*). Michael Geilenfeld, a resident of Pétion–Ville Commune, Port–au–Prince Arrondissement, Republic of Haiti, is the founder and Executive Director of St. Joseph Family of Haiti. *Id.* ¶ 2. Mr. Geilenfeld has been involved with several

organizations that help Haitian children in different ways. *Id.* ¶¶ 7–39. HWH was established in 2001 to support these organizations. *Id.* ¶¶ 40–42.

### 2.   The Defendant

Paul Kendrick is a resident of Freeport, Maine. *Id.* ¶ 3. In 2011, after Mr. Kendrick became aware of allegations that Mr. Geilenfeld was abusing Haitian children, according to Mr. Kendrick, he believed the allegations to be true. Mr. Kendrick then engaged in a campaign in which he emailed and published statements to warn numerous third parties about Mr. Geilenfeld's alleged abuse of children; those third parties included benefactors of HWH. *Id.* ¶¶ 47–67. *See also Order Denying Def.'s Mot. for Partial Summ. J.*, at 4–42 (ECF No. 237) (*Partial Summ. J. Order*) (recounting examples of Mr. Kendrick's communications). Mr. Kendrick also accused HWH of funding Mr. Geilenfeld's alleged sexual abuse and turning a blind eye to the child sexual abuse allegations despite knowing or having reason to know that Mr. Geilenfeld was sexually abusing children. *See Partial Summ. J. Order* at 4–42.

### B.   Procedural History

### 1.   The Initiation of the Lawsuit

Stung by what he claimed were Mr. Kendrick's false allegations of child sexual abuse, on February 6, 2013, Mr. Geilenfeld and HWH filed suit in this Court against Mr. Kendrick, alleging he had defamed them, had placed Mr. Geilenfeld in a false

4

light,[1] and had tortiously interfered with advantageous business relations; the Plaintiffs sought damages against Mr. Kendrick. *Compl.* at 1–20. On March 8, 2013, Mr. Kendrick answered the Complaint, admitting some and denying other allegations, and asserting, among other affirmative defenses, the affirmative defense of truth or lack of falsity. *Defenses and Answer* (ECF No. 8).

### 2. Delay Caused by Mr. Geilenfeld's Imprisonment

The trial was originally scheduled to begin on October 7, 2014. *Trial List* (ECF No. 231). On September 23, 2014, counsel for the Plaintiffs informed the Court that Haitian authorities had arrested Mr. Geilenfeld in Haiti and the Plaintiffs asked the Court to continue the trial for ninety days. *Oral Mot. to Continue* (ECF No. 260). On the same day, the Court granted Mr. Geilenfeld's motion. *Oral Order Granting Mot. to Continue Trial for 90 Days* (ECF No. 261).

During a sanctions hearing on January 30, 2015, the Court asked Mr. Geilenfeld's lawyers about his status in Haiti. *Tr. of Proceedings* 6:24–7:5 (ECF No. 292). Counsel confirmed Mr. Geilenfeld remained imprisoned in Haiti. *Id.* 7:6-11:7. During subsequent telephone conferences with the Court, the Plaintiffs acknowledged the practical fact that the case could not go forward while Mr. Geilenfeld remained in jail in Haiti. Plaintiffs' counsel informed the Court that if Mr. Geilenfeld was released from jail, they could need "just a short amount of time to be prepared for trial." *Id.* 8:7-10.

---

[1]      On June 9, 2015, the Court granted Mr. Kendrick's motion to dismiss HWH's false light invasion of privacy claim; the Order did not affect Mr. Geilenfeld's claim under this theory. *Order on Def.'s Mot. to Dismiss* (ECF No. 347).

During a telephone conference on April 30, 2015, Mr. Geilenfeld's lawyers informed the Court that Mr. Geilenfeld had recently been released from Haitian prison, and the case could proceed to trial. *Min. Entry* (ECF No. 315). However, they asked for time to make certain that Mr. Geilenfeld had recovered from his time in jail and to perform some additional limited discovery. They asked that the trial be set for July, 2015, and the Court accommodated their request.

On May 8, 2015, Plaintiffs filed a supplemental complaint. *Pls.' Suppl. Compl. and Demand for Jury Trial* (ECF No. 324). Although Plaintiffs' counsel suggested on January 30, 2015 that they intended to bring a separate claim for false imprisonment, the Supplemental Complaint included only a fifth count for "Continuing Defamation and False Light." *Id.* at 9.

### 3. Motion in Limine to Exclude References or Testimony Regarding Mr. Kendrick's Imprisonment

One pre-trial motion is particularly relevant given its similarity to the argument put forward in the present motion. On June 12, 2015, in the run-up to trial, Mr. Kendrick moved in limine to exclude references or testimony regarding Mr. Geilenfeld's imprisonment in Haiti. *Def.'s Mot. in Lim. to Exclude References or Test. Concerning Imprisonment in Haiti or Pain and Suffering Therefrom* (ECF No. 354). Mr. Kendrick argued this testimony should be excluded:

> because Mr. Geilenfeld has not pled the tort of malicious prosecution, and because he cannot be permitted to do an end run around the more difficult burdens of proof placed on a plaintiff in a malicious prosecution case to try to obtain malicious prosecution type damages based merely on the lesser showing of the torts he has pled.

*Id.* at 1. Moreover, Mr. Kendrick underscored the requirements for a malicious prosecution claim, including that the proceedings at issue must have terminated in

Mr. Geilenfeld's favor, which Mr. Kendrick asserted had not yet happened as regards the Haitian authority's actions toward Mr. Geilenfeld. *Id.* at 1-3.

On June 24, 2015, the Plaintiffs asserted, contrary to Mr. Kendrick's motion, that there is a legally significant distinction between malicious prosecution and defamation actions and that "[t]here is no such thing as exclusive 'malicious prosecution' or 'imprisonment' damages." *Pls.' Mot. in Opp'n to Def.'s Mot. to Exclude Evid. of Imprisonment in Haiti*, at 1-3 (ECF No. 396). They believed their case was properly brought as a defamation case. *Id.* at 4. They also insisted that "[d]amages suffered at the hands of a third-party who acts upon a defamatory statement, like the Haitian authorities who imprisoned Geilenfeld, are recoverable in a defamation action." *Id.*

On July 2, 2015, the Court denied Mr. Kendrick's motion. *Order on Def.'s Mot. in Lim. to Exclude References or Test. Concerning Imprisonment in Haiti or Pain and Suffering Therefrom and on Pls.' Mot. in Limine to Include the Test. of Alain Lemithe* (ECF No. 431) (*Pre-trial Order*). The Court discussed at length and did not find germane the two principal cases on which Mr. Kendrick relied;[2] far from supporting "the contention that a defamation action may not state a claim for [arrest and imprisonment] damages," the Court held those cases stand for "the rather fundamental proposition that a plaintiff may not bring suit under a theory that does not fit the facts of the case." *Id.* at 14. "As any law student who has taken a torts

---

[2]      *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587 (Cal. 1990); *Jackson v. Navarro*, 665 So. 2d 340 (Fla. Dist. Ct. App. 1995). Mr. Kendrick cites both these cases in the present motion.

examination knows," the Court wrote, "a variety of tort claims may be grounded on the same nucleus of facts." *Id.* at 15.  That being the case, the Court concluded that

> if Mr. Geilenfeld successfully proves his defamation claim, the jury will consider whether to award him damages for "mental suffering, humiliation, embarrassment, effect upon reputation and loss of social standing," *Saunders v. VanPelt*, 497 A.2d 1121, 1126 (Me. 1985), "which are presumed to flow naturally, proximately and necessarily from publication of the slander." *Farrell v. Kramer*, 159 Me. 387, 390, 193 A.2d 560, 562 (1963).  Mr. Kendrick has not adequately explained why the jury could not consider whether Mr. Geilenfeld is entitled to damages for any mental suffering, humiliation, embarrassment, and/or effect on his reputation and loss of social standing as a result of his imprisonment in Haiti.

*Id.* at 16.

### 4.    Trial and Verdict

The jury trial commenced on July 6, 2015.  *Tr. of Proceedings I* (ECF No. 484). On July 14, 2015, Mr. Geilenfeld testified at length regarding his imprisonment in Haiti.  *Tr. of Proceedings VII* 21:2-42:3, 46:25-48:12 (ECF No. 452) (*Tr. VII*).  On July 23, 2015, the jury returned a verdict for the Plaintiffs: the jury awarded $2,500,000 on the defamation claim and $5,000,000 on the intentional interference claim to HWH, and it awarded $7,000,000 on the defamation, false light, and intentional interference claims to Mr. Geilenfeld.  *Jury Verdict Form as to Michael Geilenfeld* (ECF No. 474) (*Geilenfeld Jury Verdict*); *Jury Verdict Form as to Hearts with Haiti* (ECF No. 475) (*HWH Jury Verdict*); *J.* (ECF No. 480) (*J.*).

