UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HEARTS WITH HAITI, INC., et al., | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:13-cv-00039-JAW |
| | ) | |
| PAUL KENDRICK, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFFS' MOTION TO AMEND COMPLAINT AND GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

On July 23, 2015, after thirteen days of emotional and contentious testimony, a federal jury issued a stunning victory in this defamation case in favor of the Plaintiffs and against the Defendant in the total amount of $14,500,000. In an extraordinary turn of events, while this case was on appeal to the Court of Appeals for the First Circuit, the Defendant fell upon a plausible argument that this Court never had proper jurisdiction in the first place. The argument is based on an arcane exception to diversity jurisdiction that deems American citizens domiciled abroad "stateless" and renders them unable to access the federal courts on the basis of diversity jurisdiction. Here, the narrow issue is whether Mr. Geilenfeld was domiciled in Iowa or Haiti at the time he filed suit on February 6, 2013.

To say that the Defendant raised this issue late is an understatement, but unlike virtually any other legal issue, a court's jurisdiction cannot be waived and may

be raised at any time, even after verdict and on appeal, because jurisdiction goes to whether the court can legally hear the case.  After the issue was presented to the First Circuit, the appellate court remanded the case to this Court to make factual findings and resolve the question of Mr. Geilenfeld's domicile.  On remand, the Court admitted exhibits, received testimony from Mr. Geilenfeld and others, and reviewed memoranda submitted by the parties.

After analyzing the evidence and applying the law, the Court has concluded that Mr. Geilenfeld was domiciled in Haiti, not Iowa, as of February 6, 2013 and that the Court did not and does not have jurisdiction over the case.  The consequence of this decision is that the hard-fought verdict in favor of the Plaintiffs must be rendered a nullity and the case must be dismissed.

Although the Court is issuing its ruling in strict accordance with the facts as it has found them and the law as it understands it, the Court profoundly regrets that this issue was not raised earlier.  In a court whose purpose it is to resolve sometimes contentious disputes, this case stands apart.  Even though there were many side issues, the case turned on whether Mr. Geilenfeld had sexually abused young boys under his care at the St. Joseph Family of Haiti, an orphanage he founded in Port-au-Prince, Haiti.   Utterly convinced that Mr. Geilenfeld had done wrong, Mr. Kendrick repeatedly proclaimed Mr. Geilenfeld's guilt to all who could listen or read, including Hearts With Haiti (HWH) and other financial backers of the St. Joseph Family.  Equally determined to clear his name, Mr. Geilenfeld steadfastly denied Mr. Kendrick's accusations.  The discovery period was unusually rancorous, resulting in

this Court's imposition of sanctions, a rare event in the District of Maine. The trial was long, arduous, and consisted of difficult—occasionally searing—testimony from supporters and detractors of Mr. Geilenfeld, including a number of men who testified that Mr. Kendrick's allegations were true. Championed by one of the state of Maine's finest trial attorneys, the result of the trial was an unconditional victory for Mr. Geilenfeld and HWH, a United States nonprofit corporation whose main purpose has been to support St. Joseph.[1] This Court upheld the verdict from post-trial attack and assumed that the First Circuit would resolve the merits of the Defendant's appeal in the ordinary course. The remand came from out of the blue.

The Court is keenly aware that this case has taken an extraordinary toll on its participants: untold hours of attorney time and expense; the acute stress of the contentious discovery period and emotional trial; the impact on the parties and witnesses of an intense, prolonged proceeding; the hard work of the jury in listening to the evidence, applying the Court's instructions, and arriving at a verdict; and the resounding victory for the Plaintiffs. The Court assures the parties, particularly the Plaintiffs, that it does not lightly take the fruits of such a laborious victory from them. But it is this Court's duty to neutrally find the facts and apply the law, and the Court has concluded that it does not have and never had jurisdiction over the dispute and therefore the Plaintiffs' hard-earned victory is fated to be short-lived.

---

[1]     The Court was shocked to learn that Peter DeTroy, lead counsel for Mr. Geilenfeld and HWH, suddenly and unexpectedly passed away on May 28, 2016 while bicycling home.

In this opinion, the Court endeavors to explain why it has reached this conclusion.  The Court understands that its explanation is small solace to the disappointed litigants.[2]

## I.   BRIEF OVERVIEW

An American citizen domiciled abroad is considered "stateless" and does not satisfy the requirements for diversity jurisdiction.  During the pendency of Mr. Kendrick's appeal to the First Circuit, the Plaintiffs moved to amend their complaint to reflect their position that Mr. Geilenfeld remained a citizen of his home state of Iowa when they filed suit.  Mr. Kendrick then moved to dismiss for lack of jurisdiction on the ground that Mr. Geilenfeld was domiciled in Haiti at that time.  The First Circuit remanded the jurisdictional issue for resolution by this Court.  On remand, the Court held a jurisdictional hearing, and the parties submitted briefs on the issue after the hearing.

Domicile requires both physical presence in a place and intent to remain there.  A review of the voluminous record establishes that Mr. Geilenfeld left Iowa decades ago, that he traveled extensively for a time, and that he moved to Haiti in the 1980s.  From then until the filing of this suit on February 6, 2013, he lived and worked for an organization he founded in Port au Prince.  While he maintained some ties to Iowa, his life was firmly rooted in Haiti.  As such, the Court concludes that Mr. Geilenfeld

---

[2]      To answer an obvious worry, there has been no suggestion that the Defendant has been aware of this jurisdictional issue throughout this litigation and strategically stifled the question until after an adverse verdict.  The Court has no reason to suspect that the Defendant knew about this issue all along, and the Plaintiffs do not suggest that he did.  Nor would it have made sense for the Defendant to have litigated this expensive and bitter case to conclusion at the trial level and to pocket an argument that could have resulted in dismissal in its formative stages.  If the Court suspected otherwise, the issue before the Court would be different.  It does not.

was beyond its jurisdiction as a stateless American citizen domiciled abroad. It further concludes that considerations of finality cannot trump the jurisdictional defect, and that Mr. Geilenfeld's status as an indispensable, nondiverse party to this case requires the other plaintiff, HWH, to lose its verdict as well. The Court denies the Plaintiffs' motion to amend complaint and grants Mr. Kendrick's motion to dismiss.

## II.   PROCEDURAL HISTORY

### A.   Initiation of the Suit

On February 6, 2013, Michael Geilenfeld and HWH filed suit in this Court against Paul Kendrick. *Compl.* (ECF No. 1) (*Compl.*). The Plaintiffs invoked jurisdiction "pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000)." *Id.* ¶ 4. Regarding the parties' citizenship, the Plaintiffs alleged that HWH "is a North Carolina nonprofit corporation located in City of Raleigh, County of Wake, State of North Carolina, USA"; that Mr. Geilenfeld "is an individual residing in Pétion-Ville Commune, Port-au-Prince Arrondissement, Republic of Haiti and is the founder and Executive Director of St. Joseph Family of Haiti"; and that Mr. Kendrick "is an individual residing in the Town of Freeport, County of Cumberland, State of Maine, USA." *Id.* ¶¶ 1-3. On March 8, 2013, Mr. Kendrick filed an Answer, denying "that the amount in controversy exceeds Seventy-Five Thousand Dollars" and admitting "the remaining allegations" as regards diversity jurisdiction. *Defenses and Answer* ¶¶ 4-6 (ECF No. 8).

### B.    Trial

Although the Court originally scheduled the trial to begin on October 7, 2014, *Trial List* (ECF No. 231), Mr. Geilenfeld's arrest by Haitian authorities necessitated a continuance of the trial date.  *Oral Mot. to Continue* (ECF No. 260); *Oral Order Granting Mot. to Continue Trial for 90 Days* (ECF No. 261).  Eventually, the Court learned of Mr. Geilenfeld's release by Haitian authorities, *Min. Entry* (ECF No. 315), and on July 6, 2015, the jury trial commenced.  *Tr. of Proceedings I* (ECF No. 484). On July 23, 2015, the jury returned a verdict for the Plaintiffs: the jury awarded $2,500,000 on the defamation claim and $5,000,000 on the intentional interference claim to HWH, and it awarded $7,000,000 on the defamation, false light, and intentional interference claims to Mr. Geilenfeld.  *Jury Verdict Form as to Michael Geilenfeld* (ECF No. 474) (*Geilenfeld Jury Verdict Form*); *Jury Verdict Form as to Hearts with Haiti* (ECF No. 475) (*HWH Jury Verdict Form*); *J.* (ECF No. 480).

### C.    Appeal

After the Court denied Mr. Kendrick's motion for new trial on October 30, 2015, *Order on Def.'s Rule 59 Mot. for a New Trial or Alternative Post-J. Relief and Pls.' Rule 59(e) Mot. to Alter or Amend J. to Include Pre- and Post-J. Interest, to Include the April 22, 2015 Sanction, and to Reflect Dismissal without Prejudice of Pls.' Punitive Damages Claims* (ECF No. 498), Mr. Kendrick filed a notice of appeal to the First Circuit on November 18, 2015.  *Def.'s Notice of Appeal* (ECF No. 502).

On January 8, 2016, while the case was on appeal, the Plaintiffs moved to amend the pleadings to allege facts establishing diversity of citizenship.  *Hearts With*

*Haiti, Inc. v. Kendrick*, No. 15-2401, *Pls.-Appellees' Mot. to Amend Pleadings to Show Jurisdiction under 28 U.S.C. § 1653* (Doc. No. 00116942323) (*Pls.' Mot.*).[3]   On January 12, 2016, Mr. Kendrick objected to the Plaintiffs' motion to amend the pleadings and moved to dismiss the case for lack of subject matter jurisdiction.  *Hearts With Haiti, Inc. v. Kendrick*, No. 15-2401, *Def.-Appellant's Obj./Resp. to "Pls.-Appellees' Mot. to Amend Pleadings to Show Jurisdiction under 28 U.S.C. § 1653" and Def.-Appellant's Mot. for Affirmative Relief in the Form of Dismissal of the Case on Grounds of Lack of Subject Matter Jurisdiction* (Doc. No. 00116943575) (*Def.'s Mot.*).   On January 15, 2016, the Plaintiffs responded to Mr. Kendrick's motion.  *Hearts With Haiti, Inc. v. Kendrick*, No. 15-2401, *Pls.-Appellees' Resp. in Opp'n to Def.-Appellant's Mot. for Affirmative Relief in the Form of Dismissal of the Case for Lack of Subject Matter Jurisdiction and to Def.-Appellant's Mot. to Stay and to Clarify filed on January 14, 2016* (Doc. No.00116945980) (*Pls.' Resp.*).   On January 20, 2016, Mr. Kendrick replied to the Plaintiffs' response.  *Hearts With Haiti, Inc. v. Kendrick*, No. 15-2401, *Def.-Appellant's Reply to Pls.-Appellees' Resp. in Opp'n to his Mot. for Affirmative Relief in the Form of Dismissal of the Case for Lack of Subject Matter Jurisdiction* (Doc. No. 00116947111) (*Def.'s Reply*).