## II.   THE PARTIES' POSITIONS

### A.    Defendant's Post-Trial Motion

#### 1.    Defendant's Motion

On August 20, 2015, Mr. Kendrick moved pursuant Rule 59 for a new trial or alternative post-judgment relief. *Def.'s Rule 59 Mot. for a New Trial or Alternative Other Post-J. Relief* (ECF No. 488) (*Def.'s Mot.*).  Mr. Kendrick's motion presents this question: "whether under Maine common law, a defendant may be held liable for damages for the suffering of a plaintiff in jail when the plaintiff has not been acquitted from the criminal charges leveled against him that put him in jail as a result of the alleged defamation." *Id.* at 2.  Mr. Kendrick contends it was error for the Court to admit evidence regarding Mr. Geilenfeld's imprisonment for several reasons: first, "under the *Restatement* damages for emotional distress due to wrongful incarceration are not recoverable in an action for defamation"; second, "case law supports the principle that a plaintiff cannot avoid having to satisfy the elements of a malicious prosecution claim by disguising it as a different tort"; third, "public policy opposes exposing citizens to liability for incarceration damages on just the lesser proof needed to support a defamation claim"; and lastly, Mr. Kendrick argues that the contested evidence, once admitted, still "did not support a jury finding that a defamatory statement made by Mr. Kendrick caused Mr. Geilenfeld to be arrested." *Id.* at 4.  Moreover, given the "dramatic and compelling" nature of the evidence, Mr. Kendrick submits that the error was harmful and that the proper remedy is a new trial because the "testimony went as much to liability as to damages." *Id.* at 11. Likewise, Mr. Kendrick requests a new trial as regards his liability to HWH. *Id.* at 13-16.

Even if the Court holds to its earlier position that the evidence of Mr. Geilenfeld's imprisonment was properly admitted, Mr. Kendrick urges that "justice nonetheless requires that the Court condition a denial of a new trial as to Mr. Geilenfeld on both actual and presumed damages on Mr. Geilenfeld's acceptance of a remittitur of $100,000 in presumed damages . . . ." *Id.* at 18.

Finally, Mr. Kendrick asks the Court to reconsider the $8,000 sanction imposed for violation of the Consent Confidentiality Order. *Id.* at 19. Given "the size of the verdicts in this case," "the law's disdain for excessive fines," and the fact that "the years in which the jury found Mr. Kendrick's conduct gave rise to liability on Plaintiffs' claims overlap with the timing of events for which the Court found him to have violated the Consent Confidentiality Order," Mr. Kendrick argues that the sanction "is unnecessary to remedy any harm caused to Plaintiffs by Mr. Kendrick's contempt of court."[3] *Def.'s Mot.* at 19.

### 2.   Plaintiffs' Opposition

The Plaintiffs assert that "the Court correctly allowed Plaintiff Geilenfeld to testify about his incarceration in a Haitian prison, and correctly declined an instruction that would have told the jury to disregard that testimony." *Pls.' Resp. in Opp'n to Def.'s Rule 59 Mot. for New Trial*, at 2 (ECF No. 492) (*Pls.' Opp'n*). They argue that Mr. Kendrick's post-trial motion essentially reiterates the theory—i.e.,

---

[3]     The Plaintiffs address the sanctions issue not in opposition to Mr. Kendrick's motion but in their own separate motion. *See Pls.' Rule 59(e) Mot. to Alter or Amend J. to Include Pre- and Post-J. Interest, to Include the April 22, 2015 Sanction, and to Reflect Dismissal Without Prejudice of Pls.' Punitive Damages Claims* (ECF No. 489). Because the parties engage on this issue in response to the Plaintiffs' motion, it will be addressed more fully there.

damages for wrongful imprisonment require the claim to be brought under malicious prosecution—that the Court rejected in the pre-trial motion discussed above, and that such reiteration contravenes Rule 59 doctrine. *Id.* at 3 (citing *Nat'l Metal Finishing Co. v. Barclays American/Commercial, Inc.*, 899 F.2d 119 (1st Cir. 1990)). The new cases Mr. Kendrick cites for this same theory, according to Plaintiffs, are "almost completely irrelevant." *Id.* at 5. Plaintiffs push against the substantive thrust of Mr. Kendrick's argument by stating that "Geilenfeld is entitled to recover the damages that flow naturally and proximately from Defendant's tortious conduct." *Id.* at 7. They also contend that Mr. Kendrick's public policy argument, raised for the first time at the post-trial stage, is for that reason waived and would be a losing argument regardless. *Id.* at 6 n.2, 7.

Plaintiffs claim Mr. Kendrick "is not entitled to a new trial . . . on the issue of causation" because there was "overwhelming" evidence that Mr. Kendrick caused Mr. Geilenfeld's imprisonment and there was "no break in the 'causal chain.'"[4] *Id.* at 9-14.

In arguing against Mr. Kendrick's alternative relief of remittitur or a new trial, Plaintiffs claim "[t]he verdict was not improper." *Id.* at 15. Although "Geilenfeld had been previously accused," he had been "exonerated on each occasion." *Id.* Moreover,

---

[4]     Plaintiffs also address Mr. Kendrick's motion as if it were under Rule 50. *Pls.' Opp'n* at 9 (citing FED. R. CIV. P. 50). Because Mr. Kendrick moves under Rule 59, and not Rule 50, the Court treats his motion under that legal framework. Mr. Kendrick clarifies this point in his reply. *Def.'s Mem. in Reply to Pls.' Resp. in Opp'n to Def.'s Rule 59 Mot. for New Trial* at 1 ("In footnotes the Plaintiffs maintain that Mr. Kendrick waived arguments by not making a Rule 50 motion for judgment as a matter of law. The Plaintiffs are incorrect. None of Mr. Kendrick's arguments made in his Rule 59 motion for a new trial would if accepted by the Court result in entry of judgment as a matter of law for Mr. Kendrick on any claim . . .").

"[t]he law provides . . . one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." *Id.* (citing *Elms v. Crane*, 118 Me. 261, 107 A. 852, 854 (1919) (quoting *Davis v. Starrett*, 97 Me. 568, 576, 55 A. 516, 519 (1903)); *Restatement (Second) of Torts § 578* (Am. Law Inst. 1997). Plaintiffs also claim "[t]he verdict was not excessive." *Id.* at 16. The question, as they see it, is "whether the evidence *in this case* supports the award." *Id.* at 17 (emphasis in original) (citing *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 82 (1st Cir. 2010)). With regard to the damages suffered by Mr. Geilenfeld, they say "[i]t is difficult to imagine a damages verdict that would be excessive or irrational on these facts." *Id.* With regard to the tortious interference damages incurred by HWH, they point to Geoffrey Hamlyn's comparative statistical analysis as evidence that the jury's award is "far from speculation." *Id.* at 18-19. Finally, Plaintiffs argue the verdict was not "tainted" because the jury "was properly instructed by the Court to separate its liability determination and damages valuations and to evaluate each Plaintiff's claims separately." *Id.* at 19-20.

### 3.    Defendant's Reply

Mr. Kendrick first addresses matters of procedure. He emphasizes that both (1) his erroneous admission of evidence claim and (2) his sufficiency of evidence claim are properly brought under Rule 59. *Def.'s Mem. in Reply to Pls.' Resp. in Opp'n to Def.'s Rule 59 Mot. for New Trial*, at 2 (ECF No. 496) (*Def.'s Reply*). On the former, he notes that though the issue has been preserved for appeal, he thinks it is "appropriate to give the trial court the opportunity in the context of a Rule 59 motion

for a new trial to comment on whether if the evidence was improperly admitted, there should be a new trial." *Id.* As a final procedural matter, Mr. Kendrick points out that—contrary to Plaintiffs' assertion in their opposition—he did ask for the liability and damages issues to be bifurcated. *Id.* at 4.

Substantively, Mr. Kendrick believes Plaintiffs "simply fail to address" his basic argument that, as a matter of law and public policy, wrongful imprisonment damages are unavailable in a defamation lawsuit, and that this is especially true where this is an ongoing criminal procedure regarding the claims at issue in this case. *Id.* at 3. Mr. Kendrick concedes that he can "point[] to no case directly on point . . . ." *Id.* Nonetheless, he cites authorities "that he thinks fairly stand for a general common-law principle" underlying his argument, which Plaintiffs' authorities do not even "remotely discuss[]." *Id.*

## B.   Plaintiffs' Post-Trial Motion

### 1.   Plaintiffs' Motion

On August 21, 2015, the day after Mr. Kendrick filed his post-trial motion, the Plaintiffs filed a post-trial motion of their own. *Pls.' Rule 59(e) Mot. to Alter or Amend J. to Include Pre- and Post-J. Interest, to Include the April 22, 2015 Sanction, and to Reflect Dismissal Without Prejudice of Pls.' Punitive Damages Claims* (ECF No. 489) (*Pls.' Mot.*). Plaintiffs contend that they are entitled to prejudgment interest under Maine law in the amount of 3.16% calculated daily from February 6, 2013 until September 23, 2014 and again from December 23, 2014 until July 24, 2015, with a hiatus for the ninety-day continuance of trial following Mr. Geilenfeld's detention in

Haiti.  *Id.* at 1-3.  They also claim entitlement to post-judgment interest under federal law in the amount of .28% calculated daily and compounded annually beginning the date of judgment: July 24, 2015.  *Id.* at 3.

Regarding sanctions, the Plaintiffs detail Mr. Kendrick's long history of violations by reminding the Court that the $8,000 sanction "was the third sanction and the second monetary fine against Mr. Kendrick, and the culmination of three motions for sanctions necessitated by what can only be characterized as a knowing and intentional disregard of the Court's non-dissemination confidentiality orders governing discovery." *Id.* at 4.  Moreover, because the Plaintiffs view the sanction as penal rather than compensatory, they argue it cannot be seen as duplicative of the compensatory damages awarded by the jury.  *Id.* at 8.  The Plaintiffs point out two factors they believe prevent the sanction from falling foul of the Eighth Amendment's Excessive Fines Clause: (1) the sanction accounts for less than one-third of the attorney fees the Plaintiffs incurred as a consequence of their sanctions motions; and (2) Mr. Kendrick's position as a "college-educated professional" means he has the ability to pay the sanction.  *Id.* at 8-10.

After withdrawing their punitive damages claim upon hearing the jury's substantial compensatory damages verdict, Plaintiffs now "move the Court to amend the Judgment to reflect that Count IV of their complaint was dismissed *without* prejudice."  *Id.* at 11 (emphasis in original).