On February 16, 2016, the First Circuit remanded to this Court the questions "as to whether the amendment proposed by the appellees should be allowed and as to

---

[3]      The parties submitted the filings in this paragraph to the First Circuit.   At a telephone conference on February 18, 2016, the parties agreed that the Court should consider these filings in deciding the issues on remand.  *Min. Entry* (ECF No. 510).

whether diversity jurisdiction existed at the time the action was commenced." *Order of the Ct.* (ECF No. 508).

### D.    Events on Remand

On March 30, 2016, the Court held a hearing on the jurisdictional issue. *Tr. of Proceedings* (ECF No. 532) (*Hr'g Tr.*).  The Plaintiffs filed their post-hearing brief on April 15, 2016.  *Pls.' Post-Hr'g Br.* (ECF No. 534) (*Pls.' Br.*).  Mr. Kendrick filed a response on April 29, 2016, *Def.'s Suppl. Br. on Jurisdiction* (ECF No. 535) (*Def.'s Resp.*), and the Plaintiffs replied on May 6, 2016.  *Pls.' Reply Br. in Supp. of Jurisdiction* (ECF No. 538) (*Pls.' Reply*).

On May 20, 2016, Mr. Kendrick filed a motion to supplement the record by including an excerpt of one of Mr. Geilenfeld's earlier depositions.  *Def.'s Mot. to Suppl. Jurisdictional Hr'g Ex. D23* (ECF No. 541) (*Def.'s Mot. to Suppl.*).  On May 25, 2016, the Plaintiffs responded and objected to the inclusion of the exhibit.  *Pls.' Resp. in Opp'n to Def.'s Mot. to Suppl. Jurisdictional Hr'g Ex. D23* (ECF No. 544) (*Pls.' Resp. in Opp'n to Suppl. Jurisdictional Record*).  On May 27, 2016, Mr. Kendrick replied. *Def.'s Reply Mem. of Law in Supp. of Mot. to Suppl. Jurisdictional Hr'g Ex. D23* (ECF No. 545).  On June 9, 2016, the Court granted the Defendant's motion to supplement over the Plaintiffs' objection.  *Order on Mot. to Suppl. Jurisdictional Hr'g Record* (ECF No. 547).

## III.    THE PARTIES' POSITIONS

### A.    Arguments before the First Circuit

#### 1.    The Plaintiffs' Motion to Amend

The Plaintiffs moved to amend pleadings to show jurisdiction, arguing that complete diversity existed on the date the suit commenced: February 6, 2013. *Pls.' Mot.* at 1. They write that "while diversity of citizenship was uncontested and in fact existed at the time the action was filed (and continues to exist to this day), the pleadings do not address citizenship specifically." *Id.* at 2. They emphasize Mr. Geilenfeld's ties to Iowa, the state where he was born and raised, maintained his voter registration and driver's license, and kept a mailing address and a bank account. *Id.* at 2-3. According to the Plaintiffs, their error was merely technical in that they referred to "residency" rather than "citizenship" in the Complaint, and they ask the First Circuit to allow them to correct this error pursuant to 28 U.S.C. § 1653. *Id.* at 3.

### 2. Mr. Kendrick's Objection to Plaintiffs' Motion and Motion to Dismiss

Mr. Kendrick alleges that "[t]here is simply no doubt that when Mr. Geilenfeld filed his complaint in 2013, and during trial, Mr. Geilenfeld was domiciled in Port-au-Prince, Haiti, as he had been for a long, long time, and not by any stretch of the imagination living in Iowa." *Def.'s Mot* at 6 (footnote omitted). As Mr. Kendrick sees it, this factual allegation carries fatal implications for this case's jurisdictional validity given the rule that "American citizens who are domiciled abroad do not satisfy any of the enumerated categories required for a federal court's exercise of diversity jurisdiction." *Id.* at 6-7 (quoting *Freidrich v. Davis*, 767 F.3d 374, 377 (3d Cir. 2014) (citing *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828-29 (1989))). Mr. Kendrick concludes, "Mr. Geilenfeld is 'stateless' and he must be

dismissed for lack of subject matter jurisdiction." *Id.* at 9 (citations and footnotes omitted).

Mr. Kendrick then turns his attention to the other plaintiff, HWH, which he contends "must be dismissed from this case because Mr. Geilenfeld is an indispensable party and HWH gained a significant tactical advantage by the introduction of evidence of Mr. Geilenfeld's time in a Haitian prison made possible only due to Mr. Geilenfeld's presence in this case as a party." *Id.* Mr. Kendrick recalls Mr. Geilenfeld's "elegantly scripted and humbly delivered" testimony, as well as other evidence regarding his life that he believes affected the jury, and claims that this "is not a case where the appellate court is permitted to ignore the lack of complete diversity and dismiss only Mr. Geilenfeld . . . ." *Id.* at 13, 15 (citing *Newman-Green*, 490 U.S. 826). Finally, Mr. Kendrick argues that the doctrines of offensive and defensive nonmutual collateral estoppel, which exist to prevent re-litigation of previously decided issues, would apply here and underscore the notion that Mr. Geilenfeld an indispensable party. *Id.* at 16-17.

### 3.    The Plaintiffs' Response

The Plaintiffs begin by chronicling the case's protracted history and write that "[n]ow facing an impending deadline to brief a meritless appeal, Kendrick perceives in Plaintiffs' Motion for a technical conforming amendment of the pleadings, an opportunity for a 'get out of jail free' card, claiming for the first time ever that he denies Geilenfeld's domiciliary intent." *Pls.' Resp.* at 3-4. But as the Plaintiffs see it, the case has proceeded to final judgment, so "considerations of finality, efficiency, and

economy become overwhelming." *Id.* at 4 (quoting *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 75 (1996)).

On the merits of Mr. Kendrick's motion, the Plaintiffs assert that "[m]ere residence is insufficient to determine a party's jurisdictional status." *Id.* at 5 (quoting *Chico v. P.R. Elec. Power Auth.*, 312 F. Supp. 2d 153, 156 (D.P.R. 2004)). The Plaintiffs contend that all the "key indicia" of Mr. Geilenfeld's domicile point toward Iowa:

> [H]is voter registration is in Linn County, Iowa (valid at the time suit commenced); his home address is at the same Linn County, Iowa location, and is a physical residence where he receives mail, has physical presence, and to which he returns when he has been away; his drivers licenses are and have always been Iowa licenses; his personal banking and financial headquarters were and remain based in Iowa banks.

*Id.* at 6. Of these indicia, the Plaintiffs find especially significant the fact that Mr. Geilenfeld retained an Iowa voter registration—a "weighty" factor, according to the First Circuit. *Id.* at 14-15 (quoting *Bank One v. Montle*, 964 F.2d 48, 50 (1st Cir. 1992)). Moreover, the Plaintiffs argue that there is a presumption of "domicile by birth," which establishes Mr. Geilenfeld's domicile as Iowa, and that once domicile has been established, there is a presumption of "continuing domicile," which can only be broken by "both presence in the new domicile, and the intent to remain there." *Id.* at 7 (citing *Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31-32 (1st Cir. 2008); *Chico*, 312 F. Supp. 2d at 157). On this point, the Plaintiffs claim that "the exact opposite from a change in domicile has occurred," as Mr. Geilenfeld "has taken undisputed steps to maintain a presence and home base in Iowa . . . ." *Id.* at 9 (citing *Bank One*, 964 F.2d at 50).

Addressing Mr. Kendrick's argument that Mr. Geilenfeld's supposed lack of diversity would also require HWH to lose its judgment, the Plaintiffs urge the Court to take a pragmatic approach:

> [A] party that is a "jurisdictional spoiler" may be dropped from the case, particularly when—as here—the objecting party has waited until appeal to raise the challenge and requiring dismissal of the whole action "after years of litigation, would impose unnecessary and wasteful burdens on the parties, judges, and other litigants."

*Id* at 16 (quoting *Newman-Green*, 490 U.S. at 827). Further, the Plaintiffs submit that because HWH made claims based on "separate torts and separate damages" and because "the jury's verdict was based upon the sound instruction provided by the trial court that the jury was to determine liability and damages separately as to both plaintiffs," Mr. Geilenfeld cannot be considered an indispensable party to HWH's case. *Id.* at 17-18.

### 4.   Mr. Kendrick's Reply

Mr. Kendrick takes issue with several of the Plaintiffs' statements of fact and law. On the facts, Mr. Kendrick seeks to contradict Mr. Geilenfeld's declared intention to return to Iowa by quoting a deposition in which he said: "I will always continue to do good works with Haitians because my whole life is in Haiti." *Def.'s Reply* at 2 (quoting *Def.'s Obj. and Opp'n Mem. to Pls.' Mot. in Limine to Include Test. of Alain Lemithe* Attach. 2 *Extracts from the Mins. of the Ct. Registry of the Ct. of the First Instance in Port au Prince*, at 2 (ECF No. 392) (*Ct. of First Instance Mins.*)). Mr. Kendrick also tries to undermine the Plaintiffs' reliance on the domicile factors, writing, inter alia, "it is very common for U.S. citizens living in a foreign country,

especially a developing country like Haiti, to maintain a U.S. mailing address so that they can hold a U.S. driver's license." *Id.* at 3.

On the law, Mr. Kendrick clarifies that "the burden is on the proponent of federal jurisdiction to prove the jurisdictional facts by a preponderance of the evidence." *Id.* at 4 (citing *García Pérez v. Santaella*, 364 F.3d 348, 351-52 (1st Cir. 2004)). He also rejects that notion that the Court can find Mr. Geilenfeld nondiverse yet allow HWH to keep its judgment, arguing that "the most important factual issue for the jury was whether Mr. Geilenfeld sexually abused young men in Haiti. That issue was common to the defamation claims of both plaintiffs, so that if the jury found Mr. Geilenfeld did molest children, each of the plaintiff's cases would have failed." *Id.* at 5.

## B.   Arguments on Remand

### 1.   The Plaintiffs' Brief

In their post-hearing brief, the Plaintiffs stress the anomalous aspect of statelessness doctrine, which they describe as a jurisdictional "loophole" that the Court ought to avoid if it can do so. *Pls.' Br.* at 3 n.1. They say that Mr. Geilenfeld is a missionary and argue that "[t]he issue of domicile must be viewed through this lens." *Id.* at 4. While Mr. Geilenfeld "maintained his domiciliary intent in Iowa with all other objective indicia of domicile in Iowa," the Plaintiffs nonetheless caution against adherence to "[a]bstract lists of indicia of domicile" for persons—like Mr. Geilenfeld—fitting within the "recognized exceptions for United States citizens who, in pursuit of a calling or occupation, spend significant periods of time abroad . . . ."