### 2.  Defendant's Opposition

Mr. Kendrick argues that there is an "established common-law rule" against prejudgment interest on defamation claims for non-economic damages; that the rule "comports with the twin purposes under Maine law for awarding prejudgment interest," i.e., compensating plaintiffs for their inability to use money between the dates of filing and judgment, and encouraging defendants to settle meritorious claims against them; and that Maine has not abrogated the rule. *Def.'s Obj. and Opp'n Mem. to Pls.' Rule 59(e) Mot. to Alter or Amend J.* at 1-4 (ECF No. 495) (*Def.'s Opp'n*).  Even if prejudgment interest were available on such claims, Mr. Kendrick notes that the "jury found by special verdict that the years in which [his] conduct giving rise to defamation took place included 2013, 2014, and 2015" and argues it would therefore be unjust to award prejudgment interest for injuries the Plaintiffs "suffered as a result of conduct that did not even occur until years after the case was filed."  *Id.* at 3.  He then makes the same argument with regard to prejudgment interest for HWH's tortious interference claim.  *Id.* at 4.

Given the Court's discretion to premise dismissal of a claim on the condition that it does so with prejudice, and given the Plaintiffs' eleventh hour dismissal of a claim on which the parties had already spent significant time and resources, Mr. Kendrick urges the Court to let its dismissal of punitive damages with prejudice stand.  *Id.* at 5-6.

Mr. Kendrick objects to Plaintiffs' insistence that he pay the sanction, noting it "make[s] no sense for the Plaintiffs to so strenuously demand on principles of penal justice that [he] be punished by another $8,000, when the Plaintiffs waived punitive

damages that likely would have far exceeded that figure, and when in the Motion they profess that they have no taste for punishing [him]."  *Id.* at 7.

### 3.  Plaintiffs' Reply

Plaintiffs dispute the notion that there is a common-law rule against prejudgment interest for non-economic damages, pointing out that the relevant Maine statute "provides for prejudgment interest in all civil actions without distinguishing between pecuniary and non-pecuniary damages" and that Maine caselaw "commonly award[s]" prejudgment interest for "non-pecuniary damages including injury to reputation, humiliation, and emotional distress." *Pls.' Reply to Def.'s Opp'n to their Rule 59(e) Mot. to Alter or Amend J.* at 1-2 (ECF No. 497) (*Pls.' Reply*).  They also contend that their recovery of prejudgment interest would accord with the public policy underlying the statutory entitlement and that a denial of prejudgment interest on account of Mr. Kendrick's continued tortious conduct after the filing of this lawsuit would effectively reward such conduct.  *Id.* at 3.

Plaintiffs characterize their motion to amend their dismissal of the punitive damages claim from with prejudice to without prejudice as within "the usual course pursuant to Rule 15," and note that Mr. Kendrick's "unfair prejudice" argument is unpersuasive because his defense of the punitive claim "should have him well prepared if he is ever again called upon to defend [it]."  *Id.* at 4-5.

Finally, while holding to their position that the Court should impose the sanction on Mr. Kendrick, "Plaintiffs recognize that is for the Court to decide how best to set precedent relating to Defendant's pretrial violations . . . ."  *Id.* at 6.

## III.    DISCUSSION

### A.    Defendant's Motion

At the outset, it is important to clarify the procedural lens through which the Court will view the motion.  Although Mr. Kendrick does not identify under which sections of Rule 59 he moves, the Court assumes that the motion for new trial is under Rule 59(a) and that the motion for alternative relief (i.e., either a new trial on damages or remittitur of the presumed damages award) is under Rule 59(e).  *See* FED. R. CIV. P. 59(a), (e).

#### 1.    Motion for New Trial

##### a.    Legal Standard

Rule 59(a) permits a party to move for new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FED. R. CIV. P. 59(a)(1)(A).  "The decision to grant a new trial is squarely within the trial court's discretion." *Velazquez v. Figueroa-Gomez,* 996 F.2d 425, 427 (1st Cir. 1993) (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)).  A trial court's "discretion is quite limited concerning motions for new trials.  A trial judge may not upset the jury's verdict merely because he or she might have decided the case differently." *Id.* at 428.  Rather, "[a] verdict may be set aside and new trial ordered when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Colon-Millin v. Sears Roebuck De Puerto Rico, Inc.*, 455 F.3d 30, 35 (1st Cir. 2006) (quoting *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996)).

17

### b.     Application

The Court retraces familiar ground with this motion for new trial.  Initially, Mr. Kendrick seems to present a slightly different angle on the pre-trial issue by focusing on the fact that Mr. Geilenfeld "has not been acquitted from the criminal charges leveled against him that put him in jail as a result of the alleged defamation." *Def.'s Mot.* at 2 (getting at malicious prosecution's element of a terminated proceeding and the supposed absence of that element on these facts).  Despite this shade of difference, the issue remains nearly unchanged from its earlier iteration in the pretrial motion to exclude.  *See, e.g.*, *Def.'s Reply* at 3-4 (identifying the "basic issue raised in this case" as whether "to have recovered damages for emotional distress suffered in prison, Mr. Geilenfeld needed to have stated and proven a claim for . . . malicious prosecution").

The Court has already ruled that Plaintiffs may recover for Mr. Geilenfeld's imprisonment to the extent that it "flow[ed] naturally, proximately and necessarily" from Mr. Kendrick's defamation.  *Pre-trial Order* at 16 (quoting *Farrell v. Kramer*, 159 Me. 387, 390, 193 A.2d 560, 562 (1963)).  Where Mr. Kendrick again cites authorities he relied upon and the Court addressed at the pre-trial stage, the Court declines Mr. Kendrick's invitation to revisit its ruling and remains unpersuaded that those citations "support[] the contention that a defamation action may not state a claim for [arrest and imprisonment] damages."[5]  *Id.* at 14 (dispensing with *Pacific*

---

[5]     One of Mr. Kendrick's arguments is that the Court erred in allowing testimony about the Haitian prosecution because the judicial decision that allowed Mr. Geilenfeld's release from prison was not final.  *Def.'s Mot.* at 2.  At trial, the Court allowed the Plaintiffs and the Defendant to call as witnesses Haitian law experts.  *See Tr. of Proceedings IX* 25:23-48:23 (ECF No. 454) (*Test. of Alain*

*Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587 (Cal. 1990); *Jackson v. Navarro*, 665 So. 2d 340 (Fla. Dist. Ct. App. 1995)).

Realizing that, if merely reasserted, an unsuccessful argument is likely to meet the same fate, Mr. Kendrick cites new caselaw to convince the Court it should correct its earlier error.  The Court turns to those cases.

In *Puerto Rico Am. Ins. Co. v. Burgos-Diaz*, Civil No. 01-1186(SEC), 2006 WL 3490943 (D. P.R. Nov. 29, 2006), the defendants argued the plaintiff's false allegations in a RICO case had harmed them.  Initially, however, the defendants did not identify the legal theory under which they moved.  *Id.* at *1.  The plaintiffs moved to dismiss the counterclaim, and in opposition, the defendants identified their legal theory as resting on statutory negligence grounds rather than malicious prosecution. *Id.* at *1-2.  The court nonetheless decided that defendants' counterclaim "although not in so many words, sets forth a claim for malicious prosecution."  *Id.* at *2.  The court dismissed the counterclaim as lacking two of malicious prosecution's required elements: malice and a termination of the proceeding.  *Id.* at *3.

In *Eddy's Toyota of Wichita, Inc. v. Kmart Corp.*, 945 F. Supp. 220 (D. Kan. 1996), the plaintiff argued the defendant tortiously interfered by filing a meritless lawsuit.  The defendant moved for summary judgment claiming the plaintiff had

---

*Lemithe*) (*Lemithe Test.*); *Tr. of Proceedings XII* 133:14-153:16  (ECF No. 471) (*Test. of Jean Senat Fleury*) (*Fleury Test.*).  Mr. Lemithe confirmed that an appeal had been filed following the decision of the investigative judge.  *Lemithe Test.* 46:6-14.  Mr. Fleury testified that following the decision to release Mr. Geilenfeld, the prosecutor filed an appeal, and under Haitian law, there would be a new trial on the appeal with witnesses called, including the alleged victims of Mr. Geilenfeld.  *Fleury Test.* 151:14-152:17.  Using Federal Rule of Evidence 609 as guidance, the Court determined that the evidence of the status of the criminal case in Haiti was admissible, but so was evidence of the pendency of the appeal.  FED. R. EVID. 609(e) ("A conviction that satisfies this rule is admissible even if an appeal is pending.  Evidence of the pendency is also admissible").

effectively sued for malicious prosecution, as opposed to tortious interference, and that the statute of limitations for malicious prosecution had lapsed. *Id.* at 225. The court concluded that "because [plaintiff's] case rests solely on the allegation that [defendant] caused its agent to file a baseless lawsuit, [plaintiff] cannot avoid the one-year statute of limitations for malicious prosecution." *Id.* at 226.