*Id.* at 5-6; *see also id.* at 8 (citing *Kaiser v. Loomis*, 391 F.2d 1007 (6th Cir. 1968) (missionary doctor residing away from domicile); *Lewis v. Splashdam By-Products Corp.*, 233 F. Supp. 47 (W.D. Va. 1964) (same for labor union representative); *Sherman v. Roosevelt Co.*, 48 F. Supp. 434 (D. Mass. 1943) (same for railroad transportation inspector)).

The Plaintiffs document Mr. Geilenfeld's and his family's deep ties to Iowa, as well as the fact that he often referred to Iowa as "home" and to himself as an "Iowan." *Id.* at 9-11.  After Mr. Geilenfeld's mother died in 2003, the family sold its home in Algona, Iowa, and Mr. Geilenfeld began keeping a room in a house owned by Lucille Dietrich—a close friend whom he considers "surrogate" family—at 212 Wesley Drive NW, Cedar Rapids, Iowa.  *Id.* at 11-12.  The Plaintiffs allege this address was Mr. Geilenfeld's "home" from that time to this day.  *Id.* at 12.

Turning to the indicia, the Plaintiffs point to Mr. Geilenfeld's voter registration, driver's license, and bank accounts bearing his Iowa address, as well as ties between his mission work and Iowa.  *Id.* at 12-14.  From the Plaintiffs vantage, "[t]here is not much more that Geilenfeld could have done to establish and maintain domicile in Iowa . . . ."  *Id.* at 18.  They maintain that Mr. Geilenfeld "has very little by way of personal possessions," and that while he "technically" owns the assets comprising his mission work in Haiti, these assets are "essentially" held in trust by Mr. Geilenfeld for the benefit of the children whom he serves.  *Id.* at 14-15.  Regarding Mr. Geilenfeld's immigration status in Haiti, they explain that he applies annually for an extended visa referred to as "Permis de Sejure."  *Id.* at 15.

Finally, "in an abundance of caution," the Plaintiffs reiterate the argument they made to the First Circuit that if Mr. Geilenfeld is found to be non-diverse, he should also be found to be a dispensable party with regard to HWH's claim against Mr. Kendrick. *Id.* at 18-20. As a consequence, they maintain, HWH's verdict against Mr. Kendrick should stand however the Court resolves the issue of Mr. Geilenfeld's domicile. *Id.*

### 2.     The Defendant's Brief

On the law, Mr. Kendrick argues that "[t]he intent to remain need not be permanent, only indefinite," *Def.'s Resp.* at 2 (citing *Hawes v. Club Ecuestre el Comandante*, 598 F.2d 698, 701 (1st Cir. 1978)), and that affidavits regarding a person's subjective intent made after a jurisdictional challenge are "suspect." *Id.* at 3 (quoting *Hawes*, 598 F.2d at 704). Mr. Kendrick says that Mr. Geilenfeld moved to Haiti on his own accord in 1985 and has lived and worked exclusively in Haiti since then, including at the time the Complaint was filed. *Id.* 3-5. Mr. Kendrick also finds significance in the fact that Haiti is where Mr. Geilenfeld owns property worth "several millions of dollars," operates a sizeable organization with people who are like family to him, and even had a crypt constructed for himself. *Id.* at 6-10. Moreover, according to Mr. Kendrick, Mr. Geilenfeld's proclamations of his status as a missionary do not change the legal analysis, as "the word 'missionary' is not a magic talisman that exempts any person who affixes that label to himself from the established law of domicile." *Id.* at 11.

Meanwhile, Mr. Kendrick sees any Iowa ties as superficial matters of "personal convenience," noting that "Mr. Geilenfeld has not lived or worked in Iowa for over forty years, does not own any real property in Iowa, does not pay any taxes in Iowa, and has had no involvement in any civic affairs, charitable works, or organizations of any kind in Iowa." *Id.* at 12-13.  Mr. Kendrick points out that Mr. Geilenfeld has been to Iowa twice since 2010 and has not voted there since the 1972 presidential election. *Id.* at 13-15.  He also alleges that Mr. Geilenfeld "fraudulently" applied for an Iowa voter registration as a means of more easily obtaining an Iowa driver's license. *Id.* at 15.  According to Mr. Kendrick, Mr. Geilenfeld used his Iowa State Bank account for the purpose of running his organization in Haiti and cannot be considered to have been domiciled in a friend's guest room that "he has only visited twice for a matter of weeks in the last six years." *Id.* at 16-17.

Mr. Kendrick advocates for an application of diversity jurisdiction's usual rules notwithstanding "practical concerns" and "considerations of finality." *Id.* at 18-19 (citing *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 568-69, 575-82 (2004)). He relies on his briefing to the First Circuit for his argument "that Mr. Geilenfeld cannot be dropped as a party to preserve complete diversity." *Id.* at 1 n.1.

### 3.    The Plaintiffs' Reply Brief

The Plaintiffs portray Mr. Kendrick as making "two central, categorical errors" in his brief. *Pls.' Reply* at 1.  His first is "to equate 'residence' with 'domicile,' and to urge, incorrectly, that every reference to Haitian residence is a reference to

citizenship or domicile." *Id.* His second relates to his understanding of Mr. Geilenfeld's missionary work:

> [I]f it is true as the Defendant appears to concede that the Court would exercise jurisdiction over Geilenfeld had he *not* left the Brothers' ecclesiastical order, because his native Iowa domicile would have continued presumptively, then there must still be jurisdiction over him despite whatever canonical decision permitted him to leave the Brothers but to engage in precisely the same work.

*Id.* at 3.

## IV.  LEGAL STANDARD

In *Newman-Green, Inc. v. Alfonzo-Larrain*, the Supreme Court wrote that "[i]n order to be a citizen of a State within the meaning of the diversity statute, a natural person must be both a citizen of the United States *and* be domiciled within a state." 490 U.S. at 828 (emphasis in original) (citing *Robertson v. Cease*, 97 U.S. 646, 648-49 (1878); *Brown v. Keene*, 33 U.S. 112, 115 (1834)).  That is, "Americans who are domiciled abroad do not satisfy any of the enumerated categories required for a federal court's exercise of diversity jurisdiction."  *Friedrich*, 767 F.3d at 377 (citing *Newman-Green*, 490 U.S. at 828-29); *see also D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra*, 661 F.3d 124, 126 (1st Cir. 2011) ("United States citizens who are domiciled abroad are citizens of no state" (citing *Newman-Green*, 490 U.S. at 829). "For the purposes of diversity, a person is a citizen of the state in which he is domiciled."  *Padilla-Mangual*, 516 F.3d at 31 (collecting cases).  The courts refer to these United States citizens who domicile in none of her constituent states as "stateless."  *See, e.g., Zwirn*, 661 F.3d at 126.  Stateless litigants fall through the cracks of the diversity jurisdiction statute because their American citizenship

17

deprives them of diversity as "citizens or subjects of a foreign state" under § 1332(a)(2), while their statelessness disqualifies them from diversity as "citizens of different States" under § 1332(a)(3). *Id.* In Professor Chemerinsky's crisp articulation, the rule is that "a person may not sue or be sued in a diversity case if he or she is a citizen of the United States but not a citizen of a particular state." ERWIN CHEMERINKSY, FEDERAL JURISDICTION § 5.3 (6th ed. 2012).

Here, the crucial question is domicile, which must be determined from the time the suit was filed. *Padilla-Mangual*, 516 F.3d at 31 (citations omitted). "Once challenged, the party invoking diversity jurisdiction must prove domicile by a preponderance of the evidence." *García Pérez*, 364 F.3d at 350 (citing *Bank One*, 964 F.2d at 50). "A person's domicile 'is a place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" *Padilla-Mangual*, 516 F.3d at 31 (quoting *Rodríguez-Díaz v. Sierra-Martínez*, 853 F.2d 1027, 1029 (1st Cir. 1988)). Significantly, "[w]hile a person may have more than one residence, he can only have one domicile." *One Bank*, 964 F.2d at 53; *see also Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 366 (1st Cir. 2001) ("A party only can have one domicile at a time") (citing *Bank One*, 964 F.2d at 53). There are two requirements for domicile: (1) "physical presence in a place" and (2) "the intent to make that place one's home." *Valentín*, 254 F.3d at 366 (citing *Rodríguez-Díaz*, 853 F.2d at 1029).

In assessing the latter requirement, intent, the First Circuit has instructed courts to consider these factors: "current residence; voting registration and voting

practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs and other associations; place of employment or business; driver's license and other automobile registration; [and] payment of taxes." *García Pérez*, 364 F.3d at 351 (alteration in original) (quoting 13B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3612 (2d ed. 1984)); *see also Bank One*, 964 F.2d at 50 ("the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment") (quoting *Lundquist v. Precision Valley Aviation, Inc.*, 946 F.2d 8, 11-12 (1st Cir. 1991) (per curiam)). These factors are to be applied in a holistic rather than mechanistic manner, as "[n]o single factor is dispositive, and the analysis focuses not simply on the number of contacts with the purported domicile, but also on their substantive nature." *García Pérez*, 364 F.3d at 351 (citing *Lundquist*, 946 F.2d at 12).

In terms of the evidence the Court may consider in making its domicile determination, the Court—consistent with First Circuit guidance—takes an inclusive approach in an effort to bring before it all relevant, probative facts. *See, e.g.*, *Padilla-Mangual*, 516 F.3d at 34 ("In conducting a jurisdictional inquiry, the court enjoys broad authority to order discovery, consider extrinsic evidence, hold an evidentiary hearing, and hear testimony in order to determine its own jurisdiction") (citing *Valentín*, 254 F.3d at 363); *Bank One*, 964 F.2d at 54-55 ("[W]e direct the district

19

court to conduct further inquiry into the relevant jurisdictional facts and make further findings thereon.   Additional evidence should be secured in whatever expeditious manner the district court determines—whether by evidentiary hearing, discovery, further affidavits, or any combination of these, or by other means").

## V.   DISCUSSION

### A.   Physical Presence

"Physical presence" is a particular concept in the domicile context.  It does not literally mean actual physical presence in the state on the date the lawsuit was filed; otherwise, a life-long resident of a state would lose that status because he happened to be out of state the day the lawsuit was filed.

The First Circuit has described two indispensable requirements to change a legal domicile as "[f]irst, residence in a new domicil[e]; and second, the intention to remain there." *Hawes*, 598 F.2d at 701 (quoting *Sun Printing & Publ'g Ass'n v. Edwards*, 194 U.S. 377, 383 (1904)).  In 2001, the First Circuit wrote that "[d]omicile requires both physical presence in a place and the intent to make that place one's home.  It follows logically that in order to change domiciles, a person must move to a new state in which she intends to remain indefinitely." *Valentín*, 254 F.3d at 366 (citations omitted); *see also* 13E WRIGHT, MILLER & COOPER § 3613 (3d ed. 2009) ("When the two required elements of physical presence and intention to remain concur, the new domicile is established").