In *Davis v. Currier*, 1997 ME 199, 704 A.2d 1207, a defendant in a personal injury action arising from a parking lot fistfight brought a counterclaim for the intentional infliction of emotional distress; i.e., he claimed that plaintiff's "negligence suit against him constituted extreme and outrageous conduct on her part." *Id.* ¶ 6. After a jury decided for the defendant on the counterclaim, the Maine Superior Court granted the plaintiff's motion for judgment as a matter of law. *Id.* ¶ 5. The Maine Supreme Judicial Court affirmed on the Superior Court's reasoning that "a party cannot be liable for intentional infliction of emotional distress for insisting on his or her rights in a permissible manner." *Id.* ¶ 6. Rather, "[i]f a lawsuit has been initiated without a legitimate basis and has terminated unsuccessfully, then the tort of malicious prosecution may be invoked for redress." *Id.*

Mr. Kendrick argues these holdings throw new light on the issue. *Burgos-Diaz*, he says, shows "Mr. Geilenfeld should not be permitted to disguise his malicious prosecution claim as a defamation claim and thus avoid having to plead and prove the elements of malicious prosecution." *Def.'s Mot.* at 6. Likewise, he takes from *Eddy's Toyota* that "Mr. Geilenfeld should not be permitted to avoid the legal obstacles of a malicious prosecution claim by dressing it as a defamation or false light

claim." *Id.* at 7.  In addition, he thinks it follows from *Davis* that "when a party seeks redress for the institution of a meritless criminal charges against him, even if the party could make a case for defamation, the party must look to the tort of malicious prosecution for redress for damage for emotional distress suffered in jail." *Id.*

None of these cases, however, elucidates the relationship between defamation and malicious prosecution: in relevant part, *Burgos-Diaz* resolved an issue of Puerto Rican statutory law, *Eddy's Toyota* turned on tortious interference, and *Davis* addressed intentional infliction of emotional distress.  As with Mr. Kendrick's earlier-cited cases, the Court views these newly-cited cases as "stand[ing] for the rather fundamental proposition that a plaintiff may not bring suit under a theory that does not fit the facts of the case and must bring suit under a theory that does." *Pre-trial Order* at 14.  There is, in the Court's view, a meaningful difference between the related propositions that (1) a malicious prosecution case must be brought as such (which *Burgos-Diaz*, *Eddy's Toyota*, and *Davis* support) and (2) malicious prosecution offers the exclusive means of recovery for wrongful imprisonment (which they do not support).

Indeed, Mr. Kendrick himself concedes that he is unable to cite a single "directly on point" case. *Def.'s Reply* at 3.  This is despite the fact that by now Mr. Kendrick has had several opportunities to call any such cases to the Court's attention. Given the high standard applied to motions for new trial under Rule 59(a), which if granted would displace the jury's considered judgment, the Court finds Mr. Kendrick is not entitled to a new trial.

Apart from the caselaw, Mr. Kendrick's appeal to the Restatement and to considerations of public policy do not persuade the Court that it should order a new trial pursuant Rule 59(a). The Court holds to its view that it was proper for the jury, after finding Mr. Kendrick defamed Mr. Geilenfeld, to award Mr. Geilenfeld damages for "mental suffering, humiliation, embarrassment, effect upon reputation and loss of social standing," *Saunders v. Van Pelt*, 497 A.2d 1121, 1126 (Me. 1985), "which are presumed to flow naturally, proximately and necessarily from publication of the slander." *Farrell v. Kramer*, 159 Me. 387, 390, 193 A.2d 560, 562 (1963). Thus, the Court denies Mr. Kendrick's motion for a new trial on all issues as regards Mr. Geilenfeld. Because Mr. Kendrick premises his motion for new trial as regards HWH on the same grounds of supposedly improperly admitted testimony, the Court also denies that motion.

### 2. Remittitur

#### a. The Issue

On July 23, 2015, the jury made five damage awards: (1) a $2,000,000 award to Michael Geilenfeld for Mr. Kendrick's negligent defamation; (2) a $5,000,000 award to Mr. Geilenfeld for Mr. Kendrick's defamation knowing that the statements were false or with reckless disregard as to their truth; (3) a $1,500,000 award to HWH for Mr. Kendrick's negligent defamation; (4) a $1,000,000 award to HWH for Mr. Kendrick's defamation knowing that the statements were false or with reckless disregard as to their truth; and (5) a $5,000,000 award to HWH for Mr. Kendrick's

intentional inference with advantageous economic relations. *Geilenfeld Jury Verdict* at 1-2; *HWH Jury Verdict* at 1-2.

In his motion for new trial, Mr. Kendrick states generally that the damage award in favor of HWH "cannot stand," but he focuses on the $5,000,000 award for tortious inference. *Def.'s Mot.* at 15-16. Turning to the damage award in favor of Mr. Geilenfeld, Mr. Kendrick limits his criticism to the $5,000,000 presumed damages award. *Id.* at 16-19. The Court reviews only the remittitur issues that Mr. Kendrick himself has raised and argued. Although he has made a passing reference to the need for a new trial on damages, he has not contended that the total damage award, combining all the individual categories, is excessive as a whole, and the Court does not address that issue.

### b.    Legal Standard

Rule 59(e) permits a motion "to alter or amend a judgment." FED. R. CIV. P. 59(e). When a party moves for remittitur under Rule 59(e), it is within the trial court's discretion "to order remittitur if such an action is warranted in light of the evidence adduced at trial." *Climent-Garcia v. Autoridad de Transporte Maritimo y Las Islas Municipio*, 754 F.3d 17, 21 (1st Cir. 2014) (quoting *Trainor v. HEI Hospitality, LLC*, 699 F.3d 19, 29 (1st Cir. 2012)). Only those awards exceeding "any rational appraisal or estimate of the damages that could have been based on the evidence" warrant remittitur. *Id.* (quoting *Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2003)). A court has limited discretion "where a jury's verdict is challenged as improper based only on a damage award that allegedly fails to bear any rational

23

relation to the evidence of the damages presented at trial." *Gil de Rebollo v. Miami Heat Ass'ns*, 137 F.3d 56, 62 (1st Cir. 1998).  Indeed, the First Circuit has cautioned against judicial meddling with jury verdicts:

> We do not reverse a jury verdict for excessiveness except on "the strongest of showings."  The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained.  We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount *any* reasonable man could feel the claimant entitled to."

*Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir. 1991) (emphasis in original) (quoting *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983)).  This point applies a fortiori when it comes to "[t]ranslating legal damages into money damages," as that is "a matter peculiarly within a jury's ken."  *Id.*

### c.    Application: Hearts with Haiti

In his motion, Mr. Kendrick highlights the testimony of Geoffrey Hamlyn, HWH's former executive director, as insufficient to justify the $5,000,000 intentional interference award.  *Def.'s Mot.* at 15-16.  He claims that based on Mr. Hamlyn's testimony, the most a jury could award without speculation is $3,300,000 for the period of 2010 through 2013, and he claims that even the figure of $3,300,000 lacked any rational basis.  *Id.* at 16.

Mr. Hamlyn was HWH's executive director from July 2011 to July 2014.  *Tr. of Proceedings VIII* 23:11-14 (ECF No. 453) (*Test. of Geoffrey Hamlyn*) (*Hamlyn Test.*).  He testified at trial about the losses HWH sustained in fundraising from 2011 through 2013, comparing HWH's fundraising success during those years with other

charitable organizations operating in or for the benefit of Haiti, concluding that during that interval, if HWH fundraising had followed the market trend for other Haitian-oriented charities, HWH would have raised $3,000,000 more than it did. *Id.* at 56:3-67:15. The Court easily concludes that Mr. Hamlyn's testimony is sufficient evidence from which a jury could conclude that HWH suffered a loss in fundraising of $3,000,000 from 2011 through 2013. Given Mr. Kendrick's acknowledgement that he repeatedly reached out to the benefactors of HWH and informed them in effect that HWH was aiding and abetting a child abuser by raising funds for Mr. Geilenfeld, it is a reasonable inference that some of the donors were deterred from giving to HWH based on Mr. Kendrick's allegations.

To the extent that Mr. Kendrick continues to object to Mr. Hamlyn's testimony in which he described his comparative fundraising analysis, the Court addressed Mr. Kendrick's objections to Mr. Hamlyn's testimony in two orders. On September 24, 2014, the Court dismissed Mr. Kendrick's motion in limine concerning Mr. Hamlyn's proposed expert testimony but raised questions about his expertise in the field of statistical and financial analysis and about whether he could properly testify about the motivations of donors. *Order Dismissing Def.'s Mot. in Limine* (ECF No. 264). Then on June 26, 2015 after a *Daubert*[6] hearing on June 18, 2015, the Court issued a second order. *Min. Entry* (ECF No. 379); *Second Order Regarding the Expert Test. of Geoffrey Scott Hamlyn* (ECF No. 408). In the second order, the Court concluded that Mr. Hamlyn did not possess sufficient expertise to testify about his standard

---

[6]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

deviation analysis or his reach extender analysis. *Id.* at 1, 11-13. However, the Court also concluded that Mr. Hamlyn would be allowed to testify about his comparative statistical analysis subject to cross-examination. *Id.* at 13-18. The Court stands by its earlier orders.

Mr. Kendrick's final point is that Mr. Hamlyn's comparative statistical analysis covered only about the period from 2011 through 2013 and, even if the jury had a rational basis to conclude that HWH had suffered $3,000,000 in damages from 2011 through 2013, any award beyond 2013 was speculative. *Def.'s Mot.* at 16. Mr. Kendrick's argument ignores the fact that the jury was asked whether the conduct giving rise to the defamation and/or intentional interference took place during various years and the jury responded that Mr. Kendrick's conduct took place from 2011 into 2015. *HWH Jury Verdict* at 2.

Also, Mr. Hamlyn testified that from 2011 through 2013, HWH suffered fundraising losses totaling $3,300,000. *Pls.' Ex.* 687C. As the jury found that Mr. Kendrick continued his defamatory actions in 2014 and 2015, the jury was entitled to conclude that HWH's losses continued at the same pace, resulting in an additional $1,100,000 for 2014 and $600,000 through July 23, 2015.[7] The result is the

---

[7]       Notwithstanding the Plaintiffs' calculations, *see Pls. Opp'n* at 18, basic math illuminates the verdict. Assuming that the jury accepted Mr. Hamlyn's testimony that HWH suffered a yearly loss of $1,100,000 from 2011 through 2013, this results in a total loss during that period of $3,300,000. If the jury inferred a similar loss for 2014, the total loss rose to $4,400,000 through the end of 2014. A yearly loss of $1,100,000 results in a monthly loss of $91,666.00 ($1,100,000 ÷ 12 = $91,666.66). Adding $550,000 for the period through June 2015, the result is $4,950,000. To account for the twenty-three days of July, 2015, the jury could reasonably have added another $50,000, resulting in a total loss of $5,000,000.