Mr. Geilenfeld's decades-long residence in Haiti establishes his physical presence there, and in fact, there does not appear to be a dispute that he was

physically residing in Haiti, as he originally alleged, as of February 6, 2013, the date the Complaint was filed.  *Compl.* ¶ 2 ("Plaintiff Michael Geilenfeld is an individual residing in Pétion-Ville Commune, Port-au-Prince Arrondissement, Republic of Haiti . . .").

Even though a person's absence from the state on the date of the filing of a complaint does not bar a claim of domicile in that state, a person's physical presence in the state where he claims a domicile remains relevant.  The testimony on this issue was detailed and reveals that ever since January 31, 1985, when he founded his own mission, *Hr'g Tr.* 18:5-13, Mr. Geilenfeld has lived in Haiti and only occasionally visited Iowa.  As noted earlier, Mr. Geilenfeld grew up in Algona, Iowa and his parents remained there together until 2003, when his mother died.  *Id.* 33:25-34:3. During this period, Mr. Geilenfeld visited Iowa about twice a year: typically once in September and again during Christmas.  *Id.* 19:13-20:5.  He mentioned that the September visit was ideal because there was a lull in activity in Haiti and both his parents had September birthdays.  *Id.* 19:21-20:5.  During these visits, he would stay in his own room at his parents' home in Algona.  *Id.* 20:6-12.  When Mr. Geilenfeld's mother became ill in 2003, he returned to Algona to be with her in the time preceding her death and through her funeral, a period of about two months.  *Id.* 33:25-34:18.

After his mother passed away, his father, who was suffering from Alzheimer's Disease, was transferred to a nursing home in Oelwein, Iowa, where Mr. Geilenfeld's brother lived, about three and one-half hours from Algona and about forty minutes from Cedar Rapids.  *Id.* 34:22-35:13, 36:9-12.  At the reception following his mother's

funeral, Lucy Dietrich, who considers Mr. Geilenfeld "an emotional part of [her] family," and her husband Gary Dietrich approached Mr. Geilenfeld, informed him that they understood that the Geilenfeld family would be selling the Algona house, and offered Mr. Geilenfeld a room in their house at 212 Wesley Drive, Cedar Rapids, Iowa. *Hr'g Tr.* 35:20-36:8; *Pls.' Resp.* Attach. 2 *Decl. of Lucille Dietrich* ¶¶ 3-4 (*Lucille Dietrich Decl.*); *Pls.' Resp.* Attach. 1 *Decl. of Michael Geilenfeld* ¶ 10 (*Geilenfeld Decl.*). Mr. Geilenfeld accepted. *Hr'g Tr.* 36:9.

From 2003 through 2009, Mr. Geilenfeld visited Cedar Rapids at least once, and sometimes twice, a year. *Id.* 37:21-25. During these visits, he stayed at the Dietrichs' home at 212 Wesley Drive in Cedar Rapids. *Geilenfeld Decl.* ¶ 10; *Def.'s Hr'g Ex. 65, Pl. Michael Geilenfeld's Suppl. Answers to Interrogs. Propounded by Def. for Hr'g on Jurisdiction* ¶ 2 (*Geilenfeld Interrog.*) ("Since January 1, 2003, or soon thereafter, I would have spent the night at 212 Wesley Drive NW, Cedar Rapids every time I returned home to Iowa").

In December 2009, Mr. Geilenfeld's brother contacted him, said that their father was failing, and urged Mr. Geilenfeld to return to Iowa. *Hr'g Tr.* 45:4-11. Mr. Geilenfeld did so, but he had gone back to Haiti by the time his father passed away on December 23, 2009. *Id.* 45:16-19. Mr. Geilenfeld returned to Iowa to attend his father's funeral on December 29, 2009 then returned to Haiti a few days before the Haitian earthquake on January 9, 2010. *Id.* 45:22-46:3.

The record reveals that Mr. Geilenfeld returned to Iowa only once between early January 2010 and February 6, 2013, a span of just over three years. *Id.* 50:16-

18.   In September 2011, Mr. Geilenfeld returned to Oelwein, Iowa for a family reunion.  *Id.* 50:3-15, 54:8-55:2; *Pls.' Hr'g Ex.* 91-92.   From September 2011 to February 6, 2013, during the sixteen month period immediately before the filing of this lawsuit, Mr. Geilenfeld did not set foot in Iowa.[4]  Even the family reunion in 2011 is not unalloyed.  Mr. Geilenfeld testified that he coordinated his attendance at the family reunion with a fundraising tour for St. Joseph called Resurrection from the Rubble.  *Id.* 50:8-15; *see Pls.' Hr'g Ex.* 92.

Home is a place you return to without having a reason to do so.  In the words of the First Circuit, "[a] person's domicile 'is the place where he has his true, fixed home and principal establishment, and to which, wherever he is absent, he has the intention of returning.'"  *Padilla-Mangual*, 516 F.3d at 31 (quoting *Rodríguez-Díaz*, 853 F.2d at 1029) (quoting 13E WRIGHT, MILLER & COOPER, § 3612 (2d ed. 1984)).  For Mr. Geilenfeld, as far as the Court can determine, his trips to Iowa before he filed this lawsuit were dual-purpose trips: to visit his parents when they were alive, to attend their funerals, to be present at a family reunion, and to raise funds for St. Joseph.  Although the dual-purpose nature of his trips to Iowa do not bar his claim of an Iowan domicile, evidence that he had gone to Iowa because it was his home, not because it was his parents' home, his brother's home, or a fund-raising opportunity for his mission in Haiti, would have been more persuasive.

---

[4]      Mr. Geilenfeld testified he returned to Iowa for Christmas in 2015.  *Hr'g Tr.* 50:16-18.  This fact has only a tangential impact on the Court's analysis because the critical time for the determination of jurisdiction is as of the date of the filing of the Complaint on February 6, 2013.  Furthermore, Mr. Geilenfeld testified that his travel to Iowa for Christmas 2015 came about as a result of a gift from Lucy Dietrich.  *Id.* 48:17-49:1.  His Christmas 2015 visit to Iowa would be stronger evidence of his domicile if he had paid to return, not because a friend paid his way to visit.

### B.     Intent

The Court turns to the nub of the jurisdictional question: whether Mr. Geilenfeld intended to make Haiti his home or whether he intended to return to Iowa. Under First Circuit law, "[t]here must be an intention to remain at the new residence indefinitely; it is not required that the intention be to stay there permanently.  A 'floating intention' to return to a former domicile does not prevent the acquisition of a new domicile."  *Hawes*, 598 F.2d at 701 (citing *Gilbert v. David*, 235 U.S. 561, 569 (1915)).

### 1.     An Overview of Mr. Geilenfeld's Life

At the outset, the Court presents an overview of where Mr. Geilenfeld has resided based on his own testimony at trial, consistent with the declaration he submitted on appeal, and the testimony he gave at the jurisdictional hearing.  Mr. Geilenfeld was born and raised in Algona, Iowa, "a very small community" in which he had "a pretty normal childhood."  *Tr. of Proceedings VI* 25:14, 25:18-27:12 (ECF No. 451) (*Geilenfeld Test. I*).  After graduating from high school, he went off to a liberal arts college in Minnesota but returned to Algona just two months later.  *Id.* 29:22-25.  He then decided to attend seminary in Southfield, Michigan, and from the stand, he described his excitement upon leaving Iowa:

> It was an adventure, you know, I was driving my car and the first time I was really leaving Iowa, you know, getting out of the cornfields and going to what was like a big city, and it was the first time I had kind of struck out on my own, you know.  And it was a very exciting time for me, a sense of independence and really liberation and a new beginning.

*Id.* 31:9-15.  He stayed in Michigan for about a year and a half, *id.* 32:6-7; *Hr'g Tr.* 8:6-15, then traveled to Assisi, Italy for six months.  *Geilenfeld Test. I* 32:20-24; *Hr'g Tr.* 8:16-25.  There followed a period during which Mr. Geilenfeld travelled from place to place; he lived in Utah, *Geilenfeld Test. I* 34:6-9; *Hr'g Tr.* 11:20-24, in Vietnam and Cambodia, *Geilenfeld Test. I* 40:6-8; *Hr'g Tr.* 12:20-13:2, and spent a month in India before returning to the United States to work in Los Angeles, California.  *Geilenfeld Test. I* 43:8-23; *Hr'g Tr.* 14:17-15:12.  At the jurisdictional hearing, Mr. Geilenfeld emphasized that he returned to Iowa during his time with the Missionaries of Charity; for a while, he "was only allowed to go home once every three years, but outside of that, I was always home at least once or twice a year."  *Hr'g Tr.* 9:13-10:6.

In 1981, Mr. Geilenfeld arrived in Haiti, *Geilenfeld Test. I* 44:23, where he worked at a Haitian shelter for two years.  *Id.* 48:9-11.  In 1984, he decided to leave the missionary organization with which he had worked for eleven years in many locations throughout the world.  *Id.* 51:15-25.  Mr. Geilenfeld founded his own organization—St. Joseph's Family of Haiti—in Port-au-Prince on January 31, 1985, *id.* 134:19-20, which was located at 47 Delmas for the first six months and then moved up the street to 91 Delmas, where it would remain for decades.  *Id.* 60:24-61:6.  According to his declaration, Mr. Geilenfeld lived in Haiti for this extended period: "Since the founding of St. Joseph's Family of Haiti, I have lived in Port au Prince, Haiti, because my charitable mission work in Haiti is full-time and requires me to be there."  *Geilenfeld Decl.* ¶ 7.  This suit commenced on February 6, 2013, about twenty-

eight years after the founding of his organization, and Mr. Geilenfeld was still residing in Port-au-Prince, Haiti. *Compl.* ¶ 2.

### 2.    The Factors

The Court first addresses two contested factors, voting and property, that require more extensive analysis, then turns to a brief consideration of the remaining factors.

### a.    Voting

In their briefing to the First Circuit, the Plaintiffs argue that "[v]oter registration in Iowa should be nearly dispositive" of the jurisdictional issue, *Pls.' Resp.* at 14, and they submit along with their argument evidence establishing that Mr. Geilenfeld possesses an Iowa voter registration. *Geilenfeld Decl.* ¶¶ 8, 12, 17; *id.* Attach. 3 *Michael Karl Geilenfeld Voter Identification Card* (*Geilenfeld Voter ID*). In their briefing after the jurisdictional hearing, the Plaintiffs likewise write that "[a]fter relocating his home to Cedar Rapids, in 2005 Geilenfeld registered to vote in Linn County, Iowa, and remained registered to vote there as of February 6, 2013." *Pls.' Br.* at 12. Voter registration, according to the Plaintiffs, is a "weighty" factor. *Id.* (quoting *Bank One*, 964 F.2d at 50).