26

$5,000,000 damage verdict that the jury issued.  There is no reason to disturb that part of the verdict.

### d.    Application: Presumed Damages

Mr. Kendrick argues the jury's presumed damages award of $5,000,000 to Michael Geilenfeld is "manifestly irrational and grossly excessive." *Def.'s Mot.* at 18. Mr. Kendrick makes no claim that the Court's jury instructions on the issue of presumed damages were erroneous, *Def.'s Mot.* at 16-17, and at trial, he made no objection to the presumed damages language. *Tr. of Proceedings* 2:3-58:19 (ECF No. 487) (*Jury Charge Conference*).    In fact, the Court's jury instructions on Mr. Geilenfeld's entitlement to presumed damages tracked the language Mr. Kendrick proposed.  *Compare Tr. of Proceedings XIV* 21:13-22:5 (ECF No. 485), *with Def.'s Revised Jury Instr.s* at 2-3 (ECF No. 351).  Furthermore, in analyzing Mr. Kendrick's objections to the presumed damages award of $5,000,000, the Court assumes that the jury followed the Court's instruction. *United States v. Ziskind*, 491 F.3d 10, 15 (1st Cir. 2007) (noting an "almost invariable assumption of the law that jurors follow their instructions") (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).

The Court's task, in considering his remittitur argument, is to determine whether the jury's verdict can be interpreted as bearing "any rational relation" to the evidence. *Gil de Rebollo*, 137 F.3d at 62.  The standard for overturning a jury's damages award is daunting for the movant.  As explained by the First Circuit, "[c]onverting legal damages into a monetary award is the jury's job—consequently, only rarely and in extraordinary circumstances will we veto the jury's decision."

*Bielunas*, 621 F.3d at 80 (citing *Casillas-Díaz v. Palau*, 463 F.3d 77, 82-83 (1st Cir. 2006)).

The Court acknowledges that $5,000,000 is an extremely high defamation award.  However, to analyze the amount of the award, the Court must accept the underlying verdict where the jury found not only that Mr. Kendrick defamed Mr. Geilenfeld but also that Mr. Geilenfeld had proven by clear and convincing evidence that Mr. Kendrick did so either knowing that the statements were false or with reckless disregard for their truth.  *Geilenfeld Jury Verdict* at 1-2.  Accepting the liability findings, the evidence that Mr. Kendrick's defamatory statements damaged Mr. Geilenfeld is overwhelming.  The sensational nature of the allegations, the specific fact Mr. Kendrick accused Mr. Geilenfeld of sexual predation of multiple young boys in his care, the language Mr. Kendrick used, the broad dissemination of the allegations both in the United States and Haiti, the length of time Mr. Kendrick repeated the allegations, the ensuing governmental investigations in the United States and Haiti, Mr. Geilenfeld's arrest and imprisonment in Haiti, and the loss in contributions as a measure of his loss in reputation, and other probative evidence, all support an extremely substantial award.  So while the verdict was extremely high, the jury heard evidence that was extreme.

Mr. Kendrick calls to the Court's attention cases in which presumed damages awards have been reduced.  *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717 (7th Cir. 2004) (reducing presumed damages from over $3,000,000 to $1,000,000); *NuWave Inv. Corp. v. Hyman Beck & Co.*, 75 A.3d 1241 (N.J. Super. Ct.

App. Div. 2013) (vacating them altogether).  Context helps to clarify the relevance of these cases.  The *Republic Tobacco* court contended with an Illinois law that proscribed "substantial" presumed damages awards.  *Republic Tobacco Co.*, 381 F.3d at 734.  The *NuWave* court, writing in the shadow of a recent Supreme Court of New Jersey case that held "a defamation plaintiff may proceed to trial in the absence of proof of 'actual harm' by utilizing the 'procedural mechanism' of presumed damages," went a step further and inferred that a jury "cannot do both, i.e., award both presumed nominal damages and other 'actual damages.'"  *NuWave Inv. Corp.*, 75 A.3d at 1252 (discussing *W.J.A. v. D.A.*, 43 A.3d 1148 (N.J. 2012)).[8]  The point is that the way these two cases came down on the presumed damages question turned largely on unique state-law considerations inapplicable to the present case.

Mr. Kendrick cites one case that lends some support to his position because it lacks restrictive state laws: *Blaine Larsen Processing, Inc. v. Hapco Farms, Inc.*, Civ. No. 97-0212-E-BLW, 2000 WL 355539979 (D. Idaho Aug. 9, 2000).  For a defamation claim involving the supposed mislabeling of potatoes, the *Blaine Larsen* jury awarded presumed damages of $11,200,000.  *Id.* at *1.  Idaho law permitted "substantial" presumed damages, though the Ninth Circuit proscribed "grossly excessive" presumed damages.  *Id.* at *10-11 (citations omitted).  At the post-trial stage, the

---

[8]     A superior court of the appellate division in New Jersey decided *NuWave*, a court presumably bound to apply the law as directed by the Supreme Court of New Jersey.  In *NuWave*, the Appellate Division referred to *W.J.A. v. D.A.*, 43 A.3d 1148 (N.J. 2012), a defamation case the New Jersey Supreme Court decided after the *NuWave* appeal was briefed.  *NuWave*, 75 A.3d at 1250.  In *W.J.A.*, the New Jersey Supreme Court held that "the doctrine of presumed damages continues to have vitality by permitting a plaintiff to survive summary judgment and *to obtain nominal damages at trial*.  That approach sensibly delimits the doctrine of presumed damages *by precluding a compensatory award*, thus obviating the argument regarding unguided jury verdicts."  *NuWave*, 75 A.3d at 1252 (emphasis in original) (quoting *W.J.A.*, 43 A.3d at 1148).

*Blaine* Court had to determine whether the award "cross[ed] the poorly-defined boundary between damages that are 'substantial' and those which may be considered 'grossly excessive.'" *Id.* at *12. Determining the evidence did not bear a rational relationship to the jury's eight-figure award, the *Blaine* court ordered either remittitur to $5,000,000 or a new trial on damages should the plaintiff refuse remittitur. *Id.* at *13. But there is a marked contrast between the commercial dispute in *Blaine* and the facts in the case before it.

In short, none of Mr. Kendrick's cited authority requires a remittitur in this case especially in view of the fact that the Court properly instructed the jury under Maine law on how to assess presumed damages. The Court therefore is able to discern a rational relation between the verdict and the evidence. The Court denies the motion for Mr. Kendrick's motion for remittitur to $100,000 in presumed damage.

### B.   Plaintiffs' Motion

#### 1.   Prejudgment and Post-judgment Interest

##### a.   Legal Standard

The First Circuit has noted "[i]t is well established that prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court, while post-judgment interest, even on state-law claims, is governed by federal law." *Tobin v. Liberty Mutual Ins. Co.*, 553 F.3d 121, 146 (1st Cir. 2009) (citations omitted).

###### i.   Prejudgment Interest: 14 M.R.S. § 1602-B

For prejudgment interest, Maine law provides that "[i]n civil actions . . . prejudgment interest is allowed at the one-year United States Treasury bill rate plus 3%." 14 M.R.S. § 1602-B(3). Section 1602-B also provides, however, that "[i]f the prevailing party at any time requests and obtains a continuance for a period in excess of 30 days, interest is suspended for the duration of the continuance." 14 M.R.S. § 1602-B(5). Additionally, the Maine statute authorizes the Court to fully or partially waive prejudgment interest "[o]n petition of the nonprevailing party and on a showing of good cause." *Id.*

"Section 1602-B is broad in scope, and applies to *all* civil actions except small claims actions and actions involving a contract or note that already contains an interest provision." *Avery v. Kennebec Millwork, Inc.*, 2004 ME 147, ¶ 7, 861 A.2d 634, 636 (emphasis in original) (citing 14 M.R.S. § 1602-B(1), (2)). The Maine Supreme Judicial Court has written that prejudgment interest "is designed to compensate an injured party for the inability to use money rightfully belonging to that party between the date suit is filed and the date judgment is entered," *Osgood v. Osgood*, 1997 ME 192, ¶ 10, 698 A.2d 1071, 1073-74 (citing *Masters Machine Co., Inc. v. Brookfield Athletic Shoe Co., Inc.*, 663 F. Supp. 439, 443 (D. Me. 1987)), as well as "encourag[ing] the pretrial settlement of clearly meritorious suits." *Id.* (citing *Pierce v. Central Maine Power Co.*, 622 A.2d 80, 85 (Me. 1993); *Purwin v. Robertson Enter.s, Inc.*, 506 A.2d 1152, 1155 (Me. 1986)).

### ii.  Post-judgment Interest: 28 U.S.C. § 1961(a)

31

For post-judgment interest, federal law stipulates that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The interest is to be "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.* "Because postjudgment interest 'follows as a legal incident from the statute providing for it,' *Waggoner v. R. McGray, Inc.*, 743 F.2d 643, 644 (9th Cir. 1984) (internal quotation marks omitted), the court has no discretion to deny it." *Vázquez-Filippetti v. Cooperativa de Seguros Múltiples De Puerto Rico*, 723 F.3d 24, 28 (1st Cir. 2013) (footnote omitted).

### b.    Application

The Court finds the Plaintiffs are entitled to both prejudgment and post-judgment interest.