Mr. Kendrick, meanwhile, infers that Mr. Geilenfeld "has never bothered to vote in local, state, or national elections in Iowa before," and charges that "this demonstrated lack of concern for what happened politically in Iowa for thirty years is evidence of abandonment of Iowa as his domicile long ago . . . ." *Def.'s Reply* at 2-3. After the jurisdictional hearing and additional factual development, Mr. Kendrick

writes that Mr. Geilenfeld must have had "some purpose other than a desire to vote in Iowa" given that he has not voted there since 1972, and he presumes that the other purpose was to create a presumption of residency in Iowa, which in turn made it easier to obtain an Iowa driver license. *Def.'s Resp.* at 15.

> In *Bank One*, the First Circuit wrote:

> While no single factor is controlling, some courts have established a presumption of domicile in the state in which a party is registered to vote. This court has not recognized such a presumption, but we have said that the place a person is registered to vote is a "weighty" factor in determining domicile.

964 F.2d at 50 (citations omitted); *see also Lundquist*, 946 F.2d at 12 ("We need establish no such presumption to agree that Lundquist's voting registration carries weight"). Accepting this guidance, the Court tallies Mr. Geilenfeld's Iowa voter registration card as a factor supporting his claim to Iowa domicile. But consistent with the principle that the Court must consider the "substantive nature" of each factor, *García Pérez*, 364 F.3d at 351 (citing *Lundquist*, 946 F.2d at 12), the Court finds voter registration on these facts to be much less weighty than in *Bank One* and *Lundquist*—the cases that set out this rule—for two reasons.

First, those cases dealt with litigants who had moved from one state to another state. *Bank One*, 964 F.2d at 49 (the defendant argued he was not diverse because he moved from Massachusetts to Texas before the Texan plaintiff brought suit); *Lundquist*, 946 F.2d at 9 (New Hampshirite defendants argued they were not diverse from the plaintiff who resided in Florida but was domiciled in New Hampshire). By contrast, Mr. Geilenfeld moved to a foreign country, and he concedes that he "ha[s]

never been registered or eligible to vote in any other state or country, including Haiti." *Geilenfeld Decl.* ¶ 12.  That being the case, it is unremarkable that he chose to obtain an Iowa voter registration, issued on May 13, 2005, because he lacked any alternative venue in which to vote.  *Geilenfeld Voter ID*; *Geilenfeld Decl.* ¶ 12.

Second, and more importantly, Mr. Geilenfeld never used his current Iowa voter registration.  *Hr'g Tr.* 117:25-118:1 ("I've not voted since I registered in Cedar Rapids").  In fact, the last time he voted in Iowa was 1972.  *Hr'g Tr.* 118:6-9.  The Court takes Mr. Kendrick's point that actually voting—as opposed to just maintaining voter registration—makes for a weightier claim to domicile.  The language the First Circuit uses in listing the domicile factors explicitly mentions voting registration in tandem with the act of voting.  *García Pérez*, 364 F.3d at 351 ("voting registration and voting practices") (quoting WRIGHT, MILLER & COOPER § 3612); *Bank One*, 964 F.2d at 50 ("the place where civil and political rights are exercised") (quoting *Lundquist*, 946 F.2d at 11-12); *see also Leon v. Caribbean Hosp. Corp.*, 848 F. Supp. 317, 318 (D.P.R. 1994) ("[V]oter registration is indicative of very little for a person who has previously shown no interest in participating in the electoral process").

Delving more deeply into the facts of the cases also lends support to Mr. Kendrick's point.  In *Lundquist*, for instance, the First Circuit considered a district court's finding of a lack of diversity in a case involving (1) a plaintiff who brought suit as a resident of Massachusetts but who split his time between Florida and New Hampshire and (2) defendants from New Hampshire.  The district court found the

plaintiff was not diverse in part because of his "registration to vote *and actual voting in New Hampshire*." 946 F.2d at 12 (emphasis supplied). In affirming the district court's ruling, the First Circuit considered the New Hampshire voter eligibility statute and wrote that "[g]iven this statute, [plaintiff's] *voting behavior* is tantamount to a representation of New Hampshire domicile for voting purposes." *Id.* (emphasis supplied) (discussing N.H. REV. STAT. ANN. § 654:1).

On these facts, Mr. Geilenfeld concedes he has not used his Iowa current voter registration but announces his intention to "vote in Iowa in the upcoming November elections." *Geilenfeld Interrog.* ¶ 4. The Court notes that future conduct is immaterial to domicile, which must be assessed at the time of the filing of suit. *Padilla-Mangual*, 516 F.3d at 31 (citations omitted). It decides that Mr. Geilenfeld's possession of a voter registration card issued nearly eight years before he filed suit, and which he never once used to vote in an election, diminishes what must otherwise be considered a weighty factor.[5]

### b.    Real and Personal Property

Another contested factor is Mr. Geilenfeld's personal and real property. The Plaintiffs insist that Mr. Geilenfeld "maintain[s] a permanent physical address [in Iowa] to which he returns and intends to return when he is away." *Pls.' Resp.* at 14. They say that it is "the only real property Geilenfeld calls home" and that "he has a room with a cherished photograph." *Id.; see also Hr'g Tr.* 52:15-53:13 (Mr. Geilenfeld

---

[5]    The Court need not reach Mr. Kendrick's argument that Mr. Geilenfeld procured the voter registration in 2005 as part of a fraudulent scheme, but the argument appears far-fetched. *See Def.'s Resp.* at 15.

keeps a photograph in Cedar Rapids); *Pl.'s Hr'g Ex.* 72. Indeed, the Plaintiffs submit evidence that Mr. Geilenfeld's voter registration, driver's license, and bank account are all tied to this address: 212 Wesley Drive, Cedar Rapids, Iowa. *Geilenfeld Voter ID*; *Geilenfeld Decl.* Attach. 2 *Geilenfeld Driver's License* (*Geilenfeld Driver's License*); *Geilenfeld Decl.* Attach. 4 *Letter from Grace E. Freeburg, Assistant Vice President, Consumer Banking, Iowa State Bank, to Devin W. Deane, Attorney, Norman, Hanson & DeTroy LLC (Jan. 14, 2016)* (*Geilenfeld Bank Account*). Lucille Dietrich, not Mr. Geilenfeld, is the owner of the house at 212 Wesley Drive. *Lucille Dietrich Decl.* ¶¶ 3-4; *Geilenfeld Decl.* ¶ 10. Ms. Dietrich sequesters a room in her home for Mr. Geilenfeld. Within the room are some of Mr. Geilenfeld's clothes hung in a closet, *Pls.' Hr'g Ex.* 74; *Hr'g Tr.* 53:11-13, and two photographs of people involved with St. Joseph's. *Pls.' Hr'g Ex.* 72; *Hr'g Tr.* 52:15-53:10. Other than these few items of personal property, Mr. Geilenfeld owns no property in Iowa. *Geilenfeld Decl.* ¶ 10; *Hr'g Tr.* 69:11-13.

By contrast, Mr. Geilenfeld owns three pieces of real estate in Haiti. *Hr'g Tr.* 76:22-25; *Geilenfeld Interrog.* ¶ 9. In particular, he owns the real estate where St. Joseph's Home for Boys, Wings of Hope, Trinity House, and Lekol Sen Trinite are located. *Geilenfeld Interrog.* ¶ 9. Mr. Geilenfeld has stressed that he considers these properties to be owned by God and that they are used exclusively for his mission, not for his personal use. *Id.* Nevertheless, he has conceded that these three parcels of Haitian real estate are in his name. *Hr'g Tr.* 77:1-7.

Mr. Geilenfeld's ownership of three parcels of real estate in Haiti and only a few items of personal property in Iowa is a factor that weighs against his domicile being in Iowa and in favor of it being in Haiti.

### c.    Driver's License and Motor Vehicle

Mr. Geilenfeld possesses an Iowa driver's license.  He first obtained an Iowa driver's license when he was in high school.  *Hr'g Tr.* 16:22-17:1.  When he was in California, Mr. Geilenfeld obtained a California driver's license.  *Id.* 17:2-17.  In 2005, he obtained an Iowa driver's license, using 212 Wesley Drive in Cedar Rapids, the Deitrich house, as his address, which he renewed in 2010 and again in 2015.  *Id.* 17:18-23, 39:19-40:13.  Mr. Geilenfeld does not own a motor vehicle in Iowa.  *Id.* 78:5-6.  He jointly owns a blue minivan in Haiti.  *Id.* 78:7-9; *Geilenfeld Interrog.* ¶¶ 9-11.

The fact that Mr. Geilenfeld possesses an Iowa driver's license is some evidence of an Iowan domicile.  At the same time, the fact that the only motor vehicle he owns is in Haiti is some evidence of a Haitian domicile.  This factor is mixed.

### d.    Employment

Ever since the early 1980s, Mr. Geilenfeld has worked in Haiti.  In a sworn declaration Mr. Geilenfeld filed with the Court of Appeals, he stated in pertinent part:

> In 1985, I received a calling to start a home and family for street children in Port au Prince, Haiti.  Since the founding of St. Joseph's Family of Haiti, I have lived in Port au Prince, Haiti because my charitable mission work in Haiti is full-time and requires me to be there.

*Geilenfeld Decl.* ¶ 7; *Hr'g Tr.* 65:13-66:2.  By contrast, from 1985 onward, Mr. Geilenfeld never held a job in Iowa.  *Id.* 69:1-6.  This factor favors a Haitian domicile.

### e.    Social Security Card

31

After Mr. Geilenfeld accepted Lucille Dietrich's invitation to have a room in her house, he "took the time to start putting things into the Cedar Rapids base." *Id.* 38:17-25.  He had lost his social security card and obtained a new one, using 212 Wesley Drive, Cedar Rapids as his address.  *Pls.' Hr'g Ex.* 58; *Hr'g Tr.* 38:22-25, 39:8-10.  This is some evidence of an Iowan domicile.

### f.   Banking Accounts

The record on Mr. Geilenfeld's banking is mixed.  Mr. Geilenfeld keeps what he refers to as his "core personal bank account" in Iowa, *Geilenfeld Interrog.* ¶ 14, has joint control with his brother over another Iowa account, *id.*, and set up a third account in Haiti during rebuilding efforts after the earthquake there. *Id.* ¶ 13; *Def.'s Hr'g Ex. 23, Tr. of Michael Geilenfeld's Dep. Dated Feb. 27, 2014* 148:7-8; *Hr'g Tr.* 62:25-63:15.  The evidence suggests that Mr. Geilenfeld used his "core" account, at Iowa State Bank, in relation to this work in Haiti, as he added St. Joseph's Home's name to the account in 1995.  *Hr'g Tr.* 61:22:62:20.  In fact, at the jurisdictional hearing, there was an extended back-and-forth about just how personal Mr. Geilenfeld's "core personal banking account" was, *id.* 124:21-133:19, and he ultimately conceded that he does not use money from the Iowa State Bank account "for personal expenses unrelated to the operation of St. Joseph Family homes." *Id.* 133:14-19; *see also id.* 22:10-12 ("I didn't really trust the banks in Haiti, so I set up the bank system for the St. Joseph Family in my hometown in Algona [at Iowa State Bank]").  In short, the bank account was in Iowa, but it serviced the Haitian

operation.  The Court does not view the banking factor as cutting decisively in either direction.