### i.    Prejudgment Interest

In the face of a broad Maine statute granting prejudgment interest to successful litigants, Mr. Kendrick cites no Maine caselaw supporting his contention that prejudgment interest is not allowed on defamation claims for noneconomic damages and does not contend that his case falls within one of the recognized statutory exceptions. Nonetheless, he invites the Court to eliminate a category of compensatory damages from 14 M.R.S. § 1602-B. As this Court has observed in another case, "the Law Court has reasoned that prejudgment interest is an element of compensatory damages, *Trask v. Auto. Ins. Co.*, 1999 ME 94, ¶ 8, 736 A.2d 237,

239, and that it 'falls within th[e] definition' of compensatory damages, *Moholland v. Empire Fire & Marine Ins. Co.*, 2000 ME 26, ¶ 6, 746 A.2d 362, 364." *Morin v. E. Maine Med. Ctr.*, 806 F. Supp. 2d 280, 285 (D. Me. 2011) (alteration in original). Because the presumed damages at issue are compensatory, and given the absence of cited caselaw excepting compensatory damages from the prejudgment interest statute, the Court declines Mr. Kendrick's invitation to write a significant exception into 14 M.R.S. § 1602-B that does not appear in the statute.

Remaining is Mr. Kendrick's argument that the timing of his misconduct provides the Court with good cause to deny prejudgment interest on the defamation damages for both Plaintiffs and the tortious interference damages for only HWH. At this point, it is impossible to parse which portion of damages stems from Mr. Kendrick's misconduct occurring before initiation of the lawsuit and which portion stems from continuing misconduct. It is not unusual for a jury verdict to reflect past, present, and future damages. Although Mr. Kendrick would prefer not to pay interest for the full time the lawsuit was pending because he was defaming the Plaintiffs during the entire time of its pendency, the Maine statute creates no obligation on the Court to dice the prejudgment interest award based on the timing of the defendant's tortious conduct. Instead, the Maine Supreme Judicial Court has written:

> Although punitive damages are assessed at the time of judgment and are calculated to have their punitive effect as of that time, the plain language of section 1602 does not provide for a different date, other than the date of the filing of the complaint, from which the interest accrues for punitive damages, and we decline to read one into the statute.

*Haworth v. Feigon*, 623 A.2d 150, 159-60 (Me. 1993) (citation omitted). In other words, under Maine authority, the prejudgment interest statute controls the

calculation of prejudgment interest, and as there is no evidence of a notice of claim, the starting point for the running of prejudgment interest is February 6, 2013, the date the Plaintiffs filed their Complaint.

In *Batchelder v. Tweedie*, 294 A.2d 443 (Me. 1972), the Maine Supreme Judicial Court explained the policy underlying section 1602-B:

> 14 M.R.S.A. § 1602, as amended, places responsibility to conduct litigation efficiently upon both parties. The plaintiff is allowed interest from the outset of the litigation, provided he causes no delay. The defendant is thereby given incentive to expedite a speedy trial and post trial proceeding. Delays in the process will render him liable for additional interest. The plaintiff, however, may lose his right to interest if he causes delay. The right to interest is not absolute but is subject to enlargement or loss due to the parties' conduct of the proceedings. The possibility of such enlargement or loss of the right to interest evidences a legislative intent to control the conduct of the litigation and has, therefore, a procedural purpose.

*Id.* at 444. In the Court's view, the policies underlying section 1602-B as illuminated by the Maine Supreme Judicial Court in *Batchelder* not only apply to this case, but also placed the parties on notice during the course of the litigation how section 1602-B would be applied.

Section 1602-B(5) provides for a "good cause" exception to the assessment of prejudgment interest, and Mr. Kendrick maintains that he fits within that exception. *Def.'s Opp'n* at 3-4. The Court rejects Mr. Kendrick's good cause claims. Mr. Kendrick's argument for good cause is that it would be unjust to tag him with prejudgment interest when his torts continued after the Plaintiffs filed suit. *Id.* If "good cause" under section 1602-B(5) included misdeeds the losing party continued to perpetrate throughout the pendency of a lawsuit, the good cause exception would swallow the rule and would be an odd counterincentive to continue the improper

34

action.  Mr. Kendrick has cited no caselaw that supports his interpretation of section 1602-B(5), and the Court is dubious about whether any exists.  Instead, the Maine Law Court has clearly explained the policy underlying the prejudgment interest statute, and the parties, including Mr. Kendrick, knew from the filing of the lawsuit that the prevailing party would be entitled to prejudgment interest on the verdict from the date of the filing of the Complaint.

The statute carves out an exception for periods where the prevailing party has moved for and obtained a continuance of more than thirty days.  14 M.R.S. § 1602-B(5).  In fact, the Maine Supreme Judicial Court has presumed that the prevailing party is entitled to prejudgment interest, but it has also ruled that the presumption "is lost . . . to the extent that the plaintiff causes delay."  *Pierce*, 622 A.2d at 85.  In their motion, the Plaintiffs concede that they are not entitled to prejudgment interest during the ninety-day continuance of trial following Mr. Geilenfeld's detention in Haiti.  *Pls.' Mot.* at 3 n.1.  The Court is not clear why the period of statutory continuance should be only for ninety days after the Court granted the Plaintiffs' motion to continue on September 23, 2014, as Mr. Geilenfeld caused the trial to be delayed until July 6, 2015.

As a practical matter, the Plaintiffs' continuance ran from September 23, 2014 to July 6, 2015, when the case went to trial.  The travel of the case confirms that the Plaintiffs asked for and received a continuance because Mr. Geilenfeld was in prison.  Realistically, the Court could not reset the case for trial until after Mr. Geilenfeld was released.  On September 12, 2014, the Court set this case for trial in October with

35

jury selection scheduled for October 7, 2014 and trial to commence immediately thereafter. *Report of Final Pretrial Conference and Order* (ECF No. 246). On September 23, 2014, Mr. Geilenfeld moved to continue trial for ninety days. *Oral Mot. to Continue Trial for 90 Days* (ECF No. 260). The Court granted the motion. *Oral Order Granting Mot. to Continue Trial for 90 Days* (ECF No. 261). According to Mr. Geilenfeld's testimony, he was arrested in Haiti and placed in prison on September 5, 2014. *Tr. of Proceedings VII* 19:12-15 (*Test. of Michael Geilenfeld*) (ECF No. 452). Mr. Geilenfeld was not released from prison until April 29, 2015. *Id.* 44:16-46:24.

It was apparent to the Court and the parties that the civil action in Maine could not go forward until Mr. Geilenfeld was released from Haitian prison because he was a critical witness to his own case. Periodically, the Court asked the Plaintiffs about Mr. Geilenfeld's status, and when informed he was still in prison, the Court kept the case off the trial docket and indicated it would do so until Mr. Geilenfeld was released. *See Tr. of Proceedings* 6:24-12:5 (*Sanctions Hr'g*) (ECF No. 292). It was during an April 30, 2015 telephone conference that Plaintiffs' counsel informed the Court that Mr. Geilenfeld had been released from prison in Haiti and would be available for trial. When the Court inquired about setting trial, Plaintiffs' counsel said that Mr. Geilenfeld needed time to recover from his experience in prison, that they needed about thirty days to do some additional discovery; Plaintiffs' counsel asked that the case be scheduled for trial in early July. After some further discussion with counsel, on April 30, 2015, the Court informed counsel that the trial would

36

commence in early July 2015. The Court set July 6, 2015 as the date for commencement of trial at the Final Pretrial Conference on May 29, 2015. *Final Pretrial Order* at 2 (ECF No. 342) (*Final Pretrial Order*).

In addition, on May 4, 2015, the Plaintiffs filed a motion to amend their Complaint, which the Court granted over Mr. Kendrick's objection on May 8, 2015. *Pls.' Mot. to Suppl. Compl. to Add Continuing Defamation and Suppl. Damages for Events Occurring in 2014 and 2015* (ECF No. 318); *Order Granting Mot. to Amend* (ECF No. 320). On May 8, 2015, the Plaintiffs moved to reopen discovery, and on the same day, the Court granted their motion over Mr. Kendrick's objection. *Oral Mot. to Reopen Disc.* (ECF No. 321); *Oral Order Granting Oral Mot. to Reopen Disc.* (ECF No. 322).

In light of this history, in the Court's view, the Plaintiffs are too generous to themselves in conceding only a ninety-day delay pursuant to their September 23, 2014 motion to continue. As a practical matter, the Plaintiffs prevailed upon the Court not to reset the case for trial while Mr. Geilenfeld was in a Haitian jail. Furthermore, the Plaintiffs requested and the Court granted them time in late April for Mr. Geilenfeld to reorient himself and for counsel to engage in limited discovery. The net effect was a continuance from September 23, 2014 through July 5, 2015, and the Court excludes this period of prejudgment interest under 14 M.R.S. § 1602-B(5). With the exception of this interval, the Court concludes that the Plaintiffs are entitled to prejudgment interest pursuant to 14 M.R.S.A. § 1602-B(5) from February 6, 2013,

the date of the filing of the Complaint, through July 24, 2015, the date of the entry of judgment.[9]

### ii.      Post-judgment Interest

Mr. Kendrick did not contest the Plaintiffs' request for post-judgment interest under federal law, and the Court concludes it is appropriate to impose that interest as stipulated by law on the judgment as well.[10]  In fact, the Court is without discretion to deny it.  *Vázquez-Filippetti*, 723 F.3d at 28.