### g.    Taxes

Mr. Geilenfeld has not filed Iowa state income taxes for lack of taxable income in the years 2003-2015, *Geilenfeld Interrog.* ¶ 5, but he has paid "[s]ome form of annual taxes" on real estate in his name in Haiti from 2000 to the present.  *Id.* ¶ 7; *see also Hr'g Tr.* 77:22-78:4.  Mr. Geilenfeld also pays the registration fees in Haiti for Saint Joseph's Home's two vans.  *Def.'s Hr'g Ex.* 5, *Pl. Michael Geilenfeld's Ans. to Def.'s Fourth Set of Interrogatories* ¶ 6.  This factor weighs in favor of a Haitian domicile.

### 3.    Caselaw: Presumption of Continuing Domicile

The Plaintiffs urge the Court to focus on the "undisputed steps" that Mr. Geilenfeld has taken "to maintain a presence and home base in Iowa."  *Pls.' Resp.* at 9.  This argument assumes that Mr. Geilenfeld never really left his home state of Iowa and is entitled to a "presumption of continuing domicile" there.  *Id.* at 7; *see also Pls.' Br.* at 7-8 (likewise arguing for presumption of continuing domicile).  None of the cases the Plaintiffs cite in support of their continuing domicile theory persuades the Court of its applicability to Mr. Geilenfeld's facts.  *See Mitchell v. United States*, 88 U.S. 350 (1874) (holding litigant who left Louisville, Kentucky to transact business in the Confederacy during the Civil War, leaving in 1861 and returning in 1864, did not abandon his Kentucky domicile because "[t]here is nothing in the record which tends to show that when he left Louisville he did not intend to return, or that while

in the South he had any purpose to remain, or that when he returned to Louisville he had any intent other than to live there as he had done before his departure"); *Bank One*, 964 F.2d at 50 (remanding to district court for resolution of jurisdictional facts where defendant claimed to have established domicile in the same state as the plaintiff just one month before the filing of suit); *Chico*, 312 F. Supp. 2d at 155, 158 (finding diversity while specifying that "run-of-the-mill" diversity analysis did not apply given the "intricacies in this case rest on the fact that [the plaintiff] is an enlisted member of the U.S. Army").  Here, Mr. Geilenfeld moved away from Iowa not for a month, as in *Bank One*, or even a few years, as in *Mitchell*, but for decades interspersed with infrequent, brief visits to Iowa.  So while the Plaintiffs argue that the "exact opposite from a change in domicile has occurred" on account of the ties Mr. Geilenfeld established and maintained in Iowa, *Pls.' Resp.*at 9, the Court perceives these ties as "superficial; easy to create, at little expense or inconvenience."  *Leon*, 848 F. Supp. at 318.  It also notes, without relying upon, the oddity of asserting a thread of continuity running between Mr. Geilenfeld's hometown of Algona, Iowa and the documents he currently keeps bearing an address in Cedar Falls, Iowa—a city nearly 200 miles from Algona, and one he only visited later in life.

### 4.    The Mission Home Argument

During his testimony at the jurisdictional hearing, Mr. Geilenfeld consistently referred to Cedar Rapids, Iowa as his "home" and Port-au-Prince as his "mission home."  *See e.g.*, *Hr'g Tr.* 7:16-21.  After the jurisdictional hearing, the Plaintiffs' briefing shifts focus to how Mr. Geilenfeld's work as a missionary bolsters his claim

to a presumption of continuing domicile. *Pls.' Br.* at 4-6, 8-11; *Pls.' Reply* at 2-3, 8-9. According to the Plaintiffs, "Geilenfeld's missionary work has caused him to live and work in numerous impoverished countries all over the world, often for extended periods of time, but he has always maintained his personal physical presence in Iowa with a subjective intent to return there." *Pls.' Br.* at 9. They compare missionaries to students, government officials, government contractors, and military personnel who "by necessity liv[e] for extended periods of time away from their domicile." *Id.* at 8 (citing *García Pérez*, 364 F.3d at 354; *Kaiser*, 391 F.2d at 1009; *Lewis*, 233 F. Supp. at 49; *Sherman*, 48 F. Supp. at 435-36).

*Kaiser* is the only domicile case they cite involving a missionary.[6] There, the Sixth Circuit answered in the negative the question of "whether an American citizen, born in one of the states of the United States to parents who were citizens of that state, can lose the state citizenship for purposes of diversity jurisdiction which he acquired at birth without first acquiring a new domicile." 391 F.2d at 1008. The defendant in that case was born in Illinois, where his parents still resided, but he had moved to Michigan for training, then to New York for the same purpose, and was temporarily living in Addis Ababa, Ethiopia as a medical missionary at the time of suit. *Id.* The *Kaiser* Court distinguished residence from domicile, concepts the district court in *Kaiser* had treated as "synonymous," and decided that the "residence

---

[6]      The Plaintiffs' other citations are factually distinct and thus not persuasive. *See Lewis*, 233 F. Supp. at 49 (plaintiff's status was "akin to that of congressmen, government officials and others who go to the Capitol at Washington, D.C., and live in Virginia and Maryland for convenience in the performance of their work, and who have no intention of permanently abandoning citizenship in their own state"); *Sherman*, 48 F. Supp. at 435 (plaintiff worked in Connecticut, lived at the New Haven YMCA, and returned home to Massachusetts "twice a month on week-ends and occupie[d] the same room as he formerly did").

in Ethiopia is temporary in character and, hence, could not effect a change in domicile." *Id.* at 1008-10.

*Kaiser* turned on the propositions that (1) residence is different from domicile and (2) temporary residence does not effect a change in domicile. The Court readily accepts these propositions, but it does not read *Kaiser* as establishing a separate rule for missionaries. *See Hawes*, 598 F.2d at 701 ("It has long been the rule that motive for the change in residence is irrelevant in determining domicile") (citations omitted). At the time of suit, a holistic, substantive view of the record shows that Mr. Geilenfeld had lived in Haiti on his own volition for decades and, in so doing, had established domicile there. It does not require the Court to entangle itself in religious line-drawing—or rely upon religious considerations at all—to distinguish between the facts at hand and those of person "temporarily living" in a foreign country "subject to his receiving an assignment to the same or a later post . . . ." *Kaiser*, 391 F.2d at 1009.

There was a period when Mr. Geilenfeld was formally a member of a religious order, the Missionaries of Charity, and was subject to assignment by the order. For example, the order sent him to Southeast Asia for "[j]ust a little over a year," and during that time, he was not able to return home. *Hr'g Tr.* 12:20-13:20. As Mr. Geilenfeld explained it, he was under a "vow of obedience," was instructed to go to different places in the world, and was given an "allotted time" of one month every three years to return home. *Hr'g Tr.* 14:3-9, 18:14-19:7.

36

During this interval, the Missionaries of Charity ordered Mr. Geilenfeld from place to place—places as divergent as Calcutta, Vietnam, Cambodia, Los Angeles, Honduras, Korea, and Hong Kong, from which he would return home to Iowa on rare breaks. *Id.* 12:20-16:6. The Court views Mr. Geilenfeld's situation during this time as similar to Americans who work overseas for the government in a military or civilian capacity or for an international corporation. The notion, for instance, that an American soldier stationed in Afghanistan would lose his domicile in Maine is obviously fallacious.

But things markedly changed in 1985 when Mr. Geilenfeld left the order and decided to make a life for himself in Haiti. From that point onward, he was not subject to anyone's orders but his own. The distinction between a mission home and a real home, though deft, does not fit the facts, and the analogy to his days of geographic and temporal obedience becomes strained. From 1985 onward, Mr. Geilenfeld chose to live, work, pay taxes, own property in Haiti—and not in Iowa. The difference between being subject to direction and being self-directed is, in the Court's view, significant for the purposes of domicile.

### 5. Other Caselaw

Having dispensed with the Plaintiffs' claim to a presumption of continuing domicile, the Court turns to the remaining caselaw. The parties cite several First Circuit cases that address domicile in the rather particular context of medical malpractice lawsuits in which plaintiffs had moved between Florida and Puerto Rico.[7]

---

[7] Section 1332(e) brings the Commonwealth of Puerto Rico within the meaning of "State" for the purposes of diversity jurisdiction. 28 U.S.C. § 1332(e).

*See Padilla-Mangual*, 516 F.3d at 30-34 (remanding to district court question of whether plaintiff was domiciled in Florida or Puerto Rico); *García Pérez*, 364 F.3d at 352-55 (reversing district court's determination that plaintiff was domiciled in Puerto Rico and not Florida); *Valentín*, 254 F.3d at 361-63 (affirming district court's determination that plaintiff was domiciled in Puerto Rico and not Florida).  While highly instructive on the law, the Court finds these cases factually dissimilar for two principal reasons: geographically, they occur in a state-to-state, rather than state-to-country, context; temporally, they involve very recent relocations from the one location to another, as shown by the fact patterns in *García Pérez* and *Valentín* in which the plaintiffs relocated from Puerto Rico to Florida, and vice versa, respectively, for the purpose of seeking medical treatment.  *García Pérez*, 364 F.3d at 349; *Valentín*, 254 F.3d at 361.

As the Court sees it, *Freidrich v. Davis* presents closely analogous facts.  767 F.3d 374.  In that case, the plaintiff brought suit in diversity in 2012, claiming that she was an Ohio citizen and that the defendant was a Pennsylvania citizen, but the defendant moved to dismiss on the ground that he was domiciled in Germany and therefore no longer a Pennsylvania citizen.  *Id.* at 375.  In assessing the jurisdictional issue, the district court found, inter alia, that the defendant was born in Pennsylvania; he lived there from 1985 until 1996; he moved to Germany in 1996 and has lived there since, though he returned for one six-month stint to work and for visits twice a year with family; he sold his house in Pennsylvania in 1999 and bought one in Germany in 2005; he held both Pennsylvania and German driver's licenses; he

38

voted in U.S. national elections via absentee ballot and checked a box on the Registration and Ballot Request form indicating that he intends to return to the United States. *Id.* at 376. The district court decided that it lacked jurisdiction because the defendant was a stateless citizen living abroad. *Id.* at 377. The Third Circuit affirmed, citing the *Newman-Green* rule that "a natural person must be both a citizen of the United States *and* be domiciled within the State," *id.* (emphasis in original) (quoting *Newman-Green*, 490 U.S. at 828), and concluding that, although the defendant once represented that he intended to return stateside, "[t]he vast majority of the other objective evidence in this record—evidence based upon more than mere statements of intent—points to Germany as [his] 'true, fixed and permanent home and place of habitation.'" *Id.* at 379 (citation omitted).

### 6.   Michael Geilenfeld's Descriptions of his Status

A crucial question is how Mr. Geilenfeld described his status in Haiti and Iowa, especially before the legal significance of his domicile became apparent. The first indication is the allegation in the Complaint itself:

> 2. Plaintiff Michael Geilenfeld is an individual residing in Pétion-Ville Commune, Port-au-Prince Arrondissement, Republic of Haiti . . . .