### 2.      Dismissal of Punitive Damages Claims With Prejudice

### a.      Background

When the Plaintiffs initiated their Complaint against Paul Kendrick, each included a punitive damages count in the pleading, *Compl.* at Count IV, and they maintained their demand for punitive damages in the supplemental complaint they filed on May 4, 2015.  *Pls.' Mot. to Suppl. Compl. to Add Continuing Defamation and Suppl. Damages for Events Occurring in 2014 and 2015* Attach. 1 *Supp. Compl.*, at 10-11 (ECF No. 318) ("And Defendant continues to defame Plaintiffs with such ill-will and hatred that malice under common law for purposes of punitive damages is express or implied, permitting a significant award of punitive damages to punish and deter the Defendant").

---

[9]      The Plaintiffs urge the Court to declare that the applicable prejudgment interest rate is 3.16%.  *Pls.' Mot.* at 2-3.  Mr. Kendrick did not respond to that portion of the Plaintiffs' motion.  *Def.'s Opp'n* at 1-9.  The Court has no reason to conclude that the Plaintiffs' figure is wrong but has no reason to conclude it is right.  There must be some things counsel are able to do without a court order, and the resolution of the figure for prejudgment interest is one of them.  If the parties really cannot agree, they are free to bring the issue back to the Court.

[10]      As with prejudgment interest, the Court leaves it to the parties to resolve the figure for post-judgment interest.

In his pretrial memorandum, Mr. Kendrick urged the Court to bifurcate the liability phase of trial from the damages phase. *Def.'s Second Pretrial Mem. Pursuant to Local Rule 16.4* at 6-7 (ECF No. 335). In response, the Plaintiffs stated that "[a]t this juncture," they "do not anticipate the need for a bifurcated trial on punitive damages." *Pls.' (Second) Final Pretrial Mem.* at 7 (ECF No. 336). At the pretrial conference on May 27, 2015, the Court informed the parties that it intended to bifurcate the liability and compensatory damages portion of the trial and the punitive damages portion of the trial and issued an order to that effect:

> The Court indicated that it would likely bifurcate for trial the issues of liability and damages from the issue of punitive damages. The trial will proceed with liability, including liability for punitive damages, and damages in the first phase. If the jury finds in favor of the Plaintiffs on the liability question for punitive damages, the Court will allow the Plaintiffs to present evidence in an abbreviated proceeding, mostly if not exclusively consisting of evidence of the Defendant's wealth. The Defendant will be given the opportunity to present any evidence that he wishes. The Court will allow brief closing arguments and then give instructions to the jury on the punitive damages issue.

*Final Pretrial Order* at 7. The Court's concern was that the admission of evidence of Mr. Kendrick's wealth during the initial liability and compensatory damages phase would be unfairly prejudicial to Mr. Kendrick. *See Goldenson v. Steffens*, No. 2:10-cv-00440-JAW, 2014 U.S. Dist. LEXIS 91672, at *6 (D. Me. Jul. 7, 2014) ("The Court agrees with the Defendants, however, that the introduction of evidence of the Defendants' wealth into the liability phase of this trial would be potentially prejudicial"); *Shannon v. Sasseville*, 684 F. Supp. 2d 169, 172 (D. Me. 2010) (admitting evidence regarding the defendant's wealth for the purposes of punitive damages only after the jury had awarded compensatory damages). At the same time,

the Court expressly allowed the Plaintiffs to proceed with their punitive damages claim after the resolution of the liability and compensatory damages portion of the trial and provided that the jury could use the evidence generated in the trial to resolve the punitive damages claim. *Final Pretrial Order* at 7. In addition, the Court allowed the parties to present evidence during this final phase of the trial, including evidence of Mr. Kendrick's wealth. *Id.*

Toward the end of trial, consistent with its pretrial order, the Court prepared a set of final jury instructions on the issue of punitive damages and a jury verdict form. *Final Jury Instructions: Punitive Damages*; *Special Verdict Form Punitive Damages as to Michael Geilenfeld.*[11] The Court discussed the punitive damages instructions and verdict forms with counsel at the charge conference. *Jury Charge Conference* 2:3-3:23. There were no objections to the punitive damages jury instructions or the punitive damages verdict forms. *Id.*

On July 23, 2015, following the announcement of the jury verdicts in this case, the Court informed the jury that it had "another matter for you to decide" and the Court returned the jury to the jury room. *Tr. of Proceedings XIV* 138:8-12 (ECF No. 485). The Court inquired whether the parties wished to present any further evidence during the punitive damages phase of trial, and neither wished to do so. *Id.* 138:14-21. The Court asked counsel how long they needed for their closing arguments, and

---

[11]   Because the Court could not know whether one or both of the Plaintiffs would be entitled to make a punitive damages argument to the jury, the Court prepared three sets of jury instructions and two sets of verdict forms. They are all substantially the same. The jury instructions and the jury verdict form were referenced during the proceedings, and the Court has attached a sample as exhibits to this opinion. *See Ex. A, B.*

at that point, Plaintiffs' counsel asked for "five minutes" to talk to his clients. *Id.* 138:24-139:1.

Shortly thereafter, during a brief chambers conference, Attorney DeTroy announced: "Judge, we talked to the client and we're not going to pursue punitive damages." *Id.* 139:7-8. The Court informed counsel that it would bring the jury back into the courtroom and discharge them, which it did. *Id.* 139:13-140:23. On July 24, 2015, the Court issued a judgment awarding HWH a total of $7,500,000 and Michael Geilenfeld a total of $7,000,000 against Paul Kendrick. *J.* at 1. It dismissed Count IV, the punitive damages count, with prejudice. *Id.*

The Plaintiffs object, arguing that having abandoned their punitive damages claim at the edge of closing after an extended trial, they have the right to bring it again. The Court disagrees. The Plaintiffs instruct that their motion should be considered an "oral motion to amend their complaint" pursuant to Rule 15(b), not Rule 41(a). *Pls.' Mot.* at 10-11.[12]

But the Plaintiffs ignore the actual provisions of Rule 15(b), which addresses amendments during and after trial. FED. R. CIV. P. 15(b). Rule 15(b) provides for two

---

[12]   The distinction between Rule 15 and Rule 41 is not as clean as the Plaintiffs would have it. In their authoritative treatise, authors Wright, Miller, and Kane note:

> [T]here may be some overlap between Rule 15(a) and Rule 41(a)(1) when plaintiff seeks to amend the complaint to eliminate a claim from the action. Although it may be argued that Rule 41 applies only to a dismissal of the entire controversy and Rule 15(a) governs when the party attempts to drop fewer than all of the claims, several cases have not employed this distinction, and have held that a claim may be dropped under either provision.

6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1479 (2010 ed.).

instances where a party may amend the pleadings during and after trial: (1) where an opponent has objected to evidence because it "is not within the issues raised in the pleadings," FED. R. CIV. P. 15(b)(1); and (2) where the parties try an issue by consent. FED. R. CIV. P. 15(b)(2).  Neither is present here.[13]

Nor was the issue of punitive damages a matter forgotten by the parties until trial.  To the contrary, the issue of punitive damages was a significant one throughout the litigation up to the moment the Plaintiffs abandoned it.  One of the potential factors a jury may review to assess punitive damages is the wealth of the offending party.  *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21-22 (1991) (listing the financial position of the defendant as a proper factor in assessing the amount of punitive damages); *Harris v. Soley*, 2000 ME 150, ¶ 35, 756 A.2d 499, 510 (taking into consideration defendant's "extensive assets and income" in assessing punitive damages); *Ferrell v. Cox*, 617 A.2d 1003, 1007-08 (Me. 1992) (rejecting the contention "that the imposition of punitive damages without the introduction of evidence pertaining to [defendant's] financial circumstances infringed on [defendant's] constitutional rights").[14]  Based on this caselaw, the parties engaged in a series of

---

[13]    The Court does not accept the view that the Plaintiffs' decision not to proceed with their punitive damages claims is covered by the provisions of the Rule addressing amended pleadings.  If it is a pleading amendment, their motion violated the Scheduling Order of the Court dated March 8, 2013, which set May 24, 2013 as the deadline for amending the pleadings, *Scheduling Order* at 2 (ECF No. 9), later adjusted to June 24, 2013.  *Report of Hr'g and Order Re: Scheduling* at 1 (ECF No. 21).  Accepting the Plaintiffs' Rule-based argument, the Court was authorized to grant the requested relief on its own terms especially since the Plaintiffs violated the Scheduling Order.

[14]    More recently, the United States Supreme Court expressed some disquiet about a jury considering evidence of a defendant's wealth in assessing punitive damages.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) ("[T]he presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences") (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994)).  It may be that if a defendant were a big, out-of-state business, the trial court would limit evidence of net worth.  But this is not the case here.  Under Maine law, evidence of a defendant's

disputes about the Plaintiffs' right to access Mr. Kendrick's personal financial information and the timing of such discovery.

In addition, on May 9, 2014, Mr. Kendrick filed a motion for partial summary judgment in which he argued that he was entitled to judgment on the punitive damages count. *Def.'s Mot. for Partial Summ. J.* Attach. 1 (ECF No. 191). The Plaintiffs vigorously and successfully argued against Mr. Kendrick's motion, resulting in a fifty-four page Order dated August 28, 2015 denying Mr. Kendrick's motion. *Pls.' Opp'n to Def.'s Mot. for Partial Summ. J.* (ECF No. 207); *Order Denying Def.'s Mot. for Partial Summ. J.* (ECF No. 237).

As noted earlier, the issue of punitive damages was again raised by the parties and the Court during the run-up to trial, causing yet another order that required bifurcation.