*Compl.* ¶ 2. Similarly, on April 12, 2013 when Mr. Geilenfeld made his initial discovery disclosures in this case, he identified himself as a resident of Pétionville, Haiti. *Def.'s Hr'g Ex.* 3, *Pls.' Initial Disclosure* at 1. When Mr. Geilenfeld was first deposed on February 27, 2014, he was asked about his status in Haiti:

> Q.   You - - where do you presently reside?
> A.   I reside at Delmas 91, No. 26.

*Def.'s Mot. to Suppl.* Attach. 1 *Excerpt of Dep. of Michael Geilenfeld* 54:4-5 (ECF No.

541).  The questioning continued:

> Q.      I just want to backtrack for a second.  In 1985 did you personally
> purchase 91 Delmas?
> A.      Yes, I did.
> Q.      And do the real estate laws of Haiti, if you know, are they similar
> to the U.S. where you can purchase a piece of property and own it in fee
> simple absolute for all time?
> A.      It depends on who are.
> Q.      How about you?
> A.      I am able to because I had residency there.
> Q.      Are you presently a U.S. citizen?
> A.      I am.
> Q.      And your status in Haiti, is that as a permanent resident?
> A.      Exactly.

*Id.* 55:13-56:2.  Just before trial, on June 11, 2015, Mr. Geilenfeld was deposed in

Portland, Maine and the following interchange took place:

> Q.      Can you tell me where you currently reside?
> A.      Delmas 91.  Currently, as of today?
> Q.      Yes.
> A.      In this city?
> Q.      I understand - - no.  I understand that you were recently released
> from prison.
> A.      I went back home.
> Q.      And for the record, where is home?
> A.      Delmas 91, No. 26 - -
> Q.      And is that - -
> A.      Port-au-Prince, Haiti.

*Def.'s Hr'g Ex.* 7, *Confidential Tr.* 10:3-14.  At trial, Mr. Geilenfeld testified:

> Q.      Where do you live, Michael?
> A.      I currently reside in Port-au-Prince, Haiti.

*Geilenfeld Test. I* 21:25-22:1.

Before the issue of domicile arose, Mr. Geilenfeld consistently and repeatedly

represented in legal filings, including sworn testimony, that he resided not in Iowa,

but in Port-au-Prince.  More significantly, Mr. Geilenfeld emphatically agreed with the characterization that he was a "permanent resident" of Haiti.  *Contra Kaiser*, 391 F.2d at 1010 (residence was "temporary in character and, hence, could not effect a change in domicile").  Regardless of whether the United States concept of "permanent resident" applies in Haiti, Mr. Geilenfeld's testimony is the clearest expression of his intent.[8]  To establish domicile, the Supreme Court and the First Circuit do not require that a person intend stay at a new residence permanently, only indefinitely.  *Hawes*, 598 F.2d at 701 (citing *Gilbert*, 235 U.S. at 569).  Here, by his own testimony, Mr. Geilenfeld revealed his intention to remain in Haiti permanently.  There was no mention of even a "floating intention" to return to Iowa at some point in the future.  *Id.*  Indeed, when Father John Unni, a former Board Member of HWH, was deposed on March 23, 2016, he recalled a visit to Port-au-Prince during which Mr. Geilenfeld took Father Unni to Mr. Geilenfeld's final resting place: a crypt on the top of Wings of Hope in Fermathe, Haiti.  *Def.'s Hr'g Ex.* 75, *Dep. of John Unni* 7:3-13.  Both in life and death, Mr. Geilenfeld intended to be a permanent resident of Haiti.

C.    **Summary of Findings**

Since this case was filed on February 6, 2013, the Court has become particularly well acquainted with it.  From July 6, 2015 through July 23, 2015, the Court presided over the jury trial and vividly recalls Mr. Geilenfeld's testimony.  The

---

[8]    The Court acknowledges the Plaintiffs' argument that there is no such thing as permanent residency in Haiti.  *Pls.' Resp. in Opp'n to Suppl. Jurisdictional Record* at 2.  Instead, Haiti recognizes a different concept for long-term foreign residents called a "Permis de Sejour", which requires annual renewal.  *Id.*  But this argument misses the point.  The phrase "permanent resident" is simple and unmistakable.  Mr. Geilenfeld was telegraphing his intention to remain as a resident in Haiti permanently.  This testimony, which the Court credits, is convincing evidence of his true intent.

Court thus relies on its knowledge of the record and its experience with the parties in making its finding regarding jurisdiction. First, it is clear that Mr. Geilenfeld was physically present in Haiti. Second, based on the intent factors and on the caselaw applying them, the Court finds that the Plaintiffs are unable to meet their burden of showing diversity jurisdiction by a preponderance of the evidence.

Taking a larger view of the factors, the Court heeds the First Circuit instruction that "[j]ust as no single factor is controlling, domicile need not be determined by mere numerical comparison of the number of factors that may appear to favor each side of the issue." *Lundquist*, 946 F.2d at 12. The evidence establishes that Mr. Geilenfeld left Iowa in the early 1970s, arrived in Haiti in 1981, and has lived there while operating his own organization more or less continuously since 1985. He kept a Haitian bank account as well as his real and personal property in Haiti. It is true that Mr. Geilenfeld maintains an Iowa voter registration, driver's license, and bank accounts, all using the address of a friend's home in Cedar Rapids, but these are merely "superficial" ties next to his deep bond to Haiti. *See Leon*, 848 F. Supp. at 318. After all, Mr. Geilenfeld never voted using his current Iowa voter registration, does not own a car in Iowa, and uses his bank account in Iowa to manage money for his Haitian organization. He has not paid any taxes in Iowa, though he has done so in Haiti. Moreover, the Court looks with "judicial skepticism" on Mr. Geilenfeld's claim in his declaration that he "had no intentions to remain in Haiti indefinitely." *Chico*, 312 F. Supp. 2d at 159 (quoting 13B WRIGHT, MILLER & COOPER § 3612); *Geilenfeld Decl.* ¶ 17; *see also Hawes*, 598 F.2d at 704 (labelling post-jurisdictional-

challenge statements "suspect").  After all, "a 'floating intention' to return to a former domicile at some unspecified future date does not prevent a party from acquiring a new domicile." *García Pérez*, 364 F.3d at 351 (*Hawes,* 598 F.2d at 701).

This case, like *Friedrich*, falls well within the purview of the *Newman-Green* rule, which the First Circuit has cited with approval.  *Zwirn*, 661 F.3d at 126.  Much of the caselaw concerning domicile deals with recent transplants who have moved from one state to another.  This is not Mr. Geilenfeld's position, and the Court need not engage in the nuanced analysis called for by fact patterns in the *Padilla-Mangual*, *García Pérez*, and *Valentín* line of cases.  The Court also refuses to find that Mr. Geilenfeld's status as a missionary compels a different conclusion.  Simply put, Mr. Geilenfeld is an American abroad who must be considered stateless for jurisdictional purposes; the rule set out in *Newman-Green* applies.  If anything, *Friedrich* was a closer case, as the defendant there had lived abroad for a shorter period, exercised the right to vote, and even announced his intention to return to the United States in a formal document.

Finally, at a deposition on February 24, 2014, Mr. Geilenfeld—unaware of the jurisdictional issue that would surface almost two years later—made a statement relating to his real estate ownership in Haiti in which he represented himself as a permanent resident there:

> Q:   Are you presently a U.S. citizen?
> A:   I am.
> Q:   And your status in Haiti, is that as a permanent resident?
> A:   Exactly.

*Def.'s Hr'g Ex.* 23a.  Legally, Mr. Geilenfeld has since clarified that he holds a "Permis de Sejour," which he renews annually and which permits him to stay for longer than three months.  *Geilenfeld Interrog.* ¶ 17.   Nonetheless, the Court perceives Mr. Geilenfeld's description of himself as a permanent resident of Haiti as a candid response that naturally followed from his decades of residence there.   It also notes that his intent to remain in Haiti needs to be only indefinite, not permanent, *Hawes*, 598 F.2d at 701, and that the former has been firmly established by the record, while a strong case can be made for the latter.

In sum, the Court finds that Mr. Geilenfeld's "true, fixed home and principal establishment" is at the St. Joseph's Family of Haiti at 91 Delmas, Port au Prince, Haiti.  *Padilla-Mangual*, 516 F.3d at 31 (quoting *Rodríguez-Díaz*, 853 F.2d at 1029).  The Court therefore lacks jurisdiction.

### D.    A Note on *Caterpillar*

The Plaintiffs cite *Caterpillar, Inc. v. Lewis*, 519 U.S. 61 (1996), for the argument that:

> [I]nstitutional interests adhere and considerations of finality "become overwhelming" when there is a clear showing of jurisdiction that existed at the outset of the case, and a jurisdictional challenge raised for the first time on appeal threatens "to wipe out the adjudication post-judgment, and return to state court a case now satisfying all federal jurisdictional requirements."

*Pls. Resp.* at 4 (quoting *Caterpillar*, 519 U.S. at 63); *see also Pls.' Br.* at 3 n.1, 19-20 (discussing *Caterpillar*).

The *Caterpillar* decision turned on the case's complex procedural history.  After sustaining injuries in the operation of a bulldozer, the Kentucky plaintiff brought suit

in state court against the bulldozer's manufacturer (a Delaware corporation with its principal place of business in Illinois) and its servicer (a Kentucky corporation with its principal place of business in Kentucky); the plaintiff's employer's insurer (a Massachusetts corporation with its principal place of business in Massachusetts) then intervened to assert subrogation claims against both defendants. *Caterpillar*, 519 U.S. at 64-65. The manufacturer filed a notice of removal to federal court after the plaintiff and nondiverse servicer reached a settlement, but the plaintiff objected on the ground that the nondiverse servicer had not yet reached a settlement with the insurer and so remained a party to the case. *Id.* at 65-66. The district court erroneously granted removal. *Id.* at 66. Crucially, "[b]efore trial of the case, however, all claims involving the nondiverse defendant were settled, and that defendant was dismissed as a party to the action. Complete diversity thereafter existed." *Id.* at 64. The Supreme Court held that "a district court's error in failing to remand a case improperly removed is not fatal to the ensuing adjudication *if federal jurisdictional requirements are met at the time judgment is entered.*" *Id.* (emphasis supplied). Essential to the *Caterpillar* Court's holding was the fact that "[t]he *jurisdictional* defect was cured, *i.e.*, complete diversity was established before the trial commenced," *id.* at 73 (emphasis in original), and that "no jurisdictional defect lingered through judgment in the District Court." *Id.* at 77.

*Caterpillar*, then, discussed a procedural posture in which there was not diversity at the time of removal, but there was complete diversity by the time of trial and through judgment on account of the nondiverse party's dismissal. *Id.* at 64-67.