Here, the Plaintiffs, after an arduous trial from July 6, 2015 to July 23, 2015, elected at the very last moment not to proceed with the punitive damages claim. Having waived the right to proceed to verdict at the end of a fully-litigated case, the Plaintiffs do not, in the Court's view, have the right to re-litigate an issue they intentionally elected not to pursue. To illustrate, if the Plaintiffs had proceeded to the very end of trial on the liability and compensatory damages, had become spooked by the way the evidence had gone in, by the seeming reaction of certain members of

---

wealth in a punitive damages claim remains potentially admissible but is not necessary. Here, although the parties vigorously fought whether Mr. Kendrick wealth was discoverable, whether it was admissible was never argued. To the extent the issue arose, the parties, including the Plaintiffs, indicated they had no further evidence to present at the punitive damages phase, just before the Plaintiffs elected not to proceed with the punitive damages claim. *Tr. of Proceedings XIV* 138:14-21.

the jury, or by some of the judge's rulings, and had strategically informed the Court just before the jury instructions and closing arguments that they had decided not to proceed to verdict, the Court would not allow the Plaintiffs to dismiss the case without prejudice, effectively granting the Plaintiffs the right to a completely new trial, one more to their liking.

### b.   The Current Motion

The Plaintiffs explained the reason they waived their right to proceed to verdict: "Plaintiffs withdrew this claim based on deference to the jury's compensatory damages verdicts, which were substantial, and rightfully so, and based on the fact that despite all they had been through Plaintiffs had no desire to punish Mr. Kendrick." *Pls.' Mot.* at 10.   The Plaintiffs immediately contradict themselves. Apparently, their desire to punish Mr. Kendrick could be reawakened, not because of anything Mr. Kendrick had done, but because the Court resolved the pending motion for new trial against them and "forced [them] to retry any part of their case." *Id.* The entity that would force a retrial would, of course, be the Court, and it would seem against public policy to allow the Plaintiffs to seek to punish Mr. Kendrick for the Court's ruling.   Having made the strategic decision at the critical time (presumably for good reason) not to ask the jury, which had just issued a $14,500,000 verdict against Mr. Kendrick, to issue another verdict punishing him, the Plaintiffs wish to hedge their benevolence and reserve the right to punish Mr. Kendrick on their election in the future.

44

The prospects are troubling.  As just noted, the Plaintiffs say that they would retry the punitive damages count "if they are forced to retry any part of their case." *Id.*  But if the Court granted their motion as requested and dismissed the punitive damages count without prejudice, there would be no restraint to its reassertion.[15] The Plaintiffs could proceed down several avenues.  They could demand another trial on punitive damages alone, and the Court would be faced with retrying a case that has already been contentiously and fully litigated.  They could assert collateral estoppel against Mr. Kendrick, given the defamation findings, and seek to have a trial on punitive damages alone.  In light of their insistence that they have a right to retry the entire case, including punitive damages, if they are "forced to retry any part of their case," *id.*, the Plaintiffs could force a retrial on punitive damages, even if this Court or the Court of Appeals ordered only a minor revision in the verdict or judgment.  Given the level of emotion and animosity in this case, the Court is chary about incentivizing the Plaintiffs' urge to punish.

The potential prejudice against Mr. Kendrick is palpable. He might be required to fully re-litigate a complex and expensive case already exhaustively litigated.  If in defense Mr. Kendrick elected to present actual victim witnesses and other witnesses by live testimony and deposition to counter the punitive damages claim, the Court

---

[15]     The Court is wary about leaving the reassertion of the punitive damages claim to the Plaintiffs' discretion.  The Plaintiffs have proved fickle about whether they are seeking to punish Mr. Kendrick. They vigorously asserted the punitive damages claim throughout the litigation and at the very last possible moment withdrew it.  They now seek the right to reassert it.  During the pretrial period, they aggressively pressed for sanctions against Mr. Kendrick, filing multiple motions for sanctions against him.  Yet, in their pending motion, they profess no desire to punish Mr. Kendrick while seeking the right to do so.  The contradictory positions of the Plaintiffs on whether they want to punish Mr. Kendrick convince the Court that it, not the Plaintiffs, should retain control over the issue.

would be hard-pressed to deny him the opportunity to submit the same evidence to a new jury that was before the old jury.  The old jury might not have been friendly to Mr. Kendrick, but faced with the Plaintiffs' demand to financially punish Mr. Kendrick, it may well have concluded that $14,500,000 was enough.  The new jury might be more inclined than the old one would have been to punish Mr. Kendrick financially since it would the only verdict the new jury would issue.  Finally, if the Plaintiffs are successful in obtaining a punitive damages award against Mr. Kendrick, he would face the potential of yet another trial and ancillary verdict, one added to the existing $14,500,000 judgment.

The Court allows one point for the Plaintiffs.  Their decision to waive the punitive damages was based on the extraordinary verdict the jury issued, which even the Plaintiffs acknowledge was "substantial."  *Id.*  In this Order, the Court rejected Mr. Kendrick's demand for a new trial and remittitur, but its word is not final and the Court of Appeals for the First Circuit may disagree.  Absent a separate peace among the parties, there are three possibilities: (1) an undisturbed final judgment after appeal; (2) a vacated judgment, requiring a new trial on all issues; or (3) a partially vacated judgment, requiring a new trial on some issues.  If the current judgment becomes final, it is the Court's firm intention not to allow the Plaintiffs to re-litigate the punitive damages count.  They have waived that right.  If the judgment is fully vacated, the Court would allow the Plaintiffs to reassert the punitive damages count because the size of the verdict formed the basis for the Plaintiffs' waiver.  If the

current judgment is altered, the Court will assess whether the altered judgment justifies the reassertion of the punitive damages count.

To thread this needle, the Court denies in part and grants in part the Plaintiffs' motion. The Court denies the Plaintiffs' motion to amend the judgment to the extent it seeks to alter the Court's dismissal of the punitive damages count with prejudice; however, the Court's dismissal with prejudice is conditioned on the Plaintiffs' right to move for an amended judgment, if justified under the terms of this Order, following any final resolution of the appellate process.

###    3.    Sanctions

Finally, the Court addresses whether it will continue to impose the $8,000 sanction on Mr. Kendrick for his violation of prior court orders. *See Order on Consolidated Mot. for Sanctions* (ECF No. 293) (*First Sanctions Order*); *Sanctions Order* (ECF No. 310) (*Second Sanctions Order*); *Order on Sanctions Order* (ECF No. 481). The purpose of the February 20, 2015 and April 22, 2015 sanctions orders was two-fold. The Court attempted to "fashion sanctions that will ensure compliance with the Court's orders and at the same time correct some of the damage done by their violations." *First Sanctions Order* at 31-32 (quoting *Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad v. Sec'y of the Treasury of P.R.*, Civil No. 08-1707 (JAF), 2013 U.S. Dist. LEXIS 4124, at *18 (D. P.R. Jan. 9, 2013)).

In its April 22, 2015 Sanctions Order, the Court declined to order Mr. Kendrick to pay the $8,000 sanctions award immediately, observing that it viewed "the ultimate resolution of the merits of this case by a jury, not the piecemeal

47

determination of side disputes, to be the main event . . . ." *Second Sanctions Order* at 5. The Court notes that once the sanctions orders issued and trial loomed, the orders were apparently effective in preventing further violations by Mr. Kendrick, at least the Plaintiffs have presented no evidence to the contrary. This leaves the other purpose: to correct some of the damage caused by the violation. On this point, the $14,500,000 verdict so thoroughly eclipsed the $8,000 sanction as to render it meaningless. In effect, the Court's view of this sanction resembles the Plaintiffs' view at trial that the size of the verdict eclipsed the need to punish.

In light of the multi-million dollar verdict in favor of their clients and against Mr. Kendrick, the Plaintiffs have not explained why the additional $8,000 is necessary to achieve justice in this case. Whatever else may be said, Mr. Kendrick's circumstances have dramatically changed since April 22, 2015. He now stands in the unenviable position of facing a $14,500,000 verdict with pre- and post-judgment interest and costs. In *Michael v. Liberty*, 566 F. Supp. 2d 10 (D. Me. 2008), the Court suggested that a person's inability to pay a sanction is an appropriate consideration in determining whether to order one, *id.* at 11, and the Court takes as a given that few people have the financial resources to pay such an enormous verdict. There is no evidence in this record that Mr. Kendrick is one of them. In this light, the Plaintiffs' insistence that they are entitled to extract another $8,000 in addition to the $14,500,000 seems gratuitous. Although the Court agrees with the Plaintiffs that an additional $8,000 is not a "ruinous" fine of constitutional magnitude, *see United States v. Levesque*, 546 F.3d 78, 84 (1st Cir. 2008), the Plaintiffs have not

satisfactorily explained why the Court should top a $14,500,000 verdict with an $8,000 sanction, except to mollify the Plaintiffs' still roiling sense of outrage.

As noted earlier, the First Circuit could vacate or reduce the verdict, and if the appellate court requires a marked change from the status quo, the Court is willing to revisit this order. But for now, the prospect of adding $8,000 to sanction a man already subject to a $14,500,000 judgment strikes the Court as judicial piling on and does not comport with its sense of proportion and fairness.

## IV.   CONCLUSION

The Court denies Mr. Kendrick's motion for a new trial and, in the alternative, remittitur or a new trial on damages. (ECF No. 488). It grants the Plaintiffs' motion for prejudgment interest running from February 6, 2013 through July 24, 2015, though it excepts the interval from September 23, 2014 through July 5, 2015. (ECF 489). It also grants the Plaintiff's motion for post-judgment interest from the date of judgment: July 24, 2015. (ECF No. 489). The Court denies the Plaintiffs' motion regarding sanctions subject to the terms of this Order. (ECF No. 489). It grants in part and denies in part Plaintiffs' motion to amend dismissal to without prejudice (ECF No. 489); the Court's dismissal with prejudice is conditioned on the Plaintiffs' right to move for an amended judgment, if justified under the terms of this Order, following any final resolution of the appellate process.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of October, 2015