45

That is not the case on these facts.  At the initiation of this lawsuit, the decisive moment for purposes of domicile and thus diversity, Mr. Geilenfeld was not a party over whom the Court had jurisdiction.  He remained beyond this Court's jurisdiction through trial and judgment.  At the late hour of appellate review, the parties noticed and briefed the jurisdictional defect that had lingered from the beginning: the *Newman-Green* rule that Americans domiciled abroad lack diversity.  *See Def.'s Reply* at 1 n.1 (explaining late discovery of "the esoteric and infrequently encountered" jurisdictional defect).  That is, the parties realized that Mr. Geilenfeld slipped through the cracks of this Court's diversity jurisdiction.  This fundamental lack of jurisdiction cannot be "overwhelm[ed]" by "considerations of finality, efficiency, and economy."  *Caterpillar*, 519 U.S. at 75 (citation omitted).

As the Supreme Court wrote in *Grupo Dataflux v. Atlas Global Group, L.P.*, the "time-of-filing rule is hornbook law" that "measures all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time-of-filing—whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal." 541 U.S. at 570-71. "*Caterpillar* broke no new ground," the Supreme Court explained, "because the jurisdictional defect it addressed had been cured by the dismissal of the party that had destroyed diversity.  That method of curing a jurisdictional defect had long been an exception to the time-of-filing rule." *Id.* at 572; *cf. Adrian Family Partners I, L.P. v. ExxonMobil Corp.*, 79 Fed. App'x 489, 492 (2d Cir. 2003) (distinguishing *Caterpillar* by holding that "where, as in this case, the district court's final judgment extends to

a party over whom diversity jurisdiction appears to have been lacking at the time the complaint was filed, the court cannot acquire jurisdiction simply because that party moved to another state before the entry of final judgment") (citations omitted). Indeed, the *Grupo Dataflux* Court "adhered to the time-of-filing rule regardless of the costs it imposes." 541 U.S. at 571. The costs of this complex case have been considerable, but this cannot change the Court's jurisdictional analysis.

## VI.   THE IMPLICATIONS FOR HWH

In keeping with the First Circuit's remand, the Court has considered whether diversity existed at the time the action was commenced and found that it did not. The Remand Order directed the Court to enter an order "resolving the motion to amend and ruling whether diversity jurisdiction under 28 U.S.C. § 1332 existed at the time the underlying action was commenced." *Remand Order* at 1. The First Circuit allowed "[a]ny party" to appeal the Court's ruling. From this language, the Court concludes that it should decide the impact on HWH of the absence of jurisdiction over Michael Gielenfeld. *Cf. B. Fernández & Hnos., Inc. v. Kellogg USA, Inc.,* 440 F.3d 541, 547-48 (1st Cir. 2006) (noting that district courts are in the "preferred position" to make indispensability determinations because they involve "the balancing of competing interests" and "must be steeped in pragmatic considerations") (quoting *Travelers Indem. Co. v. Dingwell,* 884 F.2d 629, 635 (1st Cir. 1989)).

### A.   The Law

Rule 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." FED. R. CIV. P. 21. As the Supreme Court wrote in

47

*Newman-Green*, "it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered."  490 U.S. at 832 (footnote omitted).  The distinction between dispensable and indispensable parties is significant; district courts may "dismiss *dispensable*, nondiverse parties to cure defects in diversity jurisdiction," but they "may not, of course, dismiss *indispensable* parties from an action in order to preserve federal jurisdiction."  *Casas Office Machs., Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 675 (1st Cir. 1994) (emphases in original); *see also Am. Fiber & Finishing, Inc. v. Tyco Healthcare Grp., LP*, 362 F.3d 136, 142 (1st Cir. 2004) ("The decision to dismiss revolves largely around whether the non-diverse litigant is a dispensable or indispensable party") (citations omitted).

Rule 21 looks to Rule 19 for guidance on whether a litigant is dispensable. WRIGHT, MILLER & COOPER § 1685.  As the First Circuit has written, "the factors which must be considered in determining whether a non-diverse party is indispensable are set forth in [Rule] 19(b)."  *H.D. Corp. of P.R. v. Ford Motor Co.*, 791 F.2d 987, 992 (1st Cir. 1986) (citations omitted); *see also DDC Operating, Inc. v. Siaca (In re Olympic Mills Corp.)*, 477 F.3d 1, 8-9 (1st Cir. 2007) (using Rule 19(b) factors to determine indispensability).  Rule 19(b) provides:

> [T]he court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
> (A) protective provisions in the judgment;
> (B) shaping the relief; or

(C) other measures;
(3) whether a judgment rendered in the person's absence would be adequate; and
(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

FED. R. CIV. P. 19(b).  These factors promote important interests, including "the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a liability it shares with another" and "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies."  *H.D. Corp.*, 791 F.2d at 992 (citing *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 108-11 (1968)).

Moreover, even if the nondiverse party is dispensable, the court should consider "whether the dismissal of a nondiverse party will prejudice any of the parties in the litigation.  It may be that the presence of the nondiverse party produced a tactical advantage for one party or another."  *Newman-Green*, 490 U.S. at 838. Although the *Newman-Green* Court directed this guidance to appellate courts, it presumably applies to district courts as well; it wrote that if a factual dispute arises, "it might be appropriate to remand the case to the district court, which would be in a better position to make the prejudice determination."  *Id.*

### B.   Application

The overarching question is "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  FED. R. CIV. P. 19(b).[9]  Taking a larger view of the matter, Mr. Geilenfeld's and HWH's claims against

---

[9]   Mr. Kendrick suggests that Rule 19(a) is the correct procedural lens through which to determine indispensability.  *Def.'s Mot.* at 15-16.  As one of his own citations makes clear, however, it

Mr. Kendrick are deeply intertwined.  If the jury determined that Mr. Kendrick's allegations against Mr. Geilenfeld were not defamatory, HWH's case against Mr. Kendrick would have fallen of its own weight.  In other words, at trial, both of HWH's defamation and intentional interference claims were collateral to or derivative of Mr. Kendrick's statements about Mr. Geilenfeld, insofar as Mr. Kendrick targeted HWH because of its association with Mr. Geilenfeld.  In essence, HWH's case against Mr. Kendrick is that he smeared the organization by falsely alleging it had enabled Mr. Geilenfeld's child abuse.  *See, e.g.*, *Compl.* ¶ 55.  In addition, the evidence demonstrated that Mr. Geilenfeld and HWH were closely linked, which is why the legal theories against Mr. Kendrick by both Mr. Gielenfeld and HWH were substantially the same and why the verdicts—though not identical—closely paralleled each other.  *Compare Geilenfeld Jury Verdict Form*, *with HWH Jury Verdict Form*.  Mr. Geilenfeld sits on HWH's board, *Tr. of Proceedings VII* 100:23-101:1 (ECF No. 452); Mr. Geilenfeld is the recipient of the money that HWH—"our principal fundraising organization"—raises in support of his works, *Geilenfeld Test. I* 167:21-22, 168:6-14; *Tr. of Proceedings VIII* 196:2-7 (ECF No. 453).  The close relation between the Plaintiffs' claims against Mr. Kendrick suggests that "in equity and good conscience" the action should be dismissed.  FED. R. CIV. P. 19(b).

---

is Rule 19(b) that determines indispensability.  *Acton Co., Inc. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76, 78 (1st Cir. 1982) ("Rule 19(a) sets forth three types of parties to be joined if feasible; but if joinder will divest the court of subject matter jurisdiction, Rule 19(b) directs the court to 'determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed'").

The plain fact is that this case would not have been the same case if Mr. Geilenfeld had not been a plaintiff. This can best be seen in two of the Plaintiffs' most telling arguments: first, that the child abuse charges against Mr. Geilenfeld, who freely acknowledged he is homosexual, were driven by superstitions and unjustified fears about homosexuals; and second, Mr. Geilenfeld's harrowing experience in Haitian jail was brought about in part by Mr. Kendrick's defamatory campaign. *See Tr. of Proceedings XIV* 75:3-24 (ECF No. 485) (*Closing Argument of Att'y DeTroy*) ("[T]he reason this pernicious, persistent thread has continued is because this is something that is very unusual in Haitian culture. He's an admitted homosexual and that's something people are uncomfortable with, something they're not used to, something that is considered to be by definition a potential risk to minors"); ("The case goes forward after 237 horrific days that, as he has said, he would not even wish on Mr. Kendrick himself, days in which he and others were literally stacked like cordwood trying to find a place to sleep, lie down, rest, where you had to defecate into a plastic bag and throw it outside, just a swarm of flies; where you had rats as big as kittens, where you can suddenly inexplicably be put in solitary, where you don't know how much you will have to eat . . . I mean conditions that are inhumane").

The Rule 19(b) factors support this conclusion. The Court focuses on the first and second factors as the ones most relevant to these facts. Under the first factor, the Court considers "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties," and under the second, "the extent to which any prejudice could be lessened or avoided." FED. R. CIV. P. 19(b)(1)-(2).

If the Court were to allow HWH's judgment to stand and dismiss Mr. Geilenfeld without prejudice, Mr. Kendrick could be subject to a separate suit in state court by Mr. Geilenfeld.  Of course, allowing the judgment to stand would also leave Mr. Kendrick liable for HWH's $7,500,000 verdict—a verdict inextricably interwoven with Mr. Kendrick's actions against Mr. Geilenfeld.  Moreover, doctrines of preclusion, which like Rule 19(b) exist to promote judicial efficiency, might prevent Mr. Kendrick from re-litigating either certain critical issues (e.g., whether Mr. Kendrick defamed the Plaintiffs knowing his statements were false or with reckless disregard for their truth) or the entire claim (if, inter alia, the Plaintiffs were found to be the same party for preclusion purposes).  *See Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012) (setting out test for issue preclusion); *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010) (setting out test for claim preclusion).  Seen in this light, there is a potential impact of the HWH judgment on Mr. Kendrick's ability to defend himself in a future state case by Mr. Geilenfeld, even though this Court had no jurisdiction over Mr. Geilenfeld to begin with.  There is also not a satisfactory way to lessen or avoid the prejudice to Mr. Kendrick.  Dismissing Mr. Geilenfeld's case with prejudice, although it would cure the issue preclusion issue, would be grossly unfair to him, and the Court will not do it.

There is of course an extraordinary prejudice against both Mr. Geilenfeld and HWH from being deprived of the fruits of their victory.  But this is a markedly unfortunate but necessary consequence of trying a case to completion in a court without proper jurisdiction.

The Court thus concludes that Mr. Geilenfeld is an indispensable party under Rule 19(b). That being the case, it need not reach the *Newman-Green's* question of whether "the presence of the nondiverse party produced a tactical advantage to one party or another." *Newman-Green*, 490 U.S. at 838.

## VII.   CONCLUSION

The Court DENIES the Plaintiffs' motion to amend complaint and DISMISSES the case for lack of jurisdiction.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of June, 2